Alexa M. Lawson-Remer (SBN 268855)
lawsonr@sullcrom.com
SULLIVAN & CROMWELL LLP
1888 Century Park East, Suite 2100
Los Angeles, California 90067-1725
Telephone:   (310) 712-6600
Facsimile:   (310) 712-8800

Theodore Edelman (*pro hac vice*)
edleman@sullcrom.com
Jessica Klein (*pro hac vice*)
kleinj@sullcrom.com
Lauren M. Goldsmith (SBN 293269)
goldsmithl@sullcrom.com
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone:   (212) 558-4000
Facsimile:   (212) 558-3588

Aaron C. Morris (*pro hac vice*)
amorris@immigrationequality.org
IMMIGRATION EQUALITY
40 Exchange Place, Suite 1300
New York, New York 10005-2744
Telephone:   (212) 714-2904

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION (LOS ANGELES)

| | |
|---|---|
| ANDREW MASON DVASH-BANKS AND E.J. D.-B., <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES DEPARTMENT OF STATE, and THE HONORABLE MICHAEL R. POMPEO, Secretary of State, <br><br> Defendants. | Case No. 2:18-cv-00523-JFW-JCx <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Judge:         Hon. John F. Walter <br> Hearing Date: Feb. 4, 2018 <br> Courtroom:   7A |

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ..................................................................... 1

II.  STATEMENT OF RELEVANT FACTS ...................................................... 4

    A.   The Dvash-Banks Family ................................................................. 4

    B.   The INA ............................................................................................ 6

    C.   The Application of the State Department's Policy to the Dvash-Banks Family ..................................................................................... 9

    D.   The Complaint ................................................................................. 12

III. ARGUMENT .............................................................................................. 13

    A.   E.J. is Entitled to a Declaration Under Section 1503 that He Acquired U.S. Citizenship At Birth Under Section 301(g) of the INA ................................................................................................... 13

        a.   The State Department's biological relationship requirement is inconsistent with the text of Section 301(g) ................................................................................. 14

        b.   The State Department's interpretation of Section 301(g) also conflicts with the INA's legislative purpose of maintaining family unity. ............................................. 20

    B.   The State Department's Interpretation and Application of the INA Violates the Due Process Clause. ................................................ 22

IV.  CONCLUSION ........................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashwander* v. *Tenn. Valley Auth.*,
  297 U.S. 288 (1936) ................................................................. 22

*Matter of Christopher YY.* v. *Jessica ZZ,*
  159 A.D.3d 18 (3d Dep't 2018) ................................................ 17

*Elisa B.* v. *Superior Court,*
  37 Cal. 4th 108 (2005) ............................................................ 17

*Fuller* v. *Idaho Dep't of Corr.*,
  865 F.3d 1154 (9th Cir. 2017) ................................................. 14

*Jaen* v. *Sessions,*
  899 F.3d 182 (2d Cir. 2018) ............................................. *passim*

*Michael H.* v. *Gerald D.*,
  491 U.S. 110 (1989) ............................................................ 16-17

*Miller* v. *Albright,*
  523 U.S. 420 (1998) ........................................................... 23, 24

*Nation* v. *Esperdy,*
  239 F. Supp. 531 (S.D.N.Y. 1965) .......................................... 20

*Neder* v. *United States,*
  527 U.S. 1 (1999) ..................................................................... 16

*Obergefell* v. *Hodges,*
  135 S. Ct. 2584 (2015) ................................................... 4, 22, 24

*Pavan* v. *Nathaniel Smith,*
  137 S. Ct. 2075 (2017) ...................................................... *passim*

*Richards* v. *Sec'y of State,*
  752 F.2d 1413 (9th Cir. 1985) ................................................. 14

*Russello* v. *United States,*
  464 U.S. 16 (1983) ................................................................... 16

-ii-

*Scales* v. *INS,*
232 F.3d 1159 (9th Cir. 2000) ..................................................*passim*

*Sessions* v. *Morales-Santana,*
137 S. Ct. 1678 (2017) ........................................................... 7

*Solis-Espinoza* v. *Gonzales,*
401 F.3d 1090 (9th Cir. 2005) ..................................................*passim*

*Sook Young Hong* v. *Napolitano,*
772 F. Supp. 2d 1270 (D. Haw. 2011) .............................................. 21

*United States* v. *Juvenile Male,*
670 F.3d 999 (9th Cir. 2012) ...................................................... 25

*Washington* v. *Glucksberg,*
521 U.S. 702 (1997) ............................................................... 24

*Zablocki* v. *Redhail,*
434 U.S. 374 (1978) ............................................................22-23

**Statutes**

1 U.S.C. § 7............................................................................. 5

5 U.S.C. § 706(2)(A) ............................................................... 12

8 U.S.C. § 1101(b)(1)-(2) ......................................................... 15

8 U.S.C. § 1101(c)(2) .............................................................. 15

8 U.S.C. § 1401..................................................................*passim*

8 U.S.C. § 1409..................................................................*passim*

8 U.S.C. § 1503..................................................................*passim*

28 U.S.C. § 2412................................................................... 13

**Other Authorities**

8 FAM § 304.1-2 .................................................................. 7, 23

41 Am. Jur. 2d *Illegitimate Children* § 8 .......................................... 17

U.S. Const., art. V ..............................................................*passim*

H.R. Rep. No. 85-1199 (1957) ...................................................... 20

*Parent*, BLACK'S LAW DICTIONARY (10th ed. 2014) ...................................................... 17

Plaintiffs Andrew Mason Dvash-Banks ("Andrew") and his son E.J. D.-B. ("E.J.") submit the following memorandum of points and authorities in support of their motion for partial summary judgment in the above-captioned action (the "Action").[1]

## I.   PRELIMINARY STATEMENT[2]

This Action challenges the improper refusal of the United States Department of State (the "State Department," and together with The Honorable Michael R. Pompeo in his official capacity as Secretary of State, "Defendants") to recognize E.J. as a United States citizen at birth.  Both E.J. and his twin brother, A.J. D.-B. ("A.J.," and together with E.J., the "Twins"), met the eligibility requirements of Section 301(g) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1401(g) ("Section 301(g)"), for U.S. citizenship at birth when they were born on September 16, 2016 in Ontario, Canada to Andrew, a U.S. citizen, and his husband, Elad, an Israeli citizen, during their marriage.  Although the State Department recognizes A.J. as a U.S. citizen at birth, it denies that E.J. is a U.S. citizen, even though A.J. and E.J. are twin brothers with the same legal parents and are being raised together in the same home.  (*See* SOF ¶¶ 33-34, 50, 91, 92, 147.)

Andrew and Elad were married in 2010 (*id.* at ¶11), and decided to start a family (*id.* at ¶ 13).  They conceived the Twins by means of assisted reproductive technology ("ART") and have been the Twins' only parents since the Twins' birth in 2016.[3]  (*Id.* at ¶¶ 14, 17-18, 37, 39.)  They are the only individuals

---

[1]   E.J. brings his claims in this Action by and through his guardian *ad litem* and other parent, Elad Dvash-Banks ("Elad").

[2]   Citations in this memorandum to "SOF" refer to *Plaintiff's Rule 56.1 Statement of Uncontroverted Facts and Conclusions of Law in Support of Plaintiffs' Motion for Partial Summary Judgment*, filed concurrently with this memorandum.

[3]   Andrew and Elad each provided sperm to fertilize eggs from the same egg donor.  (*Id.* at ¶¶ 14-15.)

whom Ontario law recognizes as the Twins' parents and they are named as the parents on the Ontario-issued Statement of Live Birth (the "birth certificate") for each Twin. (*Id.* at ¶¶ 33-36, 41-42.)  Andrew and Elad are the only individuals who have ever asserted any parental rights over the Twins (*id.* at ¶ 40), and they have raised the Twins as the children of their marriage since the day the Twins were born. (*Id.* at ¶¶ 37-38, 50-51.)  The Superior Court of Justice, Ontario, issued an order (the "Canadian Order") shortly after the Twins' birth recognizing Andrew and Elad "for all purposes in law to be the parents" of E.J. (*Id.* at ¶ 41.)  The court issued a parallel order for A.J. (*Id.* at ¶ 44.)  This is consistent with the terms and intent of Andrew and Elad's agreement with their gestational surrogate (the "Gestational Surrogate"), which provided that they were to have custody of the Twins "[i]mmediately upon the birth of the Child[ren]" (*id.* at ¶ 23).

The State Department has resisted the reality that there are no distinctions between E.J.'s familial relationships and those of his twin brother A.J. Specifically, the State Department has declined to recognize E.J.'s U.S. citizenship, and has created an artificial and unwarranted distinction in the Dvash-Banks family by granting A.J.'s applications for a Consular Report of Birth Abroad ("CRBA"), which recognizes the recipient's U.S. citizenship at birth, and U.S. passport, and denying E.J.'s applications. (*Id.* at ¶¶ 90-92.)  The sole ground cited for the denial of E.J.'s applications was that Andrew, the U.S. citizen parent of both E.J. and A.J., does not share a biological connection with E.J. (*id.* at ¶¶ 93, 97), a rationale that the Ninth Circuit specifically rejected nearly twenty years ago. In effect, the State Department has by fiat declared that Andrew is not E.J.'s parent, even though (i) Andrew and Elad were married when the Twins were born; and (ii) within days of E.J.'s birth, a Canadian court confirmed that Andrew and Elad are E.J.'s parents. (*Id.* at ¶¶ 31, 41.)  Moreover, Andrew acts in all respects as one of the two parents of E.J. and A.J. and has lived with E.J. and A.J. since the Twins left the hospital following their birth. (*Id.* at ¶¶ 22-23, 37, 38, 50.)  In

-2-

1   declining to recognize Andrew's status as E.J.'s parent for purposes of the INA,
2   the State Department has failed to recognize and honor the validity of Andrew's
3   marriage to Elad and the legitimacy of the children born during that marriage.

4           To reach its conclusion, the State Department disregarded the INA's
5   plain text and erroneously required a biological relationship between E.J. and
6   Andrew, his U.S. citizen parent.  The State Department did so notwithstanding that
7   (i) the text of the INA provision governing children born in wedlock (Section
8   301(g)) contains no such condition; (ii) two unanimous decisions of the Ninth
9   Circuit and a unanimous decision of the Second Circuit have held that Section
10  301(g) does not include a biological relationship requirement, and no federal
11  district or circuit court has interpreted Section 301(g) to include such a
12  requirement, *see Solis-Espinoza* v. *Gonzales*, 401 F.3d 1090 (9th Cir. 2005); *Scales*
13  v. *INS*, 232 F.3d 1159 (9th Cir. 2000); *Jaen* v. *Sessions*, 899 F.3d 182 (2d Cir.
14  2018); and (iii) the companion provision to Section 301 which governs children
15  born "out of wedlock," 8 U.S.C. § 1409 ("Section 309"), imposes a biological
16  relationship requirement, demonstrating that Congress specified such a condition
17  when it sought to impose one and intended no such requirement for children who,
18  like A.J. and E.J., were born in wedlock.[4]

19          Instead of recognizing that E.J. acquired U.S. citizenship when he was
20  born during the marriage of his U.S. citizen parent who had resided in the U.S. for
21  the period required by Section 301(g)—all that the INA requires—the State
22  Department classified E.J. as a child born "out of wedlock" (SOF ¶¶ 79-81), and
23  therefore denied him the rights and benefits of U.S. citizenship.  The State
24  Department did so in reliance on its policy of considering children born during the
25  marriage of spouses who are not both the biological parents to have been born "out

26

27  [4]   8 U.S.C. § 1401 ("Section 301") and Section 309 are set out in full in
28  Appendix A to this memorandum for the Court's reference.

of wedlock"—and therefore not eligible for citizenship determinations under Section 301(g)—which will always be the case for children of same-sex marriages between men.  This policy not only violates the statute but also unfairly burdens and stigmatizes same-sex marriage and deprives same-sex spouses of the full constellation of rights and benefits of marriage to spouses in opposite-sex marriages in violation of the Due Process Clause of the Fifth Amendment.  *Pavan* v. *Nathaniel Smith*, 137 S. Ct. 2075, 2077 (2017); *see also* *Obergefell* v. *Hodges*, 135 S. Ct. 2584, 2601-02 (2015).

Because E.J. meets all of the statutory criteria for U.S. citizenship at birth under Section 301(g), the Court should grant summary judgment to E.J. pursuant to 8 U.S.C. §1503(a) ("Section 1503"),[5] and declare E.J. to be a U.S. citizen at birth.  Not only does the plain language of the statute require this result, but Defendants' policy of requiring a biological relationship between a child born outside the United States and his or her U.S. citizen parent and treating the offspring of same-sex marriages as born "out of wedlock" infringes the constitutional requirement to treat same-sex marriages with dignity and to accord them the same respect and benefits as opposite-sex marriages.  As a result, Plaintiffs are entitled to summary judgment on their due process claim as well.

## II.   STATEMENT OF RELEVANT FACTS

### A.   The Dvash-Banks Family

Andrew is a U.S. citizen who was born and raised in California, where he also attended high school and college.  (SOF ¶¶ 1-5.)  Andrew resided in the United States for a continuous period from his birth in 1981 through at least

---

[5]   Section 1503(a) is set out in Appendix A to the Memorandum for the Court's reference.  It allows any person within the United States to file in the district in which he "resides or claims a residence" an action "for a judgment declaring him to be a national of the United States" if he "claims a right or privilege as a national of the United States and is denied such right or privilege … upon the ground that he is not a national of the United States."

-4-

October 2005. (*Id.* at ¶ 6.)  In 2007, Andrew enrolled in a master's degree program in Israel, where, in 2008, he met his now-husband, Elad.  (*Id.* at ¶¶ 7-8.) Thereafter, Andrew and Elad moved to Toronto,[6] (*id.* at ¶ 10) and were married there on August 19, 2010 (*id.* at ¶ 11).

Andrew and Elad decided to start a family, and they sought to conceive using ART.  (*Id.* at ¶¶ 13-18.)  As part of that process, Andrew and Elad provided their respective genetic material to create embryos using eggs from an anonymous egg donor (the "Donor"), which they did successfully.  (*Id.* at ¶¶ 14-16.)  In December 2015, Andrew and Elad then contracted with the Gestational Surrogate to carry two embryos to term. (*Id.* at ¶ 17.)   Andrew and Elad entered into an agreement with the Gestational Surrogate (the "Surrogacy Agreement") setting out the terms of the surrogacy arrangement. (*Id.*)   The Surrogacy Agreement provides, in part, that "Andrew and Elad (collectively called the 'Intended Parents') are a same-sex married couple who require assisted reproductive technology to have a child." (*Id.* at ¶ 18.)  The Surrogacy Agreement further provides that Andrew and Elad were to be "recognized as [the Twins'] parents immediately upon [their] birth," which was understood to mean "as soon as the umbilical cord is cut"; that Andrew and Elad were "to assume full care of, and all parental responsibility for [the Twins]"; and to have "permanent custody" of the Twins.  (*Id.* at ¶¶ 21-23, 25.)   The Surrogacy Agreement also stated that the Gestational Surrogate waives all rights that she has or may in the future have to the custody of or access to the Twins.  (*Id.* at ¶ 26.)

Thereafter, two embryos, one of which was created using genetic material from Elad and the other of which was created using genetic material from Andrew, were implanted into the Gestational Surrogate.  (*Id.* at ¶¶ 15, 19-20.)  On

---

[6]    When Andrew and Elad were married, the Defense of Marriage Act, 1 U.S.C. § 7, precluded Elad from obtaining permanent residence in the United States through his marriage to Andrew.

1   September 16, 2016, the Twins were born four minutes apart in Ontario, Canada.

2   (*Id.* at ¶ 30.)  Andrew cut E.J.'s umbilical cord at E.J.'s birth.  (*Id.* at ¶ 32.)  On

3   September 28, 2016, when the Twins were just twelve days old, the Ontario

4   Superior Court entered the Canadian Order, affirming that Andrew and Elad were

5   both the parents of E.J., who was conceived using Elad's sperm and an egg from

6   the Donor.  (*Id.* at ¶¶ 15, 41, 48.)  Under Ontario law, Andrew and Elad are E.J.'s

7   legal parents.  (*Id.* at ¶¶ 37, 41.)[7]

8         Andrew and Elad have raised the Twins and have been their parents

9   since the moment the Twins were born.  (*Id.* at ¶¶ 23, 38.)  From the time the

10  Twins left the hospital where they were born, Andrew, Elad and the Twins have

11  lived together under one roof as a family.  (*Id.* at ¶¶ 50-51.)  Andrew and Elad are

12  the only parents listed on E.J.'s and A.J.'s birth certificates.  (*Id.* at ¶¶ 35-36.)  No

13  other individual has ever acted as a parent to A.J. or E.J., and no other individual

14  has ever asserted parental rights over either child.  (*Id.* at ¶¶ 39-40.)  Andrew, Elad,

15  A.J., and E.J. currently reside in Los Angeles, California.  (*Id.* at ¶ 52.)  The State

16  Department accepts that Andrew and Elad are the Twins' only legal parents, that

17  the Twins were born during Andrew's marriage to Elad, and that Andrew and Elad

18  have provided sufficient proof of E.J.'s parentage.  (*Id.* at ¶¶ 61-62, 147-149.)

19  **B.    The INA**

20        The INA specifies the eligibility requirements for U.S. citizenship at

21  birth.  These requirements differ for children of a marriage, covered in Section

22  301(g), and children "born out of wedlock," covered in Section 309.  *See* 8 U.S.C.

23  § 1401(g) (applies to children "born . . . of parents one of whom is an alien, and the

24

25  [7]     The court's order "directed" the appropriate official "to register the birth of
    the child so as to show the Applicants, Elad Dvash-Banks and Andrew Dvash-
26  Banks, as the parents of the child."  (*Id.* at ¶ 43.)  Pursuant to that order, Andrew
    and Elad were "recognized for all purposes in law to be the parents of the child."
27  (*Id.* at ¶ 41.)  The Canadian Order also declared that the Gestational Surrogate was
    "not the mother of the child."  (*Id.* at ¶ 42.)

28

-6-

1   other a citizen of the United States"); *id.* § 1409 (applies to "children born out of

2   wedlock").   On its face, Section 301(g) does not include a biological relationship

3   requirement and, consistent with Congress's purpose in enacting the INA of

4   keeping families together, courts construing that provision—including the Ninth

5   Circuit—have followed the statutory text and uniformly held that there is no such

6   blood relationship requirement in Section 301(g).

7          Section 301(g) provides, in relevant part, that a child born abroad is a

8   U.S. citizen at birth if one of his or her married parents is a U.S. citizen and meets

9   certain residency requirements.   Although the word "wedlock" does not appear in

10  Section 301(g), courts have consistently interpreted that Section to apply to

11  children born abroad to married parents, in part, because of the provision's contrast

12  with Section 309, which is titled "Children born out of wedlock."   *See, e.g.*,

13  *Sessions* v. *Morales-Santana*, 137 S. Ct. 1678, 1686 (2017) (referring to Section

14  301(g) as "[a]pplicable to married couples").

15         In contrast to Section 301, which contains no reference to a "blood

16  relationship" requirement, Section 309 imposes additional and different

17  requirements, providing in relevant part that a child born abroad to an unwed U.S.

18  citizen father is a citizen at birth only if the child establishes "a blood relationship

19  between the person and the father . . . by clear and convincing evidence" and meets

20  certain other requirements.   8 U.S.C. § 1409(a)(1).

21         Despite the silence of Section 301 on the subject, and the contrast to

22  Section 309, the State Department's internal *Foreign Affairs Manual* ("FAM"),

23  purports to impose a biological relationship test for applicants for issuance of a

24  CRBA under Section 301.   It does so by requiring that, to be considered born "in

25  wedlock" (and thus to be covered by Section 301(g)), a child born outside the

26  United States must have a biological relationship with both his married parents.

27  (SOF ¶ 109.)  *See* 8 FAM § 304.1-2 ("To say a child was born 'in wedlock' means

28  that the child's biological parents were married to each other at the time of the

-7-

birth of the child.").  The State Department acknowledges that the FAM includes requirements not specifically set out in the INA (SOF ¶ 142), but purports to justify the FAM's imposition of this requirement solely on the basis of its interpretation of the reference in Section 301(g) to "a person . . . born . . . of parents one of whom is a . . . citizen of the United States." (*See id.* at ¶ 126.)   It does not contend that the requirement is necessary for any governmental purpose, *e.g.*, to address concerns about fraud in citizenship applications.  (*Id.* at ¶ 138.)  The provisions of the FAM represent the unilateral declarations of the State Department and are not the product of a formal adjudication or notice-and-comment rulemaking or congressional action.  (*See id.* at ¶¶ 140-141.)

The State Department's interpretation of the contours of this supposed biological relationship requirement has been inconsistent.   Prior to 2014, in adjudicating applications for recognition of U.S. citizenship by children born outside the United States, the State Department applied Section 309 to a gestational mother, even when she was a child's legal parent, if she had used a donor egg.  (*Id.* at ¶ 128.)  In 2014, the State Department reversed this decision, and began to apply Section 301(g) to such applications.   (*Id.* at ¶ 127.)   This change was not occasioned by any congressional amendment of the INA: the State Department simply changed its mind as to its interpretation of Section 301.  (*Id.* at ¶¶ 129-130.) In connection with this change, the State Department considered, but decided against, reading Section 301 to apply to children born through ART to same-sex couples.  (*Id.* at ¶¶ 131-132.)

The State Department's interpretation of Section 301(g) conflicts with the rulings of two federal circuit courts of appeals.  Two Ninth Circuit decisions and a Second Circuit decision have held that Section 301(g) does not include a biological relationship requirement, and no federal court has read Section 301(g) to impose such a requirement.  *See Solis-Espinoza, 401 F.3d 1090*; *Scales, 232 F.3d*

-8-

1  1159; *Jaen, 899 F.3d 182*.  The State Department does not follow these court of

2  appeals decisions and does not consider itself bound to do so.  (SOF ¶¶ 134-137.)

3  **C.  The Application of the State Department's Policy to the Dvash-**

4  **Banks Family**

5         On January 24, 2017, four months after the Twins were born, Andrew,

6  Elad, and the Twins appeared in person at the U.S. Consulate in Toronto (the

7  "Toronto Consulate") to apply for documents evidencing each Twin's U.S.

8  citizenship—a CRBA and a U.S. passport.  (SOF ¶¶ 53-55.)

9         Andrew and Elad provided the Toronto Consulate with the requisite

10  documentation for E.J., including his Statement of Live Birth, which identified

11  Andrew and Elad as E.J.'s parents, proof of Andrew's U.S. citizenship and

12  residency history, and Andrew and Elad's marriage certificate (*id.* at ¶ 56)—all

13  that Section 301(g) of the INA requires for the applicant to be declared a U.S.

14  citizen at birth.  Vice Consul Frances Terri Day was assigned as the adjudicating

15  officer for the Twins' applications.  (*See id.* at ¶ 57.)  Ms. Day was charged with

16  determining whether E.J. was entitled to recognition of U.S. citizenship, and she

17  had authority to make a final determination.  (*Id.* at ¶¶ 57-58.)  She reviewed the

18  submitted documents and interviewed the Dvash-Banks family.  (*Id.* at ¶ 57.)  Ms.

19  Day accepted Andrew and Elad's marriage license from the Ontario government as

20  sufficient proof of their marriage and E.J.'s Statement of Live Birth as a timely

21  filed Canadian birth certificate.  (*Id.* at ¶¶ 59-60.)  Ms. Day also accepted the latter

22  document—which identified Andrew and Elad as E.J.'s parents—as sufficient

23  proof that Andrew and Elad are E.J.'s legal parents.  (*Id.* at ¶ 61.)

24         Ms. Day reviewed the documentation and, during the interview,

25  consulted with State Department colleagues, one of whom provided her with

26  relevant sections of the FAM.  (*Id.* at ¶¶ 66-67.)  She referred to one or more

27  sections of the FAM during her interview of the Dvash-Banks family.  (*Id.* at ¶ 68.)

28

In the course of the interview, Ms. Day asked Andrew and Elad how they had conceived the Twins and whose egg and sperm had been used to conceive each of the children.  (*Id.* at ¶ 63.)  After consulting with her colleagues Larilyn Reffett and Margaret Ramsay, Ms. Day informed Andrew and Elad that, absent evidence of a biological relationship to Andrew, neither twin would qualify for U.S. citizenship.  (*Id.* at ¶¶ 66-72.)  Ms. Day further told Andrew and Elad that, if they wanted to proceed with the Twins' applications, they would have to provide additional information demonstrating the biological relationship required by the State Department and suggested that one way to do so would be to provide DNA evidence for each child.  (*Id.* at ¶¶ 72-73.)  This approach offended and bewildered Andrew and Elad because, as Andrew expressed to Ms. Day, "these are our children. These are our sons.  I'm the dad, and . . . Elad is the dad. . . . we're the parents of these boys."  (*Id.* at ¶ 78.)

Following the interview, Ms. Day signed a letter dated January 24, 2017 addressed to Andrew, explaining that "in reference to your application for a U.S. passport and a [CRBA] for [A.J.] and [E.J.] . . . [t]he U.S. Consulate General in Toronto has considered the evidence you submitted and concluded that the blood relationship between a U.S. citizen parent and children have not been established by a preponderance of the evidence as required to support a claim to U.S. citizenship."  (*Id.* at ¶ 75.)  Ms. Day designated the Twins' applications as "pending," a status reserved for applications that cannot be finally adjudicated on the day of an applicant's interview.  (*Id.* at ¶¶ 76-77.)

Andrew and Elad subsequently submitted the requested DNA tests, the results of which reflected that A.J. was the biological child of Andrew, and E.J. was not.  (*Id.* at ¶ 89.)  Thereafter, on March 2, 2017, Ms. Day sent Andrew a letter by mail denying E.J.'s applications for a CRBA and U.S. passport.  (*Id.* at ¶ 92.)  On the same day, the Toronto Consulate issued a CRBA for A.J.  (*Id.* at ¶ 91.)

-10-

The letter denying E.J.'s applications stated that "after careful review of the evidence you submitted with your child's application, it has been determined that his claim to U.S. citizenship has not been satisfactorily established, as you are not his biological father." (*Id.* at ¶ 93.) The letter additionally referenced the "Immigration and Nationality Act (INA) of 1952." (*Id.*) It did so, however, without citing to any particular section, but simply asserting that the statute "requires among other things, a blood relationship between a child and the U.S. citizen parent in order for the parent to transmit U.S. citizenship." (*Id.*) Because E.J. did not provide proof that he has a biological relationship to both Andrew and Elad, the Toronto Consulate apparently treated E.J. as a child born "out of wedlock" and adjudicated his application under Section 309.[8] That, in turn, meant that the State Department had determined that E.J. was not born a legitimate son of Andrew and Elad's marriage.[9]

The sole basis for the denial of E.J.'s applications for a CRBA and U.S. passport was the lack of evidence of a biological connection between Andrew and E.J. (*Id.* at ¶ 97.) In reaching this determination, the Toronto Consulate purported to apply State Department policies for adjudicating U.S. citizenship applications for children born by means of ART processes. (*Id.* at ¶ 98.)

As a result of the State Department's denial of E.J.'s application, the Dvash-Banks family has suffered greatly. (*Id.* at ¶ 100.) Andrew and Elad feel the

---

[8]    Because the FAM recognizes only children whose two biological parents are married to each other as born in wedlock, presumably the State Department adjudicated the applications of E.J.'s twin brother A.J. under Section 309 as well. In A.J.'s case, however, the blood relationship requirement of Section 309 was met because Andrew, a U.S. citizen, is A.J.'s biological father (*id.* at ¶ 47).

[9]    Because the State Department improperly reads a biological relationship requirement into Section 301, it would have denied E.J's application in any event. As is discussed below, there is no language in Section 301 referring to a blood relationship and no basis for reading such a requirement into Section 301 under the statutory scheme or in light of the Congressional purpose underlying the INA. Any such reading, as applied to same-sex marriages, would not only be counter-textual, but also would raise grave constitutional issues.

-11-

1    indignity of the U.S. Government's refusal to recognize their marriage and the

2    legitimacy of their children.  (*Id.* at ¶ 101.)  Their travel is significantly restricted

3    or impaired because E.J. entered the United States on a tourist visa, which has

4    expired, and although E.J. now has an Advance Parole document, it does not

5    guarantee re-entry into the United States.  (*Id.* at ¶ 102.)  When the Dvash-Banks

6    family has traveled, it is always with the fear that E.J., who does not have a U.S.

7    passport, may not be permitted to re-enter the United States.  (*Id.* at ¶ 103.)  The

8    Dvash-Banks family also has spent substantial time consulting with lawyers,  their

9    accountant and others about a range of issues, from E.J.'s immigration status to

10   obtaining medical benefits and a Tax ID number for E.J., who does not have a

11   Social Security number.  (*Id.* at ¶ 104.)  Above all, the Dvash-Banks family has

12   endured, and continues to endure, the pain and stigma of the State Department's

13   refusal to recognize Andrew's marriage to Elad and status as E.J.'s parent, and its

14   treatment of E.J. as illegitimate.  (*Id.* at ¶ 105.)  They also must live with the

15   invasion of their privacy resulting from their need to commence this Action in

16   order to obtain publicly what should have been provided privately two years ago—

17   recognition that E.J. was a U.S. citizen at birth, which would ensure that their

18   family will never be separated across countries.  (*See id.* at ¶ 106.)

19   **D.    The Complaint**

20           On January 22, 2018, Andrew and E.J. filed the Complaint in this

21   Action, alleging that under the INA, "[a]t birth, both [E.J.] and [A.J.] qualified for

22   United States citizenship pursuant to Section 301(g)," and seeking, in part, a

23   declaration pursuant to Section 1503 that E.J. is a U.S. citizen at birth.  The

24   Complaint alleges that the State Department's erroneous application of Section 309

25   (instead of 301) is "arbitrary, capricious, an abuse of discretion, or otherwise not in

26   accordance with law" in violation of Section 706(2)(A) of the Administrative

27   Procedure Act (the "APA").  The Complaint further alleges that the State

28   Department's refusal to treat E.J. as born in wedlock during Andrew and Elad's

-12-

marriage unconstitutionally discriminates against same-sex spouses and their children on the basis of sex and sexual orientation and deprives same-sex marriages of the same constellation of rights and benefits as is available to opposite-sex marriages, in violation of, among other provisions, the Due Process Clause of the Fifth Amendment.  The relief sought in the Complaint includes: (i) a declaration that E.J. is a U.S. citizen at birth; (ii) a declaration that the State Department's policy of classifying the children of same-sex married couples as "children born out of wedlock," and its consequent refusal to recognize E.J.'s citizenship on that basis, both on its face and as applied to Plaintiffs, is unconstitutional and in conflict with the INA; (iii) an order permanently enjoining Defendants from continuing to discriminate against Plaintiffs by classifying the children of same-sex married couples as "children born out of wedlock," and denying the children of same-sex married couples the right to acquire citizenship at birth pursuant to Section 301(g) on that basis; and (iv) an award of attorneys' fees and costs as allowed by law, including an award of reasonable litigation costs incurred in this Action pursuant to 28 U.S.C. § 2412, and such other relief as the Court deems just and proper.  (ECF No. 1.)

## III.   ARGUMENT

### A.   E.J. is Entitled to a Declaration Under Section 1503 that He Acquired U.S. Citizenship At Birth Under Section 301(g) of the INA.

The fundamental facts here are not in dispute.  The parties agree that (i) Andrew is a U.S. citizen who satisfied Section 301's residency requirements at the time of E.J.'s birth; (ii) E.J.'s legal parents, Andrew and Elad, were married at the time of E.J.'s birth; (iii) E.J. was born outside of the United States; (iv) Andrew and Elad are, and have been, E.J.'s legal parents and have acted as his only parents since his birth; (v) E.J. resides in California; and (vi) E.J. does not share a biological relationship with Andrew.  (SOF ¶¶ 1, 2, 6, 29, 31, 37-40, 46, 52, 107,

-13-

147.)[10]   The parties' only dispute relating to E.J.'s Section 1503 claim is a legal one: whether the INA imposes on persons like E.J., born during their parents' legally valid marriage, a requirement to demonstrate a biological relationship with both married parents as a prerequisite to recognition of U.S. citizenship at birth. The State Department declined to apply Section 301 to E.J.'s applications because, as the child of a male, same-sex couple, he could not meet the State Department's requirement that a child's biological parents be married to each other.  The State Department's construction of Section 301 to include such a requirement is inconsistent with the INA's text and purpose, and has been rejected by federal courts of appeals, including twice by the Ninth Circuit.  Because there is no genuine dispute of material fact and Defendants' legal interpretation is meritless, E.J. is entitled to summary judgment on his claim under Section 1503, which "authorizes a *de novo* judicial determination of the status of the plaintiff as a United States national."  *Richards* v. *Sec'y of State*, 752 F.2d 1413, 1417 (9th Cir. 1985).

> **a.    The State Department's biological relationship requirement is inconsistent with the text of Section 301(g).**

There is no dispute that Section 301(g) does not expressly impose a biological relationship requirement.  (SOF ¶ 125.)  The State Department purports to derive its position solely from the inclusion in Section 301(g) of the phrase "born … of parents," which it interprets to require that a child's biological parents

---

[10]    On a motion for summary judgment, the moving party "must demonstrate that 'there is no genuine dispute as to any material fact' and that the party 'is entitled to judgment as a matter of law.'"  *Fuller* v. *Idaho Dep't of Corr.*, 865 F.3d 1154, 1168 (9th Cir. 2017) (quoting Fed. R. Civ. P. 56(a)).   For purposes of summary judgment, "[a] material fact is one that 'might affect the outcome of the suit under the governing law,' and a genuine dispute is one for which 'a reasonable jury could return a verdict for the nonmoving party.'"  *Id.* (quoting *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   The Court must draw all reasonable inferences "in the light most favorable to the nonmoving party."  *Id.* at 1168-69 (internal quotation marks omitted).

-14-

1    are married to each other in order for a parent to convey U.S. citizenship under

2    Section 301.   (*Id.* at ¶¶ 123-126, 138.)  That interpretation conflicts with the text

3    and purpose of the INA and the decisions that have construed the statute.

4              It is plain on the face of Section 301(g) that the statute does not

5    impose a biological relationship requirement.  Section 301(g) states simply that "a

6    person born outside the geographical limits of the United States and its outlying

7    possessions of parents one of whom is an alien, and the other a citizen of the

8    United States who, prior to the birth of such person, was physically present in the

9    United States" for the requisite period is a citizen at birth.  Nothing in Section 301,

10   or any other provision of the INA, suggests that in using the phrase "born . . . of

11   parents," Congress intended to refer only to biological or genetic parents.[11]  And,

12   biology aside, there is no genuine dispute that Andrew is in fact and law E.J.'s

13   parent: the State Department acknowledges that Andrew is E.J.'s legal parent; he is

14   listed as a parent on E.J.'s birth certificate and he "is recognized for all purposes in

15   law" under the law of Ontario, Canada to be one of E.J.'s "parents," and he has,

16   along with Elad, lived with the Twins since their birth.  (SOF ¶¶ 33, 50, 145-148.)

17   No individual other than Andrew and Elad is listed on E.J.'s birth certificate or has

18   acted as his parent.  (*Id.* at ¶¶ 35, 39.)  The conclusion that follows from this is so

19   _____

[11]      Except to clarify that the term "parent" includes a deceased parent, Title III
20   of the INA, the Title that includes Sections 301(g) and 309, contains no definition
     of the term, let alone a definition limiting it to biological and/or gestational parents.
21   *See* 8 U.S.C. § 1101(c)(2).  Under Titles I and II of the INA, the term "parent" is
     defined as "a parent, father, or mother only where the relationship exists by reason
22   of any of the circumstances set forth in subdivision (1) of this subsection."
     Subdivision (1), in turn, defines the term "child" to mean "an unmarried person
23   under twenty-one years of age" who, if not born in wedlock, meets certain criteria,
     such as having been "legitimated under the law of the child's residence or
24   domicile, or under the law of the father's residence or domicile . . . ." 8 U.S.C.
     § 1101(b)(1)-(2).  Taken together, Titles I, II, and III reflect that Congress intended
25   a broad treatment of the term "parent" in the INA, imposing restrictions only in the
     case of children "not born in wedlock," a situation not applicable to E.J. and others
26   in his position.  Furthermore, as is discussed separately below, Congress did not
     intend to replace the common law usage of the terms "legitimacy" and "birth in
27   wedlock," under which it is also plain that E.J. is the child of the marriage of
     Andrew and Elad.

28

-15-

1  obvious that even the Toronto Consulate, in writing to Andrew to deny E.J. his

2  citizenship,  referred to E.J. as "your child."  And so he is.

3         Congress's inclusion of a "blood relationship" requirement in Section

4  309 (dealing with children born "out of wedlock"), but not in Section 301(g)

5  (dealing with the children of a marriage) is further evidence that Congress intended

6  children born in these different circumstances to be treated differently for purposes

7  of acquiring U.S. citizenship.  Specifically, the difference between the two parallel

8  sections of the INA demonstrates that Congress intended that there be no

9  biological relationship requirement under Section 301(g).  *See Scales*, 232 F.3d at

10  1165; *Jaen*, 899 F.3d at 189 (holding that "Congress clearly specified enhanced

11  requirements for proof of parentage in the case of children born out of wedlock"

12  and that "the 'textual distinction' between the sections regarding children of

13  married parents and children of unmarried parents is strongly suggestive of a clear

14  Congressional intent to treat the two categories differently on this point."); *see also*

15  *Russello* v. *United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes

16  particular language in one section of a statute but omits it in another section of the

17  same Act, it is generally presumed that Congress acts intentionally and purposely

18  in the disparate inclusion or exclusion." (internal quotation marks omitted)).

19         Moreover, as the Second Circuit determined in *Jaen*, absent evidence

20  of a contrary congressional intent, statutory language should be viewed against the

21  background of the common law.  *See Neder* v. *United States*, 527 U.S. 1, 21 (1999)

22  ("It is a well-established rule of construction that where Congress uses terms that

23  have accumulated settled meaning under the common law, a court must infer,

24  unless the statute otherwise dictates, that Congress means to incorporate the

25  established meanings of these terms."  (alterations and internal quotation marks

26  omitted)).  The common law meaning of "parent" rests on the presumption that,

27  where a child is born into a marriage, the married individuals are the child's

28  parents irrespective of their biological relationship to the child.  *See Michael H. v.*

-16-

*Gerald D.*, 491 U.S. 110, 124 (1989) (describing the "presumption of legitimacy" as "a fundamental principle of the common law").  In the United States, nearly every state recognizes that the term "parent" generally refers not only to biological parents but to those who by marriage or otherwise have that status.  *See e.g.*, *Jaen, 899 F.3d at 189* ("New York state—like many states—incorporates the common law presumption of parentage into its domestic relations law."); *Elisa B.* v. *Superior Court,* 37 Cal. 4th 108, 122 (2005) (explaining that California applies the "presumption of presumed parenthood"); 41 AM. JUR. 2D *Illegitimate Children* § 8 ("[I]t is clear that such a presumption [of legitimacy for children born in wedlock] exists independently of statute in practically all jurisdictions."); *see also Parent*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining the term "parent" as "[t]he lawful father or mother of someone").

The common law presumption that every child born in wedlock is the legitimate offspring of the child's married parents applies even when only one spouse is the child's biological parent, and even when the child's parents are of the same sex.  *See Elisa B., 37 Cal. 4th at 125* (holding that the presumption of parenthood was not rebutted by proof that the plaintiff was not the biological parent of her same-sex partner's children "because she actively participated in causing the children to be conceived with the understanding that she would raise the children as her own together with the birth mother, she voluntarily accepted the rights and obligations of parenthood after the children were born, and there are no competing claims to her being the children's second parent"); *Matter of Christopher YY.* v. *Jessica ZZ.,* 159 A.D.3d 18, 24 (3d Dep't 2018) ("As the child was born to respondents, a married couple, they have established that the presumption of legitimacy applies, a conclusion unaffected by the gender composition of the marital couple or the use of informal artificial insemination by donor.").  Accordingly, the common law presumption of legitimacy, regardless of "blood" ties, forms the essential background against which the Section 301

-17-

1   reference to a child having been "born . . . of parents" should be interpreted.  To

2   require a "blood relationship" not mentioned in the statute would contravene the

3   longstanding recognition that a person need not be a biological relative of the child

4   to be his parent and thereby to confer citizenship at birth.

5           In two controlling decisions, one in 2000 and the other in 2005, the

6   Ninth Circuit decided this exact issue of statutory interpretation.  In each case, the

7   court held that Section 301(g) prohibits the imposition of a biological relationship

8   requirement on children born to married parents.  In *Scales*, the petitioner was born

9   during the marriage of his Philippine citizen mother and U.S. citizen father, but

10  was not the biological child of his U.S. citizen father.  232 F.3d 1159, 1162.  The

11  Ninth Circuit nevertheless held—and in so doing conclusively refuted the sole

12  basis for Defendants' position with respect to E.J.'s Section 1503 claim—that "[a]

13  straightforward reading" of the "born of parents" language in Section 301

14  "indicates . . . that there is no requirement of a blood relationship."  *Id.* at 1164.[12]

15  The court noted that, in contrast, Section 309 does require a blood relationship

16  between a person born out of wedlock and a U.S. citizen father, but stated that the

17  provision "d[id] not apply to Petitioner . . . because he was born to parents who

18  were married at the time of his birth."  *Id.*  The Ninth Circuit further explained that

19  "[i]f Congress had wanted to ensure" that a person born to married parents only

20  one of whom was a U.S. citizen "actually shares a blood relationship with an

21  American citizen," "'it knew how to do so.'"  *Id.* (quoting *Custis* v. *United States*,

22  511 U.S. 485, 492 (1994)).  The court expressly refused to defer to the FAM,

23  concluding that it was so divergent from the statutory language as to not even be

24

_____

25  [12]     *See also Scales*, 232 F.3d at 1166 ("Section 1401 requires only that

26  Petitioner be 'born . . . of parents,' one of whom is a U.S. citizen, in order to acquire citizenship.  The record is uncontroverted that Petitioner was born to Topaz [non-U.S. citizen genetic mother] and Scales [U.S. citizen husband of genetic

27  mother at time of birth] during their marriage.  There is no requirement of a blood relationship between Petitioner and his citizen father, as there is for an illegitimate

28  child.").

-18-

1  appropriately considered "an interpretation of § 1401."  *See id.* at 1165-66.  The
2  Second Circuit similarly observed in *Jaen* that "the government's reliance upon the
3  FAM language is particularly perplexing" because the FAM "does not even
4  purport to interpret the statute, let alone to apply to the situation at hand."  899
5  F.3d at 187 n.4.

6       The Ninth Circuit reaffirmed *Scales* in *Solis-Espinoza*, 401 F.3d 1090.
7  There, the petitioner was born in Mexico and raised in the United States by his
8  biological father, a Mexican citizen, and his father's wife, a U.S. citizen, who were
9  married at the time of the petitioner's birth.  *Id.* at 1091-92.  The Board of
10  Immigration Appeals determined that the petitioner "'was born out of wedlock,'
11  because his biological father was not married to his biological mother at the time
12  of his birth."  *Id.* at 1092.  On appeal, the Ninth Circuit reversed, holding that the
13  petitioner "was a legitimate child, not born out of wedlock, and . . . thus a United
14  States citizen pursuant to 8 U.S.C. § 1401(g)."  *Id.* at 1094.  The court thus
15  reaffirmed that Section 301 does not condition eligibility for citizenship on the
16  existence of a blood relationship with a U.S. citizen parent, confirming that "the
17  requirement applied only to an illegitimate child and that it did not apply to
18  someone who was not born 'out of wedlock.'"  *Id.* at 1093 (citing *Scales*, 232 F.3d
19  at 1164).  The court emphasized that "[i]n every practical sense," the wife of the
20  petitioner's biological father was his "mother and he was her son."  *Id.* at 1094.[13]

21  ───────────────────
22  [13]    The Second Circuit similarly rejected the notion that Section 301(g) includes
   a biological relationship requirement in *Jaen*, 899 F.3d 182.  There, Jaen was born
23  to a Panamanian mother who was married to a U.S. citizen father, but his birth
   certificate reflected that his "birth" or genetic father was not a U.S. citizen.  *See id.*
   at 184-85.  Interpreting the word "parent" in former Section 301(g), which is for
24  relevant purposes identical to the current version, the Second Circuit concluded
   that the former version of Section 301(g) imported the "common law meaning of
25  'parent' . . . [and] therefore incorporated the longstanding presumption of
   parentage based on marriage" such that Jaen's mother's husband at the time of his
26  birth would be considered his parent for purposes of evaluating his citizenship.
   *See id.* at 188.  The court relied in part on the comparison of former Section 301(g)
27  and former Section 309, concluding that "[t]here is no comparable additional
   requirement for the establishment of paternity in the section regarding citizenship
28  via *married* parents," former Section 301(g).  *Id.* at 189 (emphasis in original).

-19-

Those decisions make clear that (1) the term "parents" as used in Section 301(g) is not limited to *biological* parents; and (2) the presumption of legitimacy that applies when a child is born to married parents—codified in the INA—cannot be rebutted by evidence that an applicant for U.S. citizenship at birth does not have a biological tie to a U.S. citizen parent. Indeed, in *Solis-Espinoza*, it was undisputed that the petitioner did not share a biological relationship with his U.S. citizen parent—his father's wife—but the court nonetheless rejected the same interpretation of the INA that the State Department applied to the adjudication of E.J.'s applications for a CRBA and U.S. passport. (SOF ¶ 135.) *See Solis-Espinoza, 401 F.3d at 1091-92*; *see also Jaen, 899 F.3d at 185* ("[T]he INA incorporates the common law meaning of 'parent' into [Section 301(g)], such that a child born into a lawful marriage is the lawful child of those parents, regardless of the existence or nonexistence of any biological link"). Accordingly, the plain text and structure of Sections 301(g) and 309, as interpreted in *Scales* and *Solis-Espinoza*, foreclose the State Department from imposing a biological relationship requirement to withhold recognition of E.J.'s U.S. citizenship under Section 301(g).

### b. The State Department's interpretation of Section 301(g) also conflicts with the INA's legislative purpose of maintaining family unity.

The State Department's interpretation of the INA also is inconsistent with the legislative history of the INA, which "clearly indicates that the Congress intended to provide for a liberal treatment of children and was concerned with the problem of keeping families of United States citizens and immigrants united." H.R. Rep. No. 85-1199, at 7 (1957); *see also Nation v. Esperdy, 239 F. Supp. 531, 538 (S.D.N.Y. 1965)* ("'[T]hese provisions are designed to clarify or adjust

---

The Second Circuit confirmed that "our determination that a child born into a marriage is the child of that marriage is grounded in the common law and Supreme Court precedent, and reflected in New York state law." *Id. at 190*.

-20-

existing provisions of law in the interest of reuniting broken families . . .'") (quoting 103 Cong. Rec. 15,498 (1957) (statement of Sen. John F. Kennedy)). The Ninth Circuit recognized this purpose in concluding that the concerns animating the blood relationship requirement for unmarried fathers in Section 309—that "'the unmarried male . . . need not participate in the decision to give birth rather than to choose an abortion; that he need not be present at the birth; and for at least 17 years thereafter he need not provide any parental support . . . in order to preserve his right to confer citizenship on the child pursuant to [Section 309]'"— are "not present if a child is born in wedlock." *Scales*, 232 F.3d at 1164 (quoting *Miller* v. *Albright*, 523 U.S. 420, 434 (1998)).  In other words, the Ninth Circuit affirmed that it is rational to transmit citizenship from father to child where the father is married and intends to provide "parental support."  In rejecting a biological requirement in Section 301(g), the Ninth Circuit thus recognized that "[t]he [INA] was intended to keep families together [and] should be construed in favor of family units and the acceptance of responsibility by family members." *Solis-Espinoza*, 401 F.3d at 1094; *see Sook Young Hong* v. *Napolitano*, 772 F. Supp. 2d 1270, 1278-79 (D. Haw. 2011) (collecting cases regarding the proposition that "maintenance of family unity and . . . the liberal treatment of children represent well-known goals of the INA").  The State Department's interpretation of Section 301(g) to require proof of a biological relationship with a U.S. citizen does exactly the opposite, especially in cases of same-sex marriages such as Andrew and Elad's.  Indeed, this point is plainly evident from the State Department's determinations here: it recognized A.J.'s U.S. citizenship, but not E.J.'s, even though these twin boys are being raised together in their family home by their same two parents.

There is no genuine dispute in this Action as to the facts necessary to determine E.J.'s eligibility for a declaration of citizenship under Section 301(g). Indeed, the State Department acknowledges that it denied E.J.'s U.S. passport and

-21-

CRBA applications based solely on its interpretation of Section 301 (SOF ¶¶ 96-97), an interpretation that the Ninth Circuit expressly rejected in *Scales*.  That interpretation is foreclosed by the text and history of the INA, as well as binding Ninth Circuit precedent.  As a result, E.J. is entitled to judgment as a matter of law on his claim under Section 1503 and a declaration that he is a U.S. citizen at birth.[14]

**B.      The State Department's Interpretation and Application of the INA Violates the Due Process Clause.**

The parties do not dispute that Andrew and Elad were married at the time of E.J.'s birth, that Andrew and Elad are E.J.'s legal parents, or that Andrew and Elad are both men.  (SOF ¶¶ 11, 12, 31, 147, 149.)  Given these facts, the State Department's application of a biological relationship requirement to E.J.'s CRBA application diminishes and demeans the right to marry as guaranteed by the Fifth Amendment of the Constitution.  Andrew and E.J. are thus entitled to summary judgment on this claim as well.

The State Department's unilateral imposition of a biological relationship requirement denies same-sex married couples and their children the panoply of rights and benefits of marriage, including the right of a U.S. citizen parent in a same-sex marriage to transmit citizenship to his or her legal child even absent a biological relationship.  *See Pavan*, 137 S. Ct. at 2077 ("differential treatment" of same-sex couples "infringes *Obergefell*'s commitment to provide same-sex couples the constellation of benefits that the States have linked to marriage" (internal quotation marks omitted)); *see also Obergefell*, 135 S. Ct. at 2601-02 (States have "throughout our history made marriage the basis for an expanding list of governmental rights, benefits, and responsibilities"); *Zablocki* v.

---

[14]      This result also is necessary to avoid the serious constitutional questions raised by Plaintiffs under the Fifth Amendment.  *Cf. Ashwander* v. *Tenn. Valley Auth.*, 297 U.S. 288, 345-46 (1936) (Brandeis, J., concurring).

-22-

1   *Redhail*, 434 U.S. 374, 384 (1978) ("[T]he right to marry is part of the fundamental

2   'right of privacy' implicit in the Fourteenth Amendment's Due Process Clause.").

3          The Supreme Court has long recognized the right of a married U.S.

4   citizen parent to transmit U.S. citizenship to his or her foreign-born child.   In

5   *Miller* v. *Albright*, the Supreme Court explained:

6          Under the terms of the INA, the joint conduct of a citizen
       and an alien that results in conception is not sufficient to
7          produce an American citizen . . . .   If the two parties
       engage in a second joint act—if they agree to marry one
8          another—citizenship will follow.

9

10   523 U.S. 420, 433 (1998).   As a result of *Scales* and *Solis-Espinoza*, it is settled

11   law in the Ninth Circuit that the transmission of citizenship to the child of a

12   *married* U.S. citizen's foreign-born child is one of the incidents of marriage to

13   which *all married* couples are equally entitled.   *Cf. Pavan*, 137 S. Ct. at 2078 (due

14   process is violated when a same-sex couple is denied a benefit state law attaches to

15   marriage, even when one husband "is definitively not the biological father").

16   Unlike in *Pavan*, the settled law here is federal—the INA, as reinforced by the

17   Ninth Circuit's construction of the statute in *Scales* and *Solis-Espinoza*.

18          The FAM section on which the State Department apparently relied in

19   denying E.J.'s applications in effect required that to be considered born "in

20   wedlock," and therefore eligible for citizenship under Section 301, a child must

21   have been born during the marriage of the child's biological parents to each other.

22   *See* 8 FAM § 304.1-2.   This is, of course, an impossibility in the case of a male

23   same-sex couple.   By applying Section 309 and reading into Section 301 a

24   biological relationship requirement absent from its text to analyze the citizenship

25   of such children, the FAM dictates that, if the biological parent of the child of a

26   same-sex marriage is a foreign national, as is the case here, the child is ineligible

27   for citizenship at birth.   In so doing, the State Department's counter-textual

28   interpretation of the INA relegates the children of two married men inevitably to

-23-

the stigma of illegitimacy simply because of their parents' sex and sexual orientation.   The State Department's interpretation thus eviscerates the right, provided in Section 301 and confirmed in *Miller* and its progeny, of a married U.S. citizen to transmit citizenship to the child of his or her marriage.   Only in this way could the State Department achieve the perverse result of the Twins' being treated differently despite their common parentage and identical living situations.

The deprivation of these rights and benefits violates the Fifth Amendment.   *See Pavan*, 137 S. Ct. at 2077; *see also Obergefell*, 135 S. Ct. at 2601-02 (observing that laws that deny same-sex married couples "the constellation of benefits . . . linked to marriage" violate the constitutional right to marry by consigning them "to an instability many opposite-sex couples would deem intolerable in their own lives" and by "teaching that gays and lesbians are unequal in important respects.").

Any argument that the State Department applies the FAM's biological relationship requirement to the children of opposite-sex marriages is beside the point.   The INA makes the ability to transmit U.S. citizenship to the child of a marriage part of the constellation of benefits linked to marriage.   The State Department's imposition of a biological relationship requirement completely *forecloses* the children of male same-sex marriages, like E.J., from being treated as the legitimate children of their parents' marriages and, in many cases, from being recognized as U.S. citizens at birth.   In this way, the State Department's interpretation of the INA deprives *every* male same-sex married couple of one of the incidents of marriage and discriminates against and stigmatizes their children.

Given that the State Department's actions infringe a constitutional right guaranteed by the Fifth Amendment, Defendants bear the burden of establishing that there is a compelling governmental interest in doing so, and that the rule being defended is narrowly tailored to achieve that compelling governmental interest.   *See Washington* v. *Glucksberg*, 521 U.S. 702, 721 (1997)

-24-

1  (explaining that substantive due process "forbids the government to infringe . . .

2  'fundamental' liberty interests *at all*, no matter what process is provided, unless the

3  infringement is narrowly tailored to serve a compelling interest" (emphasis in

4  original) (internal quotation marks omitted)); *United States* v. *Juvenile Male*, 670

5  *F.3d 999, 1012 (9th Cir. 2012)* (when a statute abridges a fundamental right, "the

6  statute will be subject to strict scrutiny and is invalidated unless it is narrowly

7  tailored to serve a compelling state interest." (internal quotation marks omitted)).

8  Defendants, however, fail to assert any interest, let alone a compelling reason, for

9  excluding from consideration for citizenship under Section 301(g) applicants who,

10  like E.J., were born during the marriage of their U.S. citizen parent and the

11  biological parent of the child.  Indeed, the State Department has acknowledged that

12  the only basis for this policy is its (misguided) interpretation of the text of the

13  statute.   (SOF ¶ 126.)   Given this wholesale failure, Plaintiffs are entitled to

14  summary judgment on their due process claim.

15                              **IV.   CONCLUSION**

16          For the foregoing reasons, Plaintiffs request that the Court grant in full

17  their motion for partial summary judgment and declare that E.J. is a U.S. citizen at

18  birth under Section 301(g), declare that Defendants' interpretation and application

19  of Section 301(g) to require proof of a biological relationship with a U.S. citizen is

20  unconstitutional and unlawful, enjoin Defendants from continuing to interpret

21  Section 301(g) in that manner, and grant attorneys' fees and costs and any such

22  other and further relief as the Court deems to be just and proper.

23  Dated:        January 7, 2019              Respectfully submitted,

24                                     By: /s/ Alexa M. Lawson-Remer

25                                         Alexa M. Lawson-Remer (SBN 268855)
                                           lawsonr@sullcrom.com

26                                         SULLIVAN & CROMWELL LLP
                                           1888 Century Park East, Suite 2100

27                                         Los Angeles, California 90067-1725
                                           Telephone:   (310) 712-6600

28                                         Facsimile:   (310) 712-8800

                                           -25-

Theodore Edelman (*pro hac vice*)
edlemant@sullcrom.com
Jessica Klein (*pro hac vice*)
kleinj@sullcrom.com
Lauren M. Goldsmith (SBN 293269)
goldsmithl@sullcrom.com
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone:   (212) 558-4000
Facsimile:    (212) 558-3588

Aaron C. Morris (*pro hac vice*)
amorris@immigrationequality.org
IMMIGRATION EQUALITY
40 Exchange Place, Suite 1300
New York, New York 10005-2744
Telephone:   (212) 714-2904

*Attorneys for Plaintiffs*

-26-