# EXHIBIT A

```
                   CONFIDENTIAL - PROTECTIVE ORDER
1                     UNITED STATES DISTRICT COURT

2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    ANDREW MASON DVASH-

5    BANKS and E.J.D.-B,

6            Plaintiffs,

7    v.                                   Case No.

8                            2:18-cv-00523-JFW-JCx

9    THE UNITED STATES

10   DEPARTMENT OF STATE,

11   and THE HONORABLE

12   MICHAEL R. POMPEO,

13   Secretary of State,

14           Defendants.

15   _____

16

17

18             Video Deposition of Paul Peek

19                    Washington, D.C.

20              Thursday, December 20, 2018

21                       9:15 a.m.

22

23   Job No.:  NY-203388

24   Pages:  1 - 351

25   Reported by:  Donna L. Linton, RMR-CLR
```

Plaintiffs' Partial Summary Judgment Exhibit A
Page 5

```
 1              Video deposition of Paul Peek, the 30(b)(6)

 2   witness herein, held at:

 3

 4

 5

 6

 7                    Sullivan & Cromwell

 8              1700 New York Avenue, Northwest

 9              South Conference Room, Suite 800

10                 Washington, D.C.  20006

11                    (202) 956-7500

12

13

14

15

16

17              Pursuant to Amended Notice of Rule 30(b)(6)

18   Deposition of Defendant United States Department of

19   State and Federal Rules of Civil Procedure, before

20   Donna L. Linton, Registered Merit Reporter,

21   Certified LiveNote Reporter, and Notary Public in

22   and for the District of Columbia.

23

24

25
```

Plaintiffs' Partial Summary Judgment Exhibit A
Page 6

```
 1                A P P E A R A N C E S

 2

 3   ON BEHALF OF THE PLAINTIFFS:

 4        THEODORE EDELMAN, ESQUIRE (pro hac vice)

 5        JESSICA KLEIN, ESQUIRE (pro hac vice)

 6        Sullivan & Cromwell, LLP

 7        125 Broad Street

 8        New York, New York 10004

 9        (212) 558-4000

10        kleinj@sullcrom.com

11                    - and -

12        AARON C. MORRIS, ESQUIRE (pro hac vice)

13        Immigration Equality

14        40 Exchange Place, Suite 1300

15        New York, New York  10005

16        (212) 714-2904

17        amorris@immigrationequality.org

18

19

20

21

22

23

24

25                    - continued -
```

```
 1              A P P E A R A N C E S

 2                   (continued)

 3

 4      ON BEHALF OF THE DEFENDANTS:

 5           VINITA ANDRAPALLIYAL, ESQUIRE

 6           EMILY NEWTON, ESQUIRE

 7           United States Department of Justice

 8           Civil Division - Federal Programs Branch

 9           Post Office Box 883

10           Washington, D.C. 20044

11           (202) 305-0845

12           vinita.b.andrapalliyal@usdoj.gov

13                   - and -

14           CHRISTINE L. McLEAN, ESQUIRE

15           United States Department of State

16           600 19th Street, Northwest

17           Washington, D.C. 20006

18           (202) 485-8000

19           mcleancl@state.gov

20

21

22   ALSO PRESENT:

23           Brian Mackey, Videographer

24

25
```

Plaintiffs' Partial Summary Judgment Exhibit A
Page 8

 1    Department of Justice for Defendants.

 2              MS. ANDRAPALLIYAL:  Vinita Andrapalliyal,

 3    Department of Justice, for Defendants.

 4              THE VIDEOGRAPHER:  The court reporter

 5    today is Donna Linton.

 6              Would the reporter please swear in the

 7    witness?

 8    Whereupon,

 9                      PAUL PEEK,

10    the witness herein, was called for examination by

11    counsel on behalf of Plaintiffs, and having been

12    sworn was examined and testified as follows:

13              MR. EDELMAN:  Good morning.  Just for the

14    record, since we have one other individual today,

15    could we just ask you to identify yourself for the

16    record so the transcript will reflect your

17    participation?

18              MS. McLEAN:  Yes.  I'm Christine McLean.

19    I'm here with the Department of State.

20              MR. EDELMAN:  Welcome.

21      EXAMINATION BY COUNSEL ON BEHALF OF PLAINTIFFS

22    BY MR. EDELMAN:

23         Q    Good morning Mr. Peek.

24         A    Good morning.

25         Q    Can we just, to identify you to the

```
 1          Q   Did you review the case file for E.J. --
 2    not A.J. now -- E.J. D████-B████?
 3          A   I did not review the application for A.J.
 4    D███-B███.
 5          Q   I asked you about E.J.
 6          A   I did review the application for E.J.
 7    D███-B███.
 8          Q   And were Andrew and Elad's names listed
 9    on the birth certificate for E.J. D███-B███ --
10    listed as his parents?
11          A   Yes.
12          Q   And does the State Department have any
13    reason to doubt that Andrew or -- and Elad are E.J.
14    D███-B███' parents?
15          A   His legal parents, there is no reason to
16    doubt.
17          Q   When you say his legal parents, what do
18    you mean?
19          A   As opposed to biological parents.
20          Q   Okay.  We'll come to that in a little
21    bit, but do you have any reason to believe, based on
22    the facts of these cases, that A.J. D███'s parents
23    are different from E.J. D███-B███' parents?
24              MS. ANDRAPALLIYAL:  Objection.  Exceeds
25    the scope.
```

1        A   Yes.

2        Q   All right.  Now I want to go back a

3   little bit to talk about the process of applying for

4   a CRBA.

5        A   Uh-hum.  Yes.

6        Q   In 2017, January of 2017, did the Toronto

7   consulate have its own protocol or process for

8   applications for a CRBA, or was there a general

9   process that applied for all posts?

10           MS. ANDRAPALLIYAL:  Objection.  Form.

11   Objection.  Exceeds the scope.

12        A   The requirements for the issuance of a

13   CRBA are uniform worldwide, but the process may be

14   different just depending on staffing, layout of a

15   consulate, those sorts of things.

16   BY MR. EDELMAN:

17        Q   Let's talk for a moment about the

18   elements or criteria of the application.

19        A   Uh-hum.

20        Q   Was there a -- in January of 2017 was

21   there a uniform set of criteria for issuance of a

22   CRBA?

23        A   Yes.

24        Q   And who set those criteria?

25        A   The Department of State.

1          Q    In Washington, D.C.?

2          A    Yes.

3          Q    Okay.  Would it be fair to say that at

4    that time the Toronto consulate -- the State

5    Department expected the Toronto consulate to follow

6    the criteria set by the State Department in

7    Washington?

8          A    Yes.

9          Q    And would it be fair to say that at that

10   time the State Department expected that the Toronto

11   consulate would not depart from the criteria for

12   issuance of a CRBA set by the State Department in

13   Washington, D.C.?

14         A    That is fair to say.

15         Q    Okay.  Are you familiar with the term

16   "desk officer" as it applies to the State

17   Department?

18         A    Yes.

19         Q    What do you understand that term to mean?

20         A    It's a term used throughout the

21   department for bureaus that are divided.

22   Regionally, a desk officer is generally someone who

23   is answering questions that -- or handling issues

24   related to a specific region, like the Africa desk

25   or the Somalia desk or what have you.

Plaintiffs' Partial Summary Judgment Exhibit A
Page 12

 1          Q    Okay.

 2          A    So U.S. citizenship.

 3          Q    So --

 4          A    Excuse me.

 5          Q    I'm sorry.  I didn't mean to talk over

 6     you.  Let's just unpack a little bit to make sure

 7     that we understand your answer.

 8               Does the -- do the training materials for

 9     that course cover the INA or do they cover the FAM's

10     discussion of the INA?

11               MS. ANDRAPALLIYAL:  Objection.  Form.

12     Exceeds the scope.

13          A    Both.  They're very closely intertwined.

14     BY MR. EDELMAN:

15          Q    What does that mean?

16          A    I mean, the FAM guidance is based on the

17     INA and the INA is referenced throughout the FAM

18     guidance, so --

19          Q    Okay.

20          A    -- it's hard to talk about one -- it's

21     hard to talk about the FAM without talking about the

22     INA when you're talking about the citizenship

23     sections.

24          Q    Are there any differences between the

25     language of the INA provisions relevant to

Plaintiffs' Partial Summary Judgment Exhibit A
Page 13

CONFIDENTIAL - PROTECTIVE ORDER

```
 1    adjudications of passport applications and the

 2    language of the FAM provisions relevant to

 3    adjudications of passport applications?

 4         A    The FAM goes in -- yes.

 5         Q    What are those differences?

 6         A    The FAM goes into much greater detail.

 7         Q    By that -- when you say it goes into

 8    greater detail, do you mean that the FAM includes

 9    elements that the INA does not?

10         A    The FAM gives guidance to a universe of

11    scenarios that are covered in the INA.  Yeah.

12         Q    I'm sorry.  I'm not sure I understood.

13    Are there scenarios covered in the INA?

14         A    Yeah.

15         Q    Maybe I don't understand what you mean by

16    scenarios.  So how are you using the term

17    "scenarios" in your answer?

18         A    An example would be two U.S. citizens in

19    wedlock, two U.S. citizens out of wedlock, one U.S.

20    citizen -- parents I'm referring to, biological

21    parents -- in and out of wedlock would be different

22    scenarios, for instance.

23         Q    Okay.  And is the wording of the FAM

24    identical to the wording of the INA with respect to

25    those situations?
```

Plaintiffs' Partial Summary Judgment Exhibit A
Page 14

```
 1          A    In places, yes.

 2          Q    When you say, "in places, yes," does that

 3    mean in places, no?

 4          A    The FAM goes into greater detail, so the

 5    FAM is kind of, again, how to interpret different

 6    situations in much greater detail than the INA goes

 7    into.

 8          Q    So, again, the question is, when you say,

 9    "goes into greater detail," does the FAM include

10    elements that the INA does not?

11          A    Yes.

12          Q    Now, does the State Department require

13    consular officials adjudicating applications for a

14    U.S. passport to be familiar with provisions of U.S.

15    immigration law applicable to those adjudications?

16          A    Yes.

17          Q    And does the State Department do anything

18    to train consular officials on those elements of

19    U.S. immigration law?

20               MS. ANDRAPALLIYAL:  Objection.  Exceeds

21    the scope.

22          A    Yes.

23    BY MR. EDELMAN:

24          Q    What does it do?

25          A    The basic consular course -- that's the
```

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                        Page 158

```
 1    sections 301(g) and 309.  And you had indicated that

 2    the State Department has consulted not only with

 3    USCIS but others.  And we didn't have an opportunity

 4    to ask you what others you were referring to in your

 5    answer.

 6         A    For instance, if there was a court case

 7    about something that was effected by 301(g) of the

 8    INA, they might consult with the Department of

 9    Justice about that.

10         Q    Okay.  So this isn't abstract or

11    hypothetical, were there communications -- let's

12    just ask the fact yes or no:  Were there

13    communications between the State Department and the

14    Department of Justice with respect to court cases or

15    court decisions relating to the application of INA

16    section 301(g) or 309?

17              MS. ANDRAPALLIYAL:  Objection.  Exceeds

18    the scope of the deposition.

19         A    I don't know.

20    BY MR. EDELMAN:

21         Q    Okay.  So my question really is were you

22    referring to specific communications that you had in

23    mind when you gave your answer before lunch?

24         A    No.

25         Q    So let's just ask, to be clear, does the
```

Plaintiffs' Partial Summary Judgment Exhibit A
Page 16

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                    Page 159

1   State Department require a biological relationship

2   between a married U.S. citizen parent and a child

3   born outside the United States in order to establish

4   citizenship at birth of the child?

5        A    Yes.

6        Q    And what is the source of that

7   requirement?

8        A    I'm sorry.  What is the what?

9        Q    What's the source?  What's the basis for

10  that requirement?

11       A    The Immigration and Nationality Act.

12       Q    And what in particular?

13       A    Section 301(g).

14            (Defendants' Exhibit Number 1 marked for

15  identification was introduced.)

16  BY MR. EDELMAN:

17       Q    Okay.  So just to put some texture around

18  it, I'm just going to show you Defendants'

19  Deposition Exhibit 1.  This has already been marked,

20  so I'm just going to hand you a copy and one to

21  counsel and ask you if you know what this document

22  is.

23       A    It looks like an excerpt of 7 FAM 1130,

24  Acquisition of U.S. Citizenship by Birth Abroad to

25  U.S. Citizen Parent.

Plaintiffs' Partial Summary Judgment Exhibit A
Page 17

 1    BY MR. EDELMAN:

 2         Q    So what laws?

 3         A    The laws that govern the acquisition of

 4    citizenship at birth derived of a U.S. citizen

 5    parent when born abroad.

 6         Q    Okay.  And has the State Department's

 7    interpretation of what those laws require by way of

 8    a blood relationship been constant throughout the

 9    State Department's application of those laws?

10              MS. ANDRAPALLIYAL:  Objection.  Exceeds

11    the scope.

12         A    Can you be more specific?

13    BY MR. EDELMAN:

14         Q    Has the policy about what is considered a

15    blood relationship ever been reconsidered by the

16    State Department?

17              MS. ANDRAPALLIYAL:  Objection.  Exceeds

18    the scope.

19         A    As I mentioned, the context of a

20    gestational parent was added to the scope of blood

21    relationship, or biological relationship, by the

22    department in 2014, I believe it was.

23    BY MR. EDELMAN:

24         Q    So does that mean the State Department

25    for a period of time did not consider a gestational

Plaintiffs' Partial Summary Judgment Exhibit A
Page 18

1    purposes of adjudicating CRBAs?

2          A    Yes.

3          Q    What is that definition?

4          A    I will find it and read it for you.

5          Q    I just want you to answer the question.

6                MS. ANDRAPALLIYAL:  Can we go off the

7    record?

8                MR. EDELMAN:  No.  I would like an answer

9    to the question.

10                MS. ANDRAPALLIYAL:  This is not a memory

11    test.  He's allowed to consult --

12                MR. EDELMAN:  If the witness says he

13    doesn't know, then we'll show him something to

14    refresh his recollection.

15    BY MR. EDELMAN:

16          Q    Could you answer my question, please?

17          A    Could you -- what was your question

18    again?  I'm sorry.

19                MR. EDELMAN:  Could you read it back,

20    please?

21                THE REPORTER:  "Does the State Department

22    have a definition of the term "in wedlock" for

23    purposes of adjudicating CRBAs?"

24          A    Yes.

25    BY MR. EDELMAN:

Plaintiffs' Partial Summary Judgment Exhibit A
Page 19

CONFIDENTIAL - PROTECTIVE ORDER

PAUL PEEK - 12/20/2018                                    Page 171

1          Q   What is that definition?

2          A   If both biological parents -- if the two

3    biological parents are married, then the case would

4    be considered to be in wedlock.

5              (Plaintiffs' Exhibit Number 4 marked for

6    identification was introduced.)

7    BY MR. EDELMAN:

8          Q   Okay.  Now, let's put in front of you

9    Plaintiffs' Deposition Exhibit 4.  This has been

10   previously marked.  A copy for counsel.

11             Let me ask you if this is the document

12   for which -- that you had in mind?

13         A   Yes.

14         Q   Now, turn, please, to page 4.  So it's

15   page 4 of 7.  There's little page numbers at the

16   bottom.

17         A   Uh-hum.  Yes.

18         Q   Okay.  7 FAM 1140 appendix E, In wedlock

19   and out of wedlock.

20             Do you see that?

21         A   In wedlock and of wedlock.

22         Q   Of wedlock, I beg your pardon.  Sorry.

23             Now, is -- do you see (a), "The term

24   'birth in wedlock' has been consistently interpreted

25   to mean birth during the marriage of the biological

 1    parents to each other"?

 2         A    Yes.

 3         Q    Do you see that?

 4         A    Yes.

 5         Q    And (c), "To say a child was born 'in

 6    wedlock' means that the child's biological parents

 7    were married to each other at the time of the birth

 8    of the child."  Do you see that?

 9         A    Yes.

10         Q    Is that the definition you had in mind

11    when you were asking to consult any documentation?

12         A    Yes.

13         Q    Okay.  What's the basis for the State

14    Department's definition of "in wedlock" as embodied

15    in the material we just looked at?

16         A    Their interpretation of the Immigration

17    and Nationality Act.

18         Q    What in particular in the Immigration and

19    Nationality Act?

20         A    Section 301(g).

21         Q    Okay.  Now, if a married couple used

22    assisted reproduction technology to give birth to a

23    child during their marriage, does the State

24    Department consider that child to have been born in

25    wedlock?

CONFIDENTIAL - PROTECTIVE ORDER

1          A    It depends on the circumstances.

2          Q    Can you elaborate, please?

3          A    If both parents were -- if both parents

4    were the biological parents or gestational parent --

5    a combination of -- if they were both the biological

6    parents, which can include the gestational parent,

7    and were married to each other, then the birth would

8    be considered in wedlock.

9          Q    Okay.  Now, has it always been the case,

10   by the way, that the gestational parent was included

11   in that definition?

12         A    Not by policy, no.

13         Q    Has it been that -- always the case that

14   the gestational parent was included in that

15   definition by any other means, policy or otherwise?

16         A    As I said, I'm not certain of how any

17   individual case may have been adjudicated prior to

18   the implementation of the policy.

19         Q    Now -- so the policy -- am I

20   understanding you correct that if a married couple

21   used assisted reproduction technology to give birth

22   to a child during their marriage using a gestational

23   surrogate to carry the fetus, the State Department

24   now would consider that child to have been born in

25   wedlock?

Plaintiffs' Partial Summary Judgment Exhibit A
Page 22

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                    Page 174

1          A    If both of those parents were biological

2    parents of that child, yes.

3          Q    What do you mean by biological?

4          A    If both parents had contributed genetic

5    material.

6          Q    Okay.  What if the gestational surrogate

7    was not -- was one of the married -- one of the

8    spouses?

9          A    I'm sorry.  I don't understand your

10   question.

11         Q    So I want to distinguish two things.  The

12   situation where A and B are married and they go to C

13   to act as the surrogate --

14         A    Yes.

15         Q    -- and a situation where A and B are

16   married and the egg from A is implanted into B.

17         A    If an egg from A was implanted into B,

18   then both parents would be considered to be

19   biologically related.

20         Q    Okay.  So in that circumstance, the State

21   Department does not consider one to be a surrogate

22   even though the egg moved from A to B?

23         A    I believe that, medically, they would be

24   considered to be a surrogate, but they are also a

25   biological parent, which is more important to us for

Plaintiffs' Partial Summary Judgment Exhibit A
Page 23

CONFIDENTIAL - PROTECTIVE ORDER

PAUL PEEK - 12/20/2018                    Page 175

```
 1   adjudication of citizenship.
 2        Q   And that determination that they're a
 3   biological parent is just a policy determination by
 4   the State Department, correct?
 5        A   Correct.
 6        Q   Now, let's take a case where a married
 7   couple use assisted reproduction technology to give
 8   birth to a child during the marriage using a
 9   gestational surrogate to carry the fetus.  The child
10   is born outside the United States and only one of
11   the spouses is a U.S. citizen.  Do you have that in
12   mind?
13        A   Yes.
14        Q   Okay.  In that circumstance, would the
15   State Department recognize the child as a U.S.
16   citizen from birth?
17        A   It depends.
18        Q   Okay.  And what does it depend on?
19        A   Whether there was a biological
20   relationship between the child and the U.S. citizen
21   parent.
22        Q   Okay.  And what is the basis for the
23   State Department's position on that -- in that
24   scenario?
25        A   The department's interpretation of the
```

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                          Page 177

```
 1          A    To require which result?

 2          Q    The result that we just talked about,

 3     that in that circumstance that we've been talking

 4     about the State Department would consider the child

 5     to be a U.S. citizen at birth only if the U.S.

 6     citizen patent contributed genetic material to the

 7     child.

 8          A    If only one of the parents is

 9     biologically related to the child, we would be

10     looking at INA 309 which states that a blood

11     relationship is required.

12          Q    Okay.  And -- maybe we'll come to that in

13     a minute, but let's just flesh out the issues.

14               Let's say you have two men married to

15     each other.  Okay?

16          A    Yes.

17          Q    And they use sperm from one of them and

18     an egg from a donor to give birth to a child during

19     their marriage.  Is that child considered to be born

20     in wedlock?

21          A    If both parents did not contribute

22     genetic material, no.

23          Q    Okay.  In my scenario --

24          A    And if neither one of them was the

25     gestational parent, I apologize.
```

Plaintiffs' Partial Summary Judgment Exhibit A
Page 25

```
 1          Q   Well -- okay.  In my scenario we had one
 2    of the parents -- it was the sperm from one of the
 3    parents and a donor egg.  Okay?  In that
 4    circumstance would the child be considered to have
 5    been born in wedlock?
 6          A   The donor egg is from a third party.
 7          Q   Well, there's two men, so yes.
 8          A   The child would not be considered to be
 9    born in wedlock.
10          Q   And what's the basis for the State
11    Department's position?
12          A   The Immigration and Nationality Act.
13          Q   What in particular in the Immigration and
14    Nationality Act requires that result?
15          A   Well, we would be looking at 309 for out
16    of wedlock, because 301(g) addresses a child born of
17    parents, which the department has interpreted to
18    mean both parents -- a blood relationship to both
19    parents, a biological relationship to both parents.
20          Q   Okay.  Now, if the child was born -- two
21    men married to each other, child is born outside the
22    United States, and the spouse whose sperm was used
23    for the assisted reproduction technology is not a
24    U.S. citizen, would the State Department recognize
25    the child as a U.S. citizen at birth?
```

Plaintiffs' Partial Summary Judgment Exhibit A
Page 26

1       A    It depends.

2       Q    What does it depend on?

3       A    Whether the U.S. citizen parent also

4    contributed genetic material or was the gestational

5    parent.

6       Q    Okay.  So, again, I'm talking about two

7    men, sperm from one of them; that person not a U.S.

8    citizen.  Question:  Would the resulting child born

9    outside the United States be considered a U.S.

10   citizen at birth?

11      A    Let me elaborate on why I'm saying "it

12   depends" in my answer.

13      Q    Please.

14      A    Because one of the two men could be

15   someone whose has transitioned and is now a man but

16   is not always a man.  So could theoretically have

17   contributed genetic material or been the gestational

18   parent.

19      Q    Okay.  Let's simplify it and use a

20   situation where two men who were always men.  Okay?

21      A    Born male.

22      Q    Pardon?

23      A    Born male.

24      Q    Okay.  In that circumstance -- do you

25   have the rest of the scenario in mind?

Plaintiffs' Partial Summary Judgment Exhibit A
Page 27

```
 1        A    Sure.

 2             Q    Okay.  In that circumstance, would the

 3    State Department recognize the child as a U.S.

 4    citizen at birth?

 5             A    No.

 6             Q    Okay.  Would the State Department

 7    consider the child to have been born in wedlock to

 8    the married couple?

 9             A    No.

10             Q    What is the basis for the State

11    Department's position?

12             A    Again, the interpretation that

13    section 301(g) of the INA, when it uses the language

14    "born of parents," it is referring to a biological

15    relationship to both parents.

16             Q    Okay.  So -- and just to close that

17    circle, if you go back to Plaintiffs' Deposition

18    Exhibit 4, which probably is in front of you, 7 FAM

19    1140, appendix E on page 4 -- tell me if you're

20    there.  I know this gets confusing --

21             A    The whole thing is 7 FAM appendix E --

22    1140 appendix E.  Right.

23             Q    Okay.  And page 4.  We're in the in

24    wedlock and of wedlock.

25             A    Right.
```

1          Q    Okay.   Part (a), "The term 'birth in

2     wedlock' has consistently -- has been consistently

3     interpreted to mean birth during the marriage of the

4     biological parents to each other," correct?

5          A    Yes.

6          Q    And is that -- I'm trying to close off

7     this circle here.   Is that what you mean in your

8     last answer when you talk about the requirement that

9     the biological parents be married to each other?

10         A    Yes.

11              MR. EDELMAN:   Okay.   Now, let's mark

12    as -- yeah.   I'm going to mark -- I knew this would

13    happen.   I have now lost track of what number.   Are

14    we up to 15?   Okay.   So we're going to mark the

15    first document as 15 and the second document as 16.

16    And I'll hand copies to counsel in a moment.   15,

17    16.

18              THE WITNESS:   I'm sorry.   Since we're

19    between questions, can I just take a short break to

20    get some water?

21              MR. EDELMAN:   Yeah, by all means.   We

22    have got to go off the record first.

23              THE VIDEOGRAPHER:   We're going off the

24    record.   The time is 2:16 p.m.

25              (Discussion off the record.)

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                    Page 182

```
 1              (Plaintiffs' Deposition Exhibit

 2    Numbers 15 and 16 were marked for identification.)

 3              THE VIDEOGRAPHER:  We're back on the

 4    record.  The time is 2:17 p.m.

 5    BY MR. EDELMAN:

 6         Q   Okay.  So Mr. Peek, we've placed before

 7    you two documents.  One is Plaintiffs' Deposition

 8    Exhibit 15, which is a rescript of section 301 of

 9    the Immigration and Nationality Act of 1952, as

10    amended, 8 U.S.C. section 1401, and Plaintiffs'

11    Deposition Exhibit 16, which is a rescript of

12    section 309 of the INA, 8 U.S.C. 1409.

13              Let me direct your attention first to

14    section 301, so that's Plaintiffs' Deposition

15    Exhibit 15.

16         A   Uh-hum.  Yes.

17         Q   And take as long as you want or as short

18    as you need to orientate yourself, and then I'm

19    going to ask you a question.

20         A   Go ahead.

21         Q   Okay.  So just for the record, so we're

22    all singing from the same sheet, just point us,

23    please, to where in section 301 the words "in

24    wedlock" appear.

25         A   I do not see it.
```

Epiq Court Reporting Solutions - New York

Plaintiffs' Partial Summary Judgment Exhibit A
Page 30

CONFIDENTIAL - PROTECTIVE ORDER

PAUL PEEK - 12/20/2018                        Page 183

```
 1          Q   I don't understand.  Surely, it must be
 2    somewhere if the State Department says that this is
 3    a requirement of section 301.
 4              MS. ANDRAPALLIYAL:  Objection.
 5    Argumentative.
 6    BY MR. EDELMAN:
 7          Q   Is it not in the statute?
 8          A   I don't see it in the statute.
 9          Q   Okay.  So -- again, so we're talking
10    about the same thing, just show us where in 301 the
11    words "blood relation" appear?
12          A   The words "blood relationship" do not
13    appear in 301.
14          Q   So other than the FAM, what is the source
15    of the State Department policy that requires a blood
16    relationship, as we looked at for purposes of the
17    definition of "in wedlock" as setout in Plaintiffs'
18    Deposition Exhibit 4?
19          A   I would have to look at the FAM to see
20    what that -- the background is.
21          Q   Well, is that something you were prepared
22    to address in connection with your testimony here
23    today?
24          A   I've reviewed the FAM, yes.
25          Q   And so other than the FAM, are there any
```

CONFIDENTIAL - PROTECTIVE ORDER

PAUL PEEK - 12/20/2018                          Page 186

```
 1          A    Affecting INA -- the interpretation of

 2    INA 301(g)?

 3          Q    Yes.

 4          A    Correct.  Can I go back to one other

 5    point?  I believe you asked what is the statuary

 6    authority that leads the department to interpret

 7    301(g) as requiring wedlock?

 8          Q    I don't think I asked that question but

 9    let's ask that.  Okay?  And what is it you wanted to

10    tell us about that?

11          A    That the fact that 309 specifies out of

12    wedlock implies that 301 is within wedlock, meaning

13    the fact that the law in this other area calls out

14    an out-of-wedlock birth.

15          Q    Okay.  I'll tell you what.  Let's do it

16    this way.  In the State Department's view, what

17    provision of the INA would apply to an application

18    for a CRBA by a married couple for a child born

19    during their marriage by means of assisted

20    reproduction technology using a surrogate to carry a

21    fetus?

22          A    It depends on if -- whether one or both

23    of the parents contributed genetic material to that

24    child.

25          Q    Okay.  Tell us in each case.  You say it
```

 1   always been male?

 2          Q    Yes.   Unless I specify otherwise, that's

 3   always the premise of the scenarios.

 4          A    Okay.   I will go with that premise going

 5   forward.   Can you repeat your question?

 6          Q    Yes.   Application for a CRBA.   Two men

 7   married to each other.   They apply on behalf of a

 8   child born outside the U.S. during their marriage.

 9   The child was born using the sperm from one of them

10   and the egg from a donor.   Okay.   That's the

11   scenario.   Do you have that in mind?

12          A    Yes.

13          Q    And the question is what provision of the

14   INA would apply to that application?

15          A    Section 309.

16          Q    Okay.   And what's the basis for the State

17   Department's position?

18          A    As I said before, 301 -- the language of

19   301 has been interpreted to mean born of parents --

20   has been interpreted to mean born of two biological

21   parents.

22          Q    Okay.   Now, other than the FAM, what, if

23   any, sources -- any sources -- require the State

24   Department to take the position that it should apply

25   section 309 and not 301(g) of the INA to an

Plaintiffs' Partial Summary Judgment Exhibit A
Page 33

1        A    Correct.

2        Q    There is no similar reference there to a

3   blood relationship, correct?

4        A    The term "blood relationship" is not

5   present in 301.

6        Q    Okay.  So would you agree with me that

7   Congress saw fit to include the term "blood

8   relationship" in 309?

9        A    Yes.

10        Q    And saw fit not to include it in

11   section 301(g) --

12        A    Yes.

13        Q    -- or 301, correct?

14        A    Correct.

15        Q    Okay.  Now, what is the State

16   Department's understanding of the fact that the

17   words "blood relationship" appear in section 309 but

18   not in section 301?

19             MS. ANDRAPALLIYAL:  Objection.  It calls

20   for a legal conclusion.

21             MR. EDELMAN:  It calls for the position

22   of the State Department.

23        A    I'm sorry.  Can you restate the question?

24   BY MR. EDELMAN:

25        Q    Yes.  We've agreed, correct, that the

Plaintiffs' Partial Summary Judgment Exhibit A
Page 34

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                        Page 201

```
 1    would be the appropriate...

 2          Q    All right.   Now, if two individuals who

 3    were born men and are still men are married to each

 4    other, would you agree that they cannot both be

 5    biological parents of the same child?

 6          A    Correct.

 7          Q    Okay.   So under the State Department's

 8    policy, am I correct in understanding that two men

 9    who are married to each other can never have a child

10    whom the State Department would consider to be born

11    in wedlock?

12          A    Assuming they have both been men their

13    entire lives, that's correct.

14          Q    Okay.   Even though they're legally

15    married, correct?

16          A    Correct.

17          Q    And even though the child is born into

18    their family during their marriage?

19          A    Correct.

20          Q    Okay.   And that is because of the way

21    that the State Department interprets the INA,

22    correct?

23          A    Correct.

24          Q    Okay.   Now, are there circumstances in

25    which the State Department considers children of
```

Plaintiffs' Partial Summary Judgment Exhibit A
Page 35

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018

Page 211

```
 1    BY MR. EDELMAN:

 2         Q   Okay.  Are you familiar with the

 3    legitimation laws of any country of the world?

 4              MS. ANDRAPALLIYAL:  Objection.  Exceeds

 5    the scope.

 6         A   Off the top of my head?

 7    BY MR. EDELMAN:

 8         Q   Are you familiar with the legitimation

 9    laws of any country?  It's a yes or no question.

10         A   Am I familiar with -- go ahead and repeat

11    it.

12         Q   Are you familiar with the legitimation

13    laws of any country?

14         A   Yes.

15         Q   What laws are you familiar with?

16         A   The United States.

17         Q   And what do those laws provide?

18         A   It depends if the child -- I -- I guess I

19    don't know off the top of my head.  I wouldn't be

20    able to --

21         Q   Okay.

22         A   -- spout off the law.

23         Q   I'm not going to fence with you.  Isn't

24    it true that notwithstanding your efforts to

25    advocate to the contrary, the State Department's
```

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                              Page 212

```
 1    position is that when two nontransgender men who are

 2    married to each other have a child using assisted

 3    reproduction technology and that child is born

 4    outside the United States, the government of the

 5    United States tells those men their child is not

 6    legitimate unless some action happens down the line

 7    to change the status of that child to legitimate?

 8                MS. ANDRAPALLIYAL:  Okay.

 9    Mischaracterizes testimony.

10    BY MR. EDELMAN:

11          Q   Yes or no?

12          A   No.

13          Q   It's not true?

14          A   I do not agree with that statement.

15          Q   And why do you disagree with that

16    statement?

17          A   Again, I refer you to section 4(c).  The

18    law of the applicant's country of birth may deem

19    them legitimate and the United States would honor

20    that.

21          Q   Okay.  I'll amend my question to say

22    absent the possibility that some law would recognize

23    the child as legitimate, the State Department

24    doesn't recognize the child as legitimate, yes or

25    no?
```

Epiq Court Reporting Solutions - New York
1-800-325-3376                              www.deposition.com

Epiq Court Reporting Solutions - New York
1-800-325-3376                              www.deposition.com

Plaintiffs' Partial Summary Judgment Exhibit A
Page 37

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                        Page 213

1          A    Absent the law of where the country --

2    absent the laws of the country of the birth -- the

3    State Department would follow the laws of the

4    country of birth --

5          Q    We're going to do this --

6          A    -- for legitimation.

7          Q    -- all day until we get an answer to this

8    question.

9               MR. EDELMAN:  Please read back the

10   question.

11              MS. ANDRAPALLIYAL:  Objection.

12   Argumentative.

13              THE REPORTER:  "I'll amend my question to

14   say absent the possibility that some law would

15   recognize the child as legitimate, the State

16   Department doesn't recognize the child as

17   legitimate, yes or no?"

18              THE WITNESS:  Could you read it again one

19   more time?  I'm sorry.

20              THE REPORTER:  "I'll amend my question to

21   say absent the possibility that some law would

22   recognize the child as legitimate, the State

23   Department doesn't recognize the child as

24   legitimate, yes or no?"

25          A    Yes.

```
 1          A    It looks like a cable, an incomplete
 2    cable but -- yeah.
 3          Q    Meaning a cable disseminated within the
 4    State Department?
 5          A    Correct.
 6          Q    Okay.  Focusing on the first sentence of
 7    text of Plaintiffs' Deposition Exhibit 18, read
 8    along with me, please, and make sure I do this
 9    properly, "There has been a recent policy change
10    related to children born abroad through assisted
11    reproductive technology (ART)."
12               Did I read that correctly?
13          A    Yes.
14          Q    "The previous policy required that a
15    mother have a genetic connection to a child in order
16    to qualify as a parent for the purpose of obtaining
17    immigration benefits."  Did I read that correctly?
18          A    Yes.
19          Q    "Under the new policy, birth mothers
20    (gestational mothers) who are also the legal parent
21    of the child will be treated the same as genetic
22    mothers for the purposes of immigration benefits."
23               Do you see that?
24          A    Correct.  Yes.
25          Q    Okay.  So would you agree with me that
```

1    Plaintiffs' Deposition Exhibit 18 indicates that the

2    State Department changed the policy with respect to

3    whether gestational mothers were considered to have

4    a blood relationship for purposes of the INA, in

5    particular, section 301 of the INA?

6         A    Based on the fact that it says there's

7    been a recent policy change, I would agree with that

8    statement.

9              MR. EDELMAN:  Okay.  Now, let's mark as

10   Plaintiffs' Deposition Exhibit 19 the document you

11   were referring us to in the binder so we can talk

12   about that.  So if you would be so kind as to give

13   that document to the reporter so the reporter can

14   apply the appropriate exhibit sticker, we can go

15   from there.

16             (Plaintiffs' Deposition Exhibit Number 19

17   was marked for identification.)

18             MR. EDELMAN:  Let me just use yours for a

19   moment, please, sir, so I can identify it properly.

20             So the reporter has marked a three-page

21   document bearing production numbers DEFS001382

22   through 1384.  I'm placing that document back before

23   the witness.

24   BY MR. EDELMAN:

25        Q    And ask you, Mr. Peek, please can you

```
 1    I could get your question I was answering at the

 2    time I started looking for this.

 3         Q    The question, I believe, though I don't

 4    represent to you that it was said exactly this way,

 5    was how does the State Department know that USCIS

 6    interprets section 301 of the INA to require a blood

 7    relationship between the child and a U.S. citizen

 8    parent?

 9         A    I'm just going to start reading the third

10    paragraph on the first page:  CA and L -- which

11    refers to the Bureau of Consular Affairs and the

12    department's legal department -- in consultation

13    with DHS -- the Department of Homeland Security --

14    have been studying whether we can interpret the INA

15    to allow U.S. citizen parents to transmit U.S.

16    citizenship to their children born abroad through

17    ART in a broader range of circumstances, and in

18    other circumstances, amend visa requirements for

19    such children.  Related to this, we are considering

20    how this would impact children born through ART

21    overseas to same-sex couples.  Because we regularly

22    encounter people seeking to document children who

23    are not theirs, we use DNA testing to verify

24    parentage.

25         Q    Okay.  Now, just explain, if you will,
```

1    you see that?

2          A    Yes.

3          Q    Now, what consideration occurred with

4    respect to this issue?

5          A    Consideration of the various scenarios

6    and how the broadening of the definition to include

7    gestational parents would affect same-sex couples.

8          Q    But in particular what was the

9    consideration or was there a proposal to make a

10   change?

11              MS. ANDRAPALLIYAL:  Objection.  Exceeds

12   the scope.

13              MR. EDELMAN:  The witness opened the

14   door, Counsel.

15         A    Could you repeat your question?

16   BY MR. EDELMAN:

17         Q    Yes.  What specific consideration was the

18   State Department giving to assist you?

19         A    What specific consideration was the State

20   Department --

21         Q    It says, "We are considering how this

22   would impact children born through ART overseas to

23   same-sex couples."

24              So I'm asking you to describe the

25   consideration that was given.

Plaintiffs' Partial Summary Judgment Exhibit A
Page 42

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                    Page 225

1        A    The consideration would have included the

2   impact of a change on various scenarios affecting

3   same-sex couples.

4        Q    What scenarios in particular?

5             MS. ANDRAPALLIYAL:  Objection.  Exceeds

6   the scope.

7        A    The universe of scenarios that could have

8   taken place.

9   BY MR. EDELMAN:

10       Q    Okay.  And one of them would be to read

11   section 301 -- by "read" I mean the State

12   Department -- for the State Department to read 301

13   as including the children born through assisted

14   reproductive technology to same-sex couples as

15   citizens at birth under section 301, correct?

16       A    Correct.

17       Q    Okay.  And what happened with respect to

18   that consideration?

19             MS. ANDRAPALLIYAL:  Objection.  Exceeds

20   the scope of the deposition.

21       A    I'm sorry.  Can you repeat the question?

22   BY MR. EDELMAN:

23       Q    Yes.  What happened with respect to that

24   consideration?

25       A    What happened -- can you be more

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                        Page 228

1    how it interprets the biological relationship

2    requirement of its policy as it relates to children

3    born through assisted reproductive technology

4    overseas to same-sex couples?

5         A    The department did.

6         Q    Did?

7         A    Well -- I'm sorry.  Could you repeat your

8    question?

9              MR. EDELMAN:  Why don't we read it back?

10             THE REPORTER:  "So am I correct in my

11   understanding that the State Department did not

12   change its policy with respect to how it interprets

13   the biological relationship requirement of its

14   policy as it relates to children born through

15   assisted reproductive technology overseas to

16   same-sex couples?"

17             THE WITNESS:  I'm sorry -- could you read

18   that one more time?  I'm sorry.

19   BY MR. EDELMAN:

20        Q    Here.  Let me see if I can make this

21   easier.  So aside from the gestational parent issue,

22   okay, did the State Department change its

23   interpretation of when a biological relationship

24   between a child and a U.S. citizen parent is

25   required for purposes of citizenship at birth?

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                    Page 229

 1          A   Can you be more specific?  Can I get a
 2    time period?
 3          Q   Well, in the time period we're talking
 4    about in Exhibit 19, which is, say, 2012 through
 5    2014.
 6          A   I just want to make sure I'm accurate in
 7    my answer.  Aside from the gestational mother's
 8    policy, no.
 9          Q   Okay.  Now, flip the page, please, so
10    that -- we're still in Exhibit 19.  About six lines
11    up from the end --
12          A   I'm sorry.  Give me a moment to find what
13    I did with Exhibit 19.
14          Q   Nobody told you that there's a lot of
15    document management work in these depositions.
16          A   I'm just not sure where I put the piece
17    of paper.
18          Q   It should have a sticker on it.
19          A   Yeah, I'm looking for that.
20          Q   It looks like this (indicating).
21          A   I just don't know what I did with 19.
22              I have it.  I'm sorry.
23          Q   So turn the page.
24          A   Uh-hum.
25          Q   Okay.  Now --

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                          Page 242

```
 1              MR. EDELMAN:  Let's just do this for the
 2   record.  We've just marked as Plaintiffs' Exhibit 20
 3   a multipage document bearing production numbers
 4   DEFS000650 through 52, which has an MRN number of
 5   14 STATE 10952 dated January 31, 2014.
 6        A   I'm sorry.  If you don't mind, I'll note
 7   that on your Exhibit 18, that same 10952 number is
 8   at the top of yours, but as you can see, yours is an
 9   incomplete version.
10        Q   Okay.  Let's just do as much as we can,
11   and this is question and answer, so that the record
12   will be clear.
13        A   I apologize.
14        Q   You can keep that in front of you, but my
15   question was really referring to Exhibit 15.  Okay?
16        A   Yes.
17        Q   And to answer my question, we have to
18   look -- we can look at Exhibit 20 for a minute to
19   say we've agreed already the State Department
20   changed the policy as it relates to gestational
21   mothers, correct?
22        A   Correct.  And that --
23        Q   Okay.
24        A   -- means I misstated my earlier
25   testimony.
```

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                    Page 243

1         Q   Okay.  Now, prior to or leading up to

2    that policy change, was there an amendment to

3    section 301?

4         A   No.

5         Q   Okay.  So the State Department just

6    changed its interpretation, correct?

7              MS. ANDRAPALLIYAL:  Objection.  Exceeds

8    the scope.

9         A   I would say it's incorrect to say that

10   the department changed its interpretation of 301(g).

11   BY MR. EDELMAN:

12        Q   Well, what would you say happened?

13        A   We expanded the scope of what was

14   allowable under 301(g).

15        Q   Well, something previously wasn't

16   allowable and then it was, correct?

17        A   Correct.

18        Q   Okay.  So the State Department changed

19   its mind, right?

20        A   Yes.

21        Q   Okay.  All right.  Now, would you agree

22   with me that the FAM is an internal State Department

23   document?

24        A   Much of it is internal.  There are

25   sections of it that are available in the public

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                    Page 244

 1    domain.

 2            Q    Is it subject to approval by any

 3    individual or entity outside the State Department?

 4            A    No.

 5            Q    Is it subject to congressional approval?

 6            A    No.

 7            Q    Are any provisions of the State

 8    Department subject to public notice and comment?

 9                 MS. ANDRAPALLIYAL:  Objection.  Exceeds

10    the scope.

11                 MR. EDELMAN:  I'm sorry.

12    BY MR. EDELMAN:

13            Q    The provisions of the FAM -- are any

14    provisions of the FAM subject to public notice and

15    comment?

16                 MS. ANDRAPALLIYAL:  Objection.  Exceeds

17    the scope.  Calls for a legal conclusion.

18            A    No.  I can't think of one.

19    BY MR. EDELMAN:

20            Q    Okay.  Would you agree with me that the

21    FAM does not have the force of law?

22                 MS. ANDRAPALLIYAL:  Objection.  Calls for

23    a legal conclusion.  Exceeds the scope.

24            A    The FAM is guidance.  I do not believe it

25    has the force of the law.

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                    Page 245

```
 1   BY MR. EDELMAN:

 2         Q   Okay.  All right.  Now, you, I believe,

 3   testified earlier -- and I'm asking you is it

 4   correct -- that the principal consideration that the

 5   State Department brings to bear in interpreting the

 6   INA is a desire to be compliant with law; is that

 7   correct?

 8         A   Correct.

 9         Q   Now, would you agree that the State

10   Department's requirement that there be a biological

11   relationship between a married U.S. citizen parent

12   and a child born outside the United States for

13   purposes of recognizing U.S. citizenship at birth --

14   would you agree that that requirement is

15   inconsistent with rulings by various federal

16   appellate courts?

17               MS. ANDRAPALLIYAL:  Objection.  Exceeds

18   the scope.

19         A   I believe that it is, yes.

20   BY MR. EDELMAN:

21         Q   Okay.  So help us understand how --

22         A   Can I clarify?

23         Q   Yes.  Of course.

24         A   I'm not sure if it's appellate courts.  I

25   can look at my documents and see if I have an
```

```
 1   formalities.

 2              (Plaintiffs' Deposition Exhibit Number 21

 3   was marked for identification.)

 4              MR. EDELMAN:  We have now marked as

 5   Plaintiffs' Deposition Exhibit 21 a two-page

 6   document bearing production numbers DEFS001431

 7   through 32.  And I'm going to put that back in front

 8   of the witness.

 9   BY MR. EDELMAN:

10       Q   Mr. Peek, do you now have Plaintiffs'

11   Deposition Exhibit 21 in front of you?

12       A   Yes.

13       Q   And could you please identify what that

14   is for the record?

15       A   It is a cable from the Secretary of

16   State, via others, to a post answering a question

17   about adjudication of a citizen -- a citizenship

18   adjudication question.

19       Q   Okay.  Now, I had asked you about three

20   federal court decisions, and you wanted to refer us

21   to Exhibit 21 in responding to those, so please go

22   ahead.

23       A   Starting with paragraph 5 of this cable,

24   "U.S. citizenship is transmitted from father to

25   child only when a blood relationship is established.
```

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                    Page 249

```
 1   That the INA requires a blood relationship is
 2   evidenced in the provisions that require both the
 3   establishment of biological paternity and a legal
 4   relationship for children born out of wedlock to
 5   U.S. citizen fathers, INA section 309."
 6           "Mr." -- redacted on my copy -- "also
 7   points to the U.S. Court of Appeals for the 9th
 8   Circuit recent opinion in Solis versus Espinoza
 9   versus" -- I'm sorry -- "Solis-Espinoza v. Gonzalez
10   and argues that this case should be persuasive in
11   the department's adjudication of the children's
12   claim.  As a court of limited geographic
13   jurisdiction, decisions of the 9th Circuit are not
14   binding upon the department's adjudication in
15   New Jersey or Mexico."
16           Q    Okay.  So my question to you was would
17   you agree that the State Department's interpretation
18   is inconsistent with those decisions?
19           A    It sounds like it's inconsistent with
20   this decision, yes.
21           Q    Okay.  What about the other two?
22           A    Let me see if I have the documentation of
23   the other two.  I don't know -- I don't know that I
24   have any documentation of the other two
25   specifically.
```

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                    Page 250

1          Q    Okay.  Well, let's make sure this is as

2    clear as we can make it, in fairness to you.

3              So the question I asked, in its

4    completeness, is would you agree that the State

5    Department's requirement that it -- through its

6    interpretation of section 301 of the INA, that there

7    be a biological relationship between a married U.S.

8    citizen parent and his child born outside the U.S.

9    in order to recognize that the child acquired U.S.

10   citizenship at birth, that that interpretation is

11   inconsistent with the decisions that we looked at in

12   Plaintiffs' Deposition Exhibit 10?

13             MS. ANDRAPALLIYAL:   Objection.  Calls for

14   a legal conclusion.

15          A   I believe that is the case.

16   BY MR. EDELMAN:

17          Q   Okay.  Now, should I understand your

18   reference to paragraph 6 in Exhibit 21 as suggesting

19   that the State Department's view is, notwithstanding

20   the inconsistency, it just doesn't believe it has to

21   follow those decisions?

22          A   Again, the department has a worldwide

23   scope and are consistent regardless of geographic

24   location in our application of the INA.

25          Q   So wouldn't the answer to my question be

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                    Page 251

```
 1   yes?

 2        A    Could you ask your question again?

 3             MR. EDELMAN:  Please read it back.

 4             THE REPORTER:  Should I understand your

 5   reference to paragraph 6 in Exhibit 21 as suggesting

 6   that the State Department's view is, notwithstanding

 7   the inconsistency, that it just doesn't believe it

 8   has to follow those decisions?

 9        A    Yes.

10   BY MR. EDELMAN:

11        Q    Okay.  Now, let's go back to the

12   paragraph we were looking at on page 7 of

13   Defendant's Exhibit 10 -- I'm sorry.  Plaintiffs'

14   Deposition Exhibit 10.

15        A    I'm sorry.  What page?

16        Q    Page 7.

17        A    Page 7, paragraph 7.

18        Q    Right.  Now, let's look -- right.  Let's

19   look at lines 23 and 24.

20        A    Uh-hum.

21        Q    So we'll take them one at a time.

22   There's a decision there, Pavan versus Smith, which

23   is a United States Supreme Court decision from 2017.

24   Do you see the reference there?

25        A    Yes.
```

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                      Page 260

```
 1         A   Yes.

 2         Q   Okay.  And is it fair to say with a

 3   little more specificity that the only reason the

 4   State Department denied E.J.'s application was

 5   because he did not share a biological relationship

 6   with his U.S. citizen parent --

 7         A   Correct.

 8         Q   -- Andrew?

 9         A   Correct.  I'm sorry.

10         Q   Okay.  All right.  Now, let's just put

11   some context around this to make sure we're on the

12   same page.

13             Does the State Department agree that

14   Andrew and Elad, the spouses, that they were validly

15   married?

16         A   Yes.

17         Q   Okay.  And does the State Department

18   agree that Andrew and Elad were validly married at

19   the time of E.J.'s birth?

20         A   Yes.

21         Q   Let's make sure we have commonality on

22   some other things.

23             Does the State Department agree that

24   Andrew and Elad are identified as E.J.'s parents on

25   E.J.'s birth certificate?
```

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                    Page 261

1          A    That's correct.

2          Q    And does the State Department agree that

3    no one other than Andrew and Elad has asserted

4    parental rights with respect to E.J.?

5          A    Correct.

6          Q    So does the State Department agree -- I

7    just want to make sure it's clear so we're talking

8    about the same thing.  Does the State Department

9    agree that only Andrew and Elad are considered to be

10   E.J.'s parents?

11              MS. ANDRAPALLIYAL:  Objection.  Exceeds

12   the scope.

13         A    I'm sorry.  Could you restate your

14   question?  I'm sorry.

15   BY MR. EDELMAN:

16         Q    Does the State Department agree that only

17   Andrew and Elad are considered to be E.J.'s parents?

18         A    His legal parents, yes.

19         Q    Okay.  And should I understand your last

20   answer as recognition that Andrew and Elad used a

21   gestational surrogate to carry E.J. and his twin

22   brother?

23         A    Yes.

24         Q    Okay.  And are you aware that Andrew and

25   Elad had a written contract, agreement, with the

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                    Page 268

```
 1         A   The legal parent, yes.
 2         Q   Okay.  And does the State Department
 3   consider Andrew to be E.J.'s parent at birth under
 4   Ontario law?
 5         A   His legal parent at birth, yes.
 6         Q   Okay.  And you referred earlier today to
 7   a court order, correct?
 8         A   Yes.
 9         Q   Okay.  So let me show you a document and
10   make sure we're talking about the same thing.
11         A   Sure.
12         Q   So in Exhibit 5, which you have open in
13   front of you --
14         A   Okay.
15         Q   -- if you go to the page -- and we're
16   looking now at the top stamped page numbers --
17   ending dash 1768 and 1769.  Tell me when you have
18   that.
19         A   I do.  Can I just take one more question
20   before we break?
21         Q   Yes.  Again, we'll accommodate whatever
22   your schedule is.  If you want to break right now,
23   we can do that.
24         A   You can ask your question; then I would
25   like to take a break.
```

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                    Page 271

```
 1   the scope.

 2         A   I don't know.

 3   BY MR. EDELMAN:

 4         Q   Okay.  Did you -- in your communications

 5   with Ms. Day or anyone else in preparation for

 6   today's deposition, did you discuss the

 7   circumstances of what transpired during the

 8   application and interview process for E.J.'s

 9   application for a CRBA?

10         A   Yes.

11         Q   And did that issue come up?

12         A   Which issue?

13         Q   Of where E.J. was at the time of the

14   issuance of this order.

15         A   I do not recall it.

16         Q   Okay.  So let's see if we can streamline

17   some of this, given the hour.  I just want to ask

18   you a bunch of propositions and see if that is the

19   State Department's position.

20             So is it the State Department's position

21   that E.J. was born out of wedlock?

22         A   Yes.

23         Q   And is it the State Department's position

24   that A.J., E.J.'s twin, was born out of wedlock?

25             MS. ANDRAPALLIYAL:  Objection.  Exceeds
```

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                    Page 273

```
 1        A    -- shouldn't have done that.
 2             Q    So now we're talking about the State
 3    Department's adjudication of the applications for
 4    E.J. for a U.S. passport and a CRBA.  Okay?  In
 5    connection with those adjudications, did the State
 6    Department apply the criteria of section 309?
 7        A    Yes.
 8             Q    And just for the record, why did the
 9    State Department determine that those were the right
10    criteria to apply?
11        A    The State Department determined that INA
12    309 was the correct statute to apply because both of
13    the parents did not have a biological connection --
14        Q    Okay.
15        A    -- to the child.
16        Q    Now, just so there's no confusion on this
17    point down the line, is it the State Department's
18    position that the adjudication by the consular
19    officer of E.J.'s applications was correct?
20        A    Yes.
21        Q    Okay.  And some other things just to make
22    sure, you know, where we're on the same page and
23    where we're not.
24             Does the State Department dispute that
25    Andrew, the father, is a U.S. citizen?
```

```
 1          A    No.

 2          Q    Okay.  Is -- does the State Department

 3   agree that Andrew Dvash-Banks sufficiently

 4   demonstrated to the Toronto consulate that he met

 5   the residency requirements of section 301?

 6          A    I believe that he did, yes.

 7          Q    Okay.  And if I were to ask you questions

 8   about the adjudication of A.J., would you say that

 9   you haven't reviewed them?

10          A    Yes.

11          Q    Okay.  So is it the State Department's

12   position that Andrew could not have a child born in

13   wedlock under the INA if he and another man are

14   listed as the parents on the child's birth

15   certificate?

16          A    If the context of your question is the

17   same as it was earlier, that two men who have

18   been --

19          Q    Yes.

20          A    -- male their entire lives --

21          Q    Right.

22          A    -- that is correct.

23          Q    Correct.  My bad.  I should have made

24   that clear.  Yes.  So putting aside the possibility

25   of a transgender male -- man.  So is it the State
```

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                              Page 275

1    Department's position, assuming there is nobody in

2    the picture who is a transgender man, that Andrew

3    Dvash-Banks could never have a child born in wedlock

4    under the INA if he and another man are listed as

5    the parents on a child's birth certificate?

6         A    Correct.

7         Q    Okay.  So I want to focus you now on the

8    State Department's position, if you will, of what

9    transpired in the application and interview process.

10   Okay?

11        A    Okay.

12        Q    And, first, what are the sources of your

13   information on that subject?

14        A    The application itself and the attached

15   documents, a discussion that I had with Terri Day,

16   and the transcripts of -- I'm sorry.  I'm forgetting

17   her name.  The woman who was at the next window, her

18   deposition.  Marybeth, Mary --

19        Q    Margaret?

20        A    Margaret.

21        Q    Ramsay.

22        A    Yes.  I'm sorry.

23        Q    So some questions, then, about all this.

24   Did Ms. Day ask the Dvash-Banks family how -- in

25   particular, Andrew and Elad -- how they created the

CONFIDENTIAL - PROTECTIVE ORDER

PAUL PEEK - 12/20/2018                    Page 296

```
 1    that I have not actually seen this before.
 2            Q    Okay.  Do you know what this document is?
 3    I want to just -- I want to be respectful of your
 4    time and not keep you going --
 5            A    Sure.  Would you rather -- do you want me
 6    to focus on the document or --
 7            Q    I would rather you --
 8            A    -- focus on reviewing --
 9            Q    -- focus on the document.
10            A    Okay.
11            Q    Do you know what this document is?
12            A    Give me just a moment to read it.  Yes.
13            Q    What is this document?
14            A    It's a letter from the consulate in
15    Toronto to the applicant -- to Andrew Dvash-Banks
16    advising of the procedure for undergoing DNA testing
17    should he wish to do so.
18            Q    Okay.  Now, it says in the third
19    paragraph that -- three lines down or two lines down
20    in the third paragraph, "The Immigration and
21    Nationality Act (INA) of 1952, as amended, requires,
22    among other things, proof of a blood relationship
23    between the child and the U.S. citizen parent,"
24    correct?
25            A    That's what it says, yes.
```

Plaintiffs' Partial Summary Judgment Exhibit A
Page 61

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                    Page 297

1          Q   And that is the position of the State

2     Department, correct?

3          A   Correct.

4          Q   But that does not purport to be a

5     quotation from the INA, right?

6          A   Correct.

7          Q   Okay.  Now, do consular officers ask all

8     same-sex couples with children born outside the

9     United States to get DNA testing?

10         A   No.

11         Q   So, again, is it just up to the

12    discretion of the consular officer?

13         A   Correct.

14         Q   I believe -- let's do this.  Do you have

15    this?

16             MR. EDELMAN:  Just so we're closing out

17    the discussion of what happened with respect to the

18    Dvash-Banks' application, I'm going to put before

19    you Plaintiffs' Deposition Exhibit 1.  Here is a

20    copy for counsel.

21             (Plaintiffs' Exhibit Number 1 marked for

22    identification was introduced.)

23    BY MR. EDELMAN:

24         Q   Again, I don't think you need to hunt

25    through your book because it's -- we'll just see

CONFIDENTIAL - PROTECTIVE ORDER

PAUL PEEK - 12/20/2018                          Page 298

1    if -- have you seen this before?  And if you don't

2    immediately -- if it doesn't immediately trigger a

3    recollection, we can just deal with it.

4            A    Yes, I have seen this before.

5            Q    Okay.  And when did you see it for the

6    first time?

7            A    In preparation for this deposition.

8            Q    Okay.  Do you know what this is?

9            A    Yes.

10           Q    What is it?

11           A    It is what we call a denial letter.

12           Q    And denial of what?

13           A    In this instance, it is the denial of

14   consular report of birth abroad and passport

15   application for the child.

16           Q    Okay.  And did the State Department, in

17   fact, conclude that -- did, in fact, deny E.J.'s

18   application for CRBA?

19           A    Correct.

20           Q    And did it do so on the basis that it

21   concluded E.J. was not biologically related to his

22   U.S. citizen parent?

23           A    I'm sorry.  Could you restate that?

24           Q    Did the State Department deny the

25   application because it concluded that there was no

Plaintiffs' Partial Summary Judgment Exhibit A
Page 63

1    evidence that E.J. was biologically related to the

2    U.S. citizen parent?

3          A    Yes.

4          Q    Okay.  And that was the sole reason for

5    the denial, correct?

6          A    Correct.

7          Q    Okay.  Now, did the State Department

8    conclude that E.J. had been born out of wedlock?

9          A    Yes.

10          Q    Did the State Department ever believe

11    that E.J. had been born in wedlock?

12          A    I believe that Ms. Day made a case note

13    to that effect at the beginning of the process, but

14    I think she later -- later -- she left the case note

15    in but later determined that was not the case.

16          Q    All right.  Let's just mark the case note

17    so that we're not speaking in the abstract.

18                MR. EDELMAN:  This will be Plaintiffs'

19    Deposition Exhibit 26.  Oh, I'm sorry.  I beg your

20    pardon.  It's already marked as Plaintiffs'

21    Exhibit 6, at least Jessica points out, so no reason

22    to create more confusion and mark it twice.

23                (Plaintiffs' Exhibit Number 6 marked for

24    identification was introduced.)

25    BY MR. EDELMAN:

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                    Page 315

```
 1    between the U.S. citizen and the child?

 2            Q    I thought you said earlier --

 3            A    I'm sorry.  Go ahead.

 4            Q    No.  Go ahead.

 5            A    I shouldn't be speaking in absolute.

 6    Where -- it may happen in every case where the

 7    officer is not sure that the blood relationship

 8    between -- the biological relationship between the

 9    U.S. citizen and the child had been established.

10            Q    Does the State Department actually track

11    how frequently applicants are asked to undergo DNA

12    testing?

13            A    No.

14            Q    So on what basis did the State Department

15    conclude that it's common to ask them to do so?

16            A    It would be -- I guess we're parsing out

17    the definition of common because, in the universe of

18    20 million passport applications annually, it is

19    certainly uncommon.  In the much smaller subset of

20    people who are trying to establish U.S. citizenship

21    based on a birth abroad due to assisted reproductive

22    technology, it is much more common.

23            Q    Okay.  Would you agree with me that at

24    the time that Mr. Hernandez sent Plaintiffs'

25    Deposition Exhibit 27, he actually had no idea how
```

Plaintiffs' Partial Summary Judgment Exhibit A
Page 65

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                          Page 317

 1   please?

 2              THE REPORTER:  "But should I understand

 3   you still to be saying that the State Department's

 4   view that the requirements for establishing the

 5   blood relationship between a U.S. citizen parent and

 6   a child born outside the United States is not tied

 7   really in any way to concern about fraud?"

 8              A    Correct.

 9   BY MR. EDELMAN:

10         Q    Okay.  Now, look, please, at the next

11   paragraph -- the last part of that paragraph -- "He

12   may also wish to consider applying for certificate

13   of citizenship directly from USCIS."

14              Do you see that?

15         A    Yes.

16         Q    Do you know why Mr. Hernandez included

17   that suggestion in Plaintiffs' Deposition

18   Exhibit 27?

19         A    Because the child may also have a claim

20   under another section of INA, such as 320, that does

21   not require a biological relationship.

22         Q    At the time that the State Department

23   sent Plaintiffs' Exhibit 27, did the State

24   Department have an expectation that if the

25   Dvash-Banks family submitted an application for a

```
 1         Q    Does the State Department provide

 2   training regarding any -- specifically with

 3   reference to applications for U.S. passports or

 4   CRBAs by same-sex couples?

 5              You know what?  Let's come back to that

 6   if you don't know, because I want to just sort of

 7   see if we can --

 8         A    Okay.

 9         Q    -- finish up and get you home.

10         A    I just wanted to make sure I was giving

11   you an accurate answer so I was...

12         Q    Okay.  Now, is an application for a U.S.

13   passport or CRBA more likely to be denied if the

14   applicant's parents are a same-sex married couple

15   than if they are an opposite-sex married couple?

16         A    I don't know.

17         Q    Does the State Department compile any

18   statistics relating to that subject?

19         A    Can you be more specific?

20         Q    Does the State Department keep track of

21   the rate at which CRBA applications on behalf of --

22   or by same-sex couples are granted or denied?

23         A    No.

24         Q    Does it keep track of any comparison

25   statistics as to the rate at which applications for
```

Plaintiffs' Partial Summary Judgment Exhibit A
Page 67

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                              Page 321

 1    a CRBA by same-sex couples versus applications for a

 2    CRBA by opposite-sex couples are granted or denied?

 3         A    No.

 4         Q    Other than this litigation, has the State

 5    Department received any allegations of

 6    discrimination against same-sex couples in the

 7    adjudication of applications for U.S. passports or

 8    CRBAs?

 9         A    I'm sorry.  Could you repeat that?

10         Q    Yes.  Other than this litigation -- put

11    aside this litigation -- has the State Department

12    received any allegations that the State Department

13    discriminates against same-sex couples in

14    adjudicating applications for a U.S. passport or a

15    CRBA?

16              MS. ANDRAPALLIYAL:  Objection.  Exceeds

17    the scope.

18         A    It's a very broad question, so I'll say

19    yes.

20    BY MR. EDELMAN:

21         Q    Do you know of any?

22         A    I can't think of a specific instance,

23    but, I mean, in 20 million applications there's --

24         Q    Okay.

25         A    -- you know, we get congressionals on a

Plaintiffs' Partial Summary Judgment Exhibit A
Page 68

CONFIDENTIAL - PROTECTIVE ORDER
PAUL PEEK - 12/20/2018                          Page 351

1                    CERTIFICATE OF NOTARY PUBLIC

2              I, DONNA L. LINTON, RMR-CLR, and a Notary

3      Public in and for the District of Columbia, before

4      whom the foregoing deposition was taken, do hereby

5      certify that the witness whose testimony appears in

6      the foregoing deposition was duly sworn by me; that

7      the testimony of said witness was taken by me in

8      Shorthand at the time and place mentioned in the

9      caption hereof and thereafter transcribed by me;

10     that said deposition is a true record of the

11     testimony given by said witness; that I am neither

12     counsel for, related to, nor employed by any of the

13     parties to the action in which this deposition was

14     taken; and further, that I am not a relative or

15     employee of any counsel or attorney employed by the

16     parties hereto, nor financially or otherwise

17     interested in the outcome of this action.

18

19

20

21

       _____
22            DONNA L. LINTON, RMR-CLR
              Notary Public in and for
23            DISTRICT OF COLUMBIA
           Dated: December 24th 2018
24

25     My Commission expires:  June 30, 2019

Plaintiffs' Partial Summary Judgment Exhibit A
Page 69