# EXHIBIT D

In the Matter Of:

Andrew Mason Dvash-Banks, et al v.

The United States Department of State, et al

---

MARGARET RAMSAY

December 07, 2018

---



77 King Street West, Suite 2020
Toronto, ON M5K 1A2
1.888.525.6666 | 416.413.7755

Andrew Mason Dvash-Banks, et al v. The United States Department of State, et al
MARGARET RAMSAY on December 07, 2018
Case 2:18-cv-00523-JFW-JC   Document 83-7   Filed 01/07/19   Page 3 of 29   Page ID
#:1529

1                    UNITED STATES DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3

4     ANDREW MASON DVASH-BANKS and)

5     E▆▆▆  J▆▆  D▆▆▆-B▆▆▆,     ) COMPLAINT FOR

6                    Plaintiffs, ) DECLARATION AND

7                                ) INJUNCTIVE RELIEF

8                  v.            )

9     THE UNITED STATES DEPARTMENT) Docket No. Case

10    OF STATE, and THE HONORABLE ) 2:18-cv-00523-JFW-JCx

11    MICHAEL R. POMPEO, Secretary) JFW

12    of State,                   )

13                   Defendants.)

14    ---------------------------)

15

16    --- This is the Transcript of the Videotaped

17    Deposition of MARGARET RAMSAY, taken at the U.S.

18    Consulate, 360 University Avenue, Toronto, Ontario,

19    MSG 1S4, on the 7th day of December, 2018.

20

21                      --------

22    Reported By:  Deana Santedicola, CSR (Ont.), RPR,

23               CRR

24

25

Plaintiffs' Partial Summary Judgment Exhibit D
Page 147

Andrew Mason Dvash-Banks, et al v. The United States Department of State, et al
Case 2:18-cv-00523-JFW-JC   Document 83-7   Filed 01/07/19   Page 4 of 29   Page ID
#:1530

Page 2

```
 1    A P P E A R A N C E S:

 2    FOR THE PLAINTIFFS, ANDREW MASON DVASH-BANKS

 3    and E███ J████  D████-B████:

 4    SULLIVAN & CROMWELL LLP

 5    PER:  Jessica Klein, Esq.

 6          Lauren M. Goldsmith, Esq.

 7          125 Broad Street

 8          New York, New York 10004-2498

 9    Tel.  1-212-558-4000

10    Email:  goldsmithl@sullcrom.com

11            kleinj@sullcrom.com

12

13    FOR THE DEFENDANTS, THE UNITED STATES DEPARTMENT

14    OF STATE, AND THE HONOURABLE MICHAEL R. POMPEO,

15    SECRETARY OF STATE:

16    UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION

17    FEDERAL PROGRAMS BRANCH

18    PER:  Lisa Zeidner Marcus, Esq.

19          1100 L Street NW, 11th Floor,

20          Washington, DC, 20530

21    Email:  lisa.marcus@usdoj.gov

22

23    Also Present:  Jeremy Weinberg, U.S. Department of

24    State, Office of the Legal Advisor

25
```

Andrew Mason Dvash-Banks, et al v. The United States Department of State, et al
MARGARET RAMSAY on December 07, 2018
Case 2:18-cv-00523-JFW-JC Document 83-7 Filed 01/07/19 Page 5 of 29 Page ID #:1531
Page 3

```
1                      I N D E X

2


3     WITNESS:  MARGARET RAMSAY

4                                               PAGE

5     EXAMINATION BY MS. GOLDSMITH.............     5

6     REDIRECT EXAMINATION BY MS. ZEIDNER

7     MARCUS..................................    115

8     FURTHER EXAMINATION BY MS. KLEIN........    159

9     RE-REDIRECT EXAMINATION BY MS. ZEIDNER

10    MARCUS..................................    170

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Plaintiffs' Partial Summary Judgment Exhibit D
Page 149

Andrew Mason Dvash-Banks, et al v. The United States Department of State, et al
MARGARET RAMSAY on December 07, 2018
Case 2:18-cv-00523-JFW-JC Document 83-7 Filed 01/07/19 Page 6 of 29 Page ID #:1532
Page 6

1   & Cromwell.

2           MS. KLEIN:  Good morning, Jessica

3   Klein, also from Sullivan & Cromwell, also

4   representing the Plaintiffs Andrew and ▮▮▮

5   D▮▮▮-B▮▮▮ .

6           MS. ZEIDNER MARCUS:  Good morning, I am

7   Lisa Zeidner Marcus, Trial Attorney, U.S.

8   Department of Justice, Civil Division, Federal

9   Programs Branch.  I represent the United States in

10  this action and I represent the Defendants, the

11  U.S. Department of State and the Secretary of State

12  who was sued in his official capacity.

13          MR. WEINBERG:  Jeremy Weinberg, U.S.

14  Department of State, Office of the Legal Advisor.

15          THE VIDEOGRAPHER:  Would the reporter

16  please swear or affirm the witness.

17          MARGARET RAMSAY; SWORN.

18          EXAMINATION BY MS. GOLDSMITH:

19          Q.   Good morning, Ms. Ramsay, thanks

20  so much for being here today.  I just have a few

21  background questions before we get started in

22  earnest.  Have you ever been deposed before?

23          A.   No.

24          Q.   Have you ever testified in court?

25          A.   No.

Andrew Mason Dvash-Banks, et al v. The United States Department of State, et al
MARGARET ROMASAN, December 07, 2018
Case 2:18-cv-00523-JFW-JC Document 83-7 Filed 01/07/19 Page 7 of 29 Page ID #:1533

Page 17

 1              A.    It is hard to say.  There are many

 2   of them.  They are quite specific, so I couldn't

 3   speak to all of them.

 4              Q.    And when you say they are quite

 5   specific, are they specific to your role of

 6   adjudicating passport applications and other

 7   applications?

 8              A.    Some of them are, yes.

 9              Q.    And when did you complete that

10   training, if you remember?

11              A.    I probably would have completed it

12   in 2011, maybe.  I'm not quite certain.  I would

13   have to go back through my training transcript.

14              Q.    So it was before you came to

15   Toronto?

16              A.    Uhm-hmm.

17              Q.    Did your training include teaching

18   you the policies of the U.S. State Department in

19   adjudicating applications for passports and

20   Consular Reports of Birth Abroad?

21              A.    Yes.

22              Q.    And are the Toronto Consulate's

23   policies for adjudicating applications for

24   passports and Consular Reports of Birth Abroad the

25   same as the State Department's policies?

1          A.    Yes.

2                Q.    You mentioned previously that part

3    of your job involves adjudicating applications for

4    U.S. passports and Consular Reports of Birth

5    Abroad; is that correct?

6                A.    Yes.

7                Q.    Does your job involve your

8    determining who is a U.S. citizen?

9                A.    Yes.

10               Q.    Do you review any other types of

11   applications or adjudicate any other types of

12   applications?

13               A.    Can you clarify the question?

14               Q.    Other than passport applications

15   and applications for Consular Reports of Birth

16   Abroad, do you adjudicate any other types of

17   applications?

18               A.    No.

19               Q.    Does anyone report to you?

20               A.    No.

21               Q.    Who do you report to?

22               A.    The Supervisor of the American

23   Citizen Services Unit, Larilyn Reffett.

24               THE COURT REPORTER:  I'm sorry, did you

25   say a name?

Plaintiffs' Partial Summary Judgment Exhibit D
Page 152

Andrew Mason Dvash-Banks, et al v. The United States Department of State, et al
Case 2:18-cv-00523-JFW-JC   Document 83-7   Filed 01/07/19   Page 9 of 29   Page ID
#:1535
MARGARET POLLACK, 30(b)(6) - December 07, 2018

Page 40

1          Q.    And when Terri Day worked with you

2    at the consulate, would that have been true for her

3    as well?

4          A.    Yes.

5          Q.    Switching gears just a little bit,

6    were you in any way personally involved in the

7    adjudication of B█████ D█████-B█████'s application for

8    a U.S. passport or a CRBA?

9          A.    Can you clarify?

10          Q.    Are you aware of E█████

11    D█████-B█████'s application for a passport and a

12    Consular Report of Birth Abroad?

13          A.    Yes.

14          Q.    Who was the officer assigned to

15    his case, if you know?

16          A.    It was Frankie Day.

17          Q.    And were you involved in any way

18    in the process of reviewing B███'s applications?

19          A.    Yes.

20          Q.    Can you describe in what ways you

21    were involved in that process?

22          A.    I assisted my colleague Frankie by

23    sending her relevant guidance from the Foreign

24    Affairs Manual.

25          Q.    Did she request that you send her

Plaintiffs' Partial Summary Judgment Exhibit D
Page 153

Andrew Mason Dvash-Banks, et al v. The United States Department of State, et al
Case 2:18-cv-00523-JFW-JC   Document 83-7   Filed 01/07/19   Page 10 of 29   Page ID #:1536
MARGARET RAMSAY, on December 20, 2018
Page 45

1  questions, but we often used the same questions

2  when interviewing these types of cases.

3          Q.  Did you observe that both of the

4  parents in the Dvash-Banks family were men?

5          A.  Yes.

6          Q.  And did you hear any questions

7  during the interview that were related in some way

8  to the fact that they were both men?

9          A.  Yes, in terms of asking about how

10  the children were conceived and how the children

11  came to be born in Canada.

12          Q.  Do you recall anything about the

13  demeanour of the Dvash-Banks family during the

14  interview?

15          A.  Yes.

16          Q.  Can you describe what you recall?

17          A.  They were answering questions, you

18  know, just like any other family would.  I think

19  towards the end they were unhappy with how things

20  were proceeding and being asked for additional

21  things, and so they were upset towards the end of

22  the interview, if I recall correctly.

23          Q.  Do you recall what about their

24  demeanour gave you the impression that they were

25  upset?

Plaintiffs' Partial Summary Judgment Exhibit D
Page 154

Andrew Mason Dvash-Banks, et al v. The United States Department of State, et al
MARGARET RAMSAY on December 20, 2018
Case 2:18-cv-00523-JFW-JC    Document 83-7    Filed 01/07/19    Page 11 of 29    Page
ID #:1537
Page 46

1        A.   They were yelling and seemed to be

2   upset about -- about the case.

3        Q.   Was anyone crying?

4        A.   I don't believe so.

5        Q.   Do you recall what was discussed

6   about how the children came to be born in Canada?

7   And we are still talking about during the

8   interview, just to clarify.

9        A.   I don't recall specific questions.

10        Q.   Am I correct that you testified

11   before that you overheard some of the conversation

12   during the interview about how the children came to

13   be born?

14        A.   Yes.

15        Q.   And what do you recall that

16   discussion was?

17        A.   I recall that they said that they

18   used a surrogate in Canada to conceive the

19   children.

20        Q.   Do you remember anything else?

21        A.   I think that Frankie asked the

22   question about who contributed genetic material to

23   conceive the children.

24        Q.   And do you remember anything else

25   about that conversation?

Plaintiffs' Partial Summary Judgment Exhibit D
Page 155

```
 1                   A.   I told her where to find the

 2    guidance in the Foreign Affairs Manual.

 3                   Q.   Do you recall anything else from

 4    that conversation?

 5                   A.   I believe that I told her, you

 6    know, oftentimes people have documentation from the

 7    clinic that can be helpful, so we usually ask for

 8    that in these cases.

 9                   Q.   And do you recall anything else

10    from that conversation?

11                   A.   No.

12                   Q.   Did you talk to Ms. Day while the

13    Dvash-Banks family was still at the consulate?

14                   A.   Yes.

15                   Q.   And was that a separate

16    conversation from the one we were just discussing?

17                   A.   Yes, I believe so.

18                   Q.   And can you describe that

19    conversation?

20                   A.   I believe she told me that it

21    wasn't clear who the biological parents were and I

22    discussed with her that the DNA testing was an

23    option in these types of cases.

24                   Q.   So just to make sure that I'm

25    understanding, while the Dvash-Banks family was at
```

1    the consulate for their interview, you had a second

2    conversation with Ms. Day about how she should

3    proceed?

4              A.    I offered some guidance to her as

5    to, you know, how the case could proceed, but

6    ultimately she made the decision herself.

7              Q.    And what decision was that?

8              A.    She made the decision to place the

9    case in a pending status, pending additional

10   information.

11             Q.    Do you know if Ms. Day consulted

12   with anyone else while the Dvash-Banks family was

13   still at the consulate?

14             A.    Yes, I believe she consulted with

15   our Supervisor, Larilyn Reffett.

16             Q.    Were you present for that

17   conversation?

18             A.    I don't believe so.

19             Q.    Do you have any knowledge of what

20   they discussed during that conversation?

21             A.    Not specifically because I wasn't

22   present for it.

23             Q.    When you spoke to Ms. Day while

24   the Dvash-Banks family was still at the consulate,

25   did you advise her to seek Ms. Reffett's advice?

1        Q.   And did you ever discuss the
2   Dvash-Banks applications again with Ms. Day before
3   the final adjudication?
4        A.   I think I discussed it with her
5   when the results of the DNA testing came back.
6        Q.   And what did she say?
7        A.   She told me that one child was the
8   biological child of the U.S. citizen and one was
9   not.
10       Q.   Do you recall anything else about
11  the conversation?
12       A.   Not especially, no.
13       Q.   And after that conversation and
14  the final adjudication, did you ever discuss the
15  Dvash-Banks family again with Ms. Day?
16       A.   I think there was a news article
17  that someone saw and shared, and so we may have
18  discussed it at that point.
19       Q.   And when you say "we," you are
20  referring to you and Ms. Day?
21       A.   Uhm-hmm.
22       Q.   Did you discuss it with anyone
23  else?
24       A.   My Supervisor, Larilyn Reffett.
25       Q.   And do you recall the content of

Plaintiffs' Partial Summary Judgment Exhibit D
Page 158

 1              A.    No.

 2              Q.    Did you play any role in the

 3     decision to seek additional evidence, DNA evidence?

 4              A.    Can you clarify the question?

 5              Q.    What, if any, was your role in Ms.

 6     Day's decision to seek additional medical evidence

 7     such as DNA testing?

 8              A.    I suggested it to her.

 9              Q.    Did you -- why did you suggest it?

10              A.    Because it can be a useful tool in

11     cases where it is not clear if a parent and child

12     have a biological relationship.

13              Q.    Did you play a role in any other

14     decision relevant to the denial of E████

15     D████-B████'s applications?

16              MS. ZEIDNER MARCUS:  Objection to form.

17              BY MS. GOLDSMITH:

18              Q.    You can answer.

19              A.    No.

20              Q.    Okay, I am going to move on to a

21     slightly different subject.  Do you ever look at

22     U.S. statutes in your adjudication of passport

23     applications or CRBAs?

24              A.    Yes.

25              Q.    And what statutes are those?

 1   legally married, they don't have a marriage

 2   certificate.

 3                Q.   Have you reviewed the documents

 4   that the Dvash-Banks family submitted with their

 5   children's applications for a U.S. passport and a

 6   Consular Report of Birth Abroad?

 7                A.   I may have looked at them at the

 8   time.  I don't quite remember.  I don't remember

 9   looking at them very closely.

10                Q.   Do you recall whether a marriage

11   licence or other evidence of the Dvash-Banks

12   marriage was submitted with those applications?

13                A.   I believe that they had submitted

14   a marriage certificate.

15                Q.   And is it your understanding that

16   under the State Department's policies and

17   procedures, Andrew and Elad Dvash-Banks are

18   considered to be a married couple?

19                MS. ZEIDNER MARCUS:   Objection to form.

20                THE WITNESS:   That is my understanding.

21                BY MS. GOLDSMITH:

22                Q.   And was that true in January of

23   2017?

24                MS. ZEIDNER MARCUS:   The same

25   objection.  You can answer.

1          Q.    Are you aware of any changes that

2     the State Department has made to its policy related

3     to children born abroad through assisted

4     reproductive technology during the period that you

5     have been employed at the Toronto Consulate?

6          A.    No.

7          Q.    And are you aware that the State

8     Department changed its policy to treat gestational

9     mothers who are the legal parent of a child the

10    same as genetic mothers for purposes of citizenship

11    and immigration benefits?

12         A.    Yes.

13         Q.    And are you aware of why the State

14    Department changed this policy?

15         A.    No.

16         Q.    So is it your understanding that

17    this policy was changed before you arrived at the

18    Toronto Consulate?

19         A.    Yes.

20         Q.    And are you aware of whether the

21    change in policy was the result of an

22    interpretation of the Immigration and Nationality

23    Act?

24         A.    I don't know.

25         Q.    And do you know whether the State

 1          A.    Yes.

 2          Q.    Which fields specifically would

 3   you consider to determine the identities of the

 4   child's parents?

 5          A.    I don't quite understand the

 6   question.

 7          Q.    Looking at this document, who are

 8   E█████ D████-B█████'s legal parents under State

 9   Department policy and procedure?

10          A.    It would be the people listed on

11   the child's birth certificate, so Andrew and Elad.

12          Q.    All right, let's turn now to the

13   document that is Bates-stamped 00070270-1764.   It

14   is page 7 of the same exhibit, Plaintiffs

15   Deposition Exhibit No. 5.

16          I will represent to you that Plaintiffs

17   Deposition Exhibit No. 5 is E█████ D████-B█████'s

18   application file which was provided to Plaintiffs

19   by Defendants.

20          Now, looking at the document that

21   starts on page 7 of Plaintiffs Exhibit No. 5, which

22   is again Bates-stamped 00070270-1764, can you tell

23   me what is this document?

24          MS. ZEIDNER MARCUS:   Objection,

25   foundation, form, the document speaks for itself.

Andrew Mason Dvash-Banks, et al v. The United States Department of State, et al
Case 2:18-cv-0523-JFW-JC Document 83-7 Filed 01/07/19 Page 19 of 29 Page
MARGARET RAMSAY on December 5, 2018
ID #:1545

Page 104

1                    BY MS. GOLDSMITH:

2              Q.   Have you seen this document

3    before?

4              A.   Yes.

5              Q.   And what does this document appear

6    to be to you?

7              A.   It appears to be an Ontario birth

8    certificate.

9              Q.   And is the form of this document

10   consistent with other Ontario birth certificates

11   that you have reviewed?

12             A.   Yes.

13             Q.   And earlier you testified about an

14   Ontario birth certificate.  Would this be an

15   example of such an Ontario birth certificate?

16             MS. ZEIDNER MARCUS:  Objection to form.

17             THE WITNESS:  Yes.

18             BY MS. GOLDSMITH:

19             Q.   Is this document entitled

20   "Statement of Live Birth"?

21             A.   Yes.

22             Q.   And according to this document,

23   who are E████  D████-B███ 's parents?

24             A.   Andrew Mason Dvash-Banks and Elad

25   Dvash-Banks.

Plaintiffs' Partial Summary Judgment Exhibit D
Page 163

Andrew Mason Dvash-Banks, et al v. The United States Department of State, et al
Case 2:18-cv-00523-JFW-JC Document 83-7 Filed 01/07/19 Page 20 of 29 Page
ID #:1546
MARGARET RAMSAY on December 07, 2018
Page 105

1    Q.    And when you adjudicate CRBA

2    applications using a Statement of Live Birth in

3    Ontario, do you look at those fields to determine

4    who the child's parents are?

5              A.    Yes.

6              Q.    Under the State Department's

7    policies and procedures, as you understand them, is

8    this document sufficient proof of E████'s

9    parentage?

10             MS. ZEIDNER MARCUS:    Objection to form.

11             THE WITNESS:    It shows who the legal

12   parents are.

13             BY MS. GOLDSMITH:

14             Q.    Okay, if you stay on this page but

15   turn back to Plaintiffs Exhibit 6, I am going to

16   ask you a question about that document.  Plaintiffs

17   Exhibit 6 is the ACS Activity Log for E████

18   D████-B████'s CRBA application; is that correct?

19             A.    Yes.

20             Q.    And in the description field it

21   refers to, quote, "a timely filed Ontario birth

22   certificate"; is that correct?

23             A.    Yes.

24             Q.    And is it your understanding that

25   the Statement of Live Birth which is page 7 of

Andrew Mason Dvash-Banks, et al v. The United States Department of State, et al
Case 8:18-cv-01551-JVS-JDE Document 83-7 Filed 01/07/19 Page 21 of 29 Page
ID #:1547
MARGARET RAMSAY on December 20, 2018
Page 108

1          A.    Yes.

2               Q.    And under the State Department's

3     policies and procedures, is this document

4     sufficient proof of Andrew's and Elad's marriage?

5               MS. ZEIDNER MARCUS:   Objection,

6     foundation, form.

7               THE WITNESS:   Yes.

8          BY MS. GOLDSMITH:

9          Q.    And does this document appear to

10    be the marriage licence of Andrew Dvash-Banks and

11    Elad Dvash-Banks?

12         A.    Yes.

13         Q.    And can you tell when it is dated?

14         A.    To me it looks like 19th August

15    2010.

16         Q.    So it appears that sometime in

17    August 2010 this document was issued; is that

18    correct?

19         A.    Yes.

20              Q.    In your practice adjudicating

21    applications, would an Ontario marriage licence

22    such as this one sufficiently demonstrate a valid

23    marriage?

24              A.    Yes.

25              Q.    And is it your understanding based

Andrew Mason Dvash-Banks, et al v. The United States Department of State, et al
Case 2:18-cv-00523-JFW-JC   Document 83-7   Filed 01/07/19   Page 22 of 29   Page ID #:1548
MARGARET POLLASKY, December 7, 2018

Page 109

1    on this document that Andrew and Elad Dvash-Banks

2    are validly married?

3            A.    Yes.

4            Q.    And is it your understanding that

5    under the State Department's policies and

6    procedures, this document would be sufficient proof

7    of Andrew and Elad's marriage?

8            A.    Yes.

9            Q.    All right, please flip three pages

10   further into the document, and let me know when you

11   are looking at document Bates-stamped

12   00070270-1768.

13           A.    Okay.

14           Q.    And I'll represent to you that

15   this document appears to continue on to another

16   page, which is Bates-stamped 00070270-1769.  Have

17   you seen this document before?

18           A.    Not this particular document.

19           Q.    And from looking at the document,

20   can you tell what this document is?

21           A.    It looks like a court order

22   regarding parentage.

23           Q.    And does the form of this document

24   appear to be consistent with the form of other

25   documents you have seen from the Ontario Superior

Andrew Mason Dvash-Banks, et al v. The United States Department of State, et al
MARGARET RAMSAY on December 07, 2018
Case 2:18-cv-00523-JFW-JC   Document 83-7   Filed 01/07/19   Page 23 of 29   Page ID #:1549
Page 131

1    Day, would have a better sense.

2              Q.   In your practice, have you

3    received applications that you have been

4    adjudicating that contain within the application

5    materials surrogacy agreements?

6              A.   Sometimes.

7              Q.   And are those usually provided on

8    the day of the --

9              A.   Sometimes, but not always.

10             Q.   Okay.  You testified earlier that

11   you provided Ms. Day, the adjudicating officer,

12   with certain FAM citations?

13             A.   Yes.

14             Q.   Why did you do that?

15             A.   As a more experienced officer and

16   working alongside her that day, I wanted to make

17   sure that she had the relevant guidance for the

18   case.

19             Q.   Did you send her any provisions of

20   the INA itself?

21             A.   I don't believe so.

22             Q.   Do you know whether Ms. Day

23   considered E███ D███-B███ to be born in wedlock,

24   as that term is used in the FAM and the INA?

25             A.   I think initially, as evidenced by

Andrew Mason Dvash-Banks, et al v. The United States Department of State, et al
MARGARET RAMSAY on December 7, 2018
Case 2:18-cv-00523-JFW-JC   Document 83-7   Filed 01/07/19   Page 24 of 29   Page
ID #:1550

Page 132

1    her case notes, she may have considered them in

2    wedlock because she saw a marriage certificate, but

3    I believe after reviewing the guidance and as

4    evidenced by the final denial letter, ultimately

5    applied 309 of the INA to the decision-making.

6         Q.    Is it your understanding, and if

7    you need to refer to the case notes to refresh your

8    memory on this, then you can do so and then point

9    me to that section, if you do so, but is it your

10   understanding that on the day that they visited,

11   the Dvash-Banks family visited the Consulate

12   Toronto that Ms. Day on that day considered them to

13   be a married couple, the adults in the family?

14        MS. GOLDSMITH:  Objection, leading.

15        THE WITNESS:  I think what may have

16   happened is when she was reviewing all the

17   documents and she saw a marriage certificate, she

18   started typing her notes, as we often do, and then

19   over the course of the interview discovered that we

20   would have to treat the case as a 309 case instead.

21        BY MS. ZEIDNER MARCUS:

22        Q.   Do you know whether she

23   communicated to the Dvash-Banks family on that day

24   whether there was a particular provision that she

25   was going to be applying in the case?

1     A.    I believe she may have told them
2  about the provisions of INA 309.
3          Q.    What is that belief based on?
4          A.    I think I heard her talk to them
5  about the requirements for it and the requirements
6  for a biological relationship as well.
7          Q.    Is there a requirement for a
8  biological relationship under both 301 and 309, as
9  you understand and apply the -- let me start over.
10  The biological requirement that you were just
11  describing, what is that biological requirement?
12         A.    There must be, in order for a U.S.
13  citizen parent to transmit citizenship to a child
14  at birth, there must be a biological relationship
15  between parent and child.
16         Q.    Is that true for both INA 301 and
17  INA 309, in your understanding?
18         A.    Yes.
19         Q.    So would it have made a difference
20  to the outcome of this case if Ms. Day had
21  adjudicated these applications under INA 301
22  instead of INA 309?
23         A.    No.
24         Q.    Ms. Ramsay, do you have more than
25  one type of title?

1  that in some cases, in some passport or CRBA

2  adjudications, you or your colleagues consult with

3  a desk officer located in Washington, DC; is that

4  correct?

5           A.   Yes, yes.

6           Q.   Do you know whether you or any of

7  your Consulate Toronto colleagues consulted with a

8  desk officer in connection with adjudicating the

9  Dvash-Banks family's applications for U.S.

10  passports and CRBAs for their children?

11           A.   I did not personally.  I don't

12  believe that my colleagues did.  We normally reach

13  out to Washington when FAM policy guidance is not

14  clear, and it seemed to us in this case that it

15  was.

16           Q.   Why did you think that in this

17  case the FAM guidance was clear?

18           A.   Because the FAM guidance on

19  assisted reproductive technology cases is clear

20  with regards to a biological relationship

21  requirement, and once we had that information after

22  the DNA testing, it was relatively straightforward

23  to make the decision.

24           Q.   If any of your Consulate Toronto

25  colleagues had consulted on this case with the desk

Andrew Mason Dvash-Banks, et al v. The United States Department of State, et al
MARGARET RAMSAY on December 07, 2018
Case 2:18-cv-00523-JFW-JC   Document 83-7   Filed 01/07/19   Page 27 of 29   Page
ID #:1553

Page 163

1           Q.    You testified concerning

2    Plaintiffs Deposition Exhibit 6 and 7, the ACS

3    Activity Logs; correct?

4           A.    Yes.

5                 Q.    Did Ms. Ramsay -- excuse me, Ms.

6    Ramsay, did Ms. Day ever discuss with you whether

7    to apply Section 301 or 309 of the INA in

8    adjudicating E████'s applications?

9                 A.    I believe we discussed it as

10   appropriately looking at the case through the lens

11   of 309 due to the fact pattern of the case in terms

12   of artificial reproductive technology being used.

13                Q.    And when did that discussion

14   occur?

15                A.    The morning of the interview.

16                Q.    And was this the first

17   conversation you had with Ms. Day concerning the

18   Dvash-Banks applications?

19                A.    No, no.

20                Q.    This was the second conversation

21   you had with her that day concerning the

22   Dvash-Banks family's applications?

23                A.    I think after she had interviewed

24   them, I discussed with her the different FAM

25   guidance and how the case would be, because they

Andrew Mason Dvash-Banks, et al v. The United States Department of State, et al
MARGARET RAMSAY on December 07, 2018
Case 2:18-cv-00523-JFW-JC Document 83-7 Filed 01/07/19 Page 28 of 29 Page ID #:1554

Page 164

1   had used a surrogate, and how we would apply 309 to

2   the case.

3           Q.   So it is now your testimony that

4   you discussed with Ms. Day on the day that the

5   Dvash-Bankses appeared for their interview which

6   section of the INA applied to their application?

7           A.   I believe that was part of our

8   discussion, yes.

9           Q.   And did you advise Ms. Day on

10  which section of the INA to apply?

11          A.   I think so, yes.

12          Q.   And what did you advise her?

13          A.   I told her that these types of

14  cases are considered under INA 309.

15          Q.   And you testified, in response to

16  questions from counsel for Defendants, concerning

17  the notations made on the ACS Activity Log marked

18  as Plaintiffs Deposition Exhibit 6; correct?

19          A.   Yes.

20          Q.   And you testified concerning the

21  notation CRBA for child born in wedlock to U.S.

22  citizen father applicant; correct?

23          A.   Yes.

24          Q.   And was it your testimony that you

25  believe Ms. Day had initially believed that E███

Andrew Mason Dvash-Banks, et al v. The United States Department of State, et al
MARGARET RAMSAY on December 07, 2018

Page 173

1                    REPORTER'S CERTIFICATE.

2

3                    I, DEANA SANTEDICOLA, RPR, CRR,

4    CSR, Certified Shorthand Reporter, certify;

5                    That the foregoing proceedings were

6    taken before me at the time and place therein set

7    forth, at which time the witness was put under oath

8    by me;

9                    That the testimony of the witness

10   and all objections made at the time of the

11   examination were recorded stenographically by me

12   and were thereafter transcribed;

13                   That the foregoing is a true and

14   correct transcript of my shorthand notes so taken.

15

16

17              Dated this 12th day of December, 2018

18

19              _____

20              NEESON COURT REPORTING INC.

21              PER: DEANA SANTEDICOLA, RPR, CRR, CSR

22              CERTIFIED REAL-TIME REPORTER

23

24

25

www.neesonsreporting.com
(416) 413-7755  (888) 525-6666

Plaintiffs' Partial Summary Judgment Exhibit D
Page 173