# EXHIBIT G
# Part 1 of 2

U.S. Department of State

OMB NO. 1405-0011
EXPIRES: 03/31/2019
Estimated Burden: 20 minutes

## APPLICATION FOR CONSULAR REPORT OF BIRTH ABROAD OF A CITIZEN OF THE UNITED STATES OF AMERICA

Registration Number _DENIAL_

A. THIS SECTION TO BE COMPLETED BY THE CHILD'S PARENT(S) OR GUARDIAN(S) OR THE CHILD (USE SECTION D CONTINUATION SHEET)

### INFORMATION ABOUT THE CHILD

1. Name of Child in Full

D▬▬ (Last/Surname)    E▬▬ (First)    J▬▬ (Middle)

2. Sex ☒ M ☐ F
3. Date of Birth 09/16/2016 (month/day/year)
4. Place of Birth MISSISAUGA (City)   CANADA (Country)

NOTE: (If the U.S. citizen parent transmitting citizenship to the child is not present, he or she may complete State Department Form DS 5507 Affidavit of Parentage Physical Presence and Support and submit it separately. The parent completing this application should provide as much information on the parent completing the Form DS 5507 as he or she has.)

### INFORMATION ON MOTHER/FATHER/PARENT

5. Full Name DVASH-BANKS (Last/Surname)  ANDREW (First)  MASON (Middle)

6. All Previous Legal Names Used BANKS (Last/Surname)  ANDREW (First)  MASON (Middle)

(Last/Surname)  (First)  (Middle)

7. Sex ☒ M ☐ F
8. Date of Birth ▬/1981 (month/day/year)

9. Place of Birth Santa Monica (City)  CA (State/Province)  USA (Country)

10. Current Physical Address (Do not list P.O. Box) (A.P.O. Address Permitted)
AVE. #▬ (Address Line 1)
TORONTO, ON, CANADA M6B4C6 (City, State/Province, Country, Postal Code)
647-706-9556 (Phone Number(s))
▬@gmail.com (Email Address)

Use this address if Consular Report of Birth will be mailed? ☒ Yes ☐ No

### INFORMATION ON MOTHER/FATHER/PARENT

11. Full Name DVASH-BANKS (Last/Surname)  ELAD (First)  AUSTIN (Middle)

12. All Previous Legal Names Used DVASH (Last/Surname)  ELAD (First)  (Middle)

(Last/Surname)  (First)  (Middle)

13. Sex ☒ M ☐ F
14. Date of Birth ▬/1985 (month/day/year)

15. Place of Birth Ramat Gan (City)  (State/Province)  ISRAEL (Country)

16. Current Physical Address (Do not list P.O. Box) (A.P.O. Address Permitted)
AVE. #▬ (Address Line 1)
TORONTO, ON, CANADA M6B4C6 (City, State/Province, Country, Postal Code)
647-289-4389 (Phone Number(s))
▬@gmail.com (Email Address)

Use this address if Consular Report of Birth will be mailed? ☒ Yes ☐ No

17. Mailing Address (if different from Current Physical Address) (Do not list a P.O. Box.) (You may list an A.P.O. address)

(Address Line 1)    (City, State/Province, Country and Postal Code)

DS-2029
04-2016

CLASS CLEARED

Page 1 of 7

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 009**

| (Continued) INFORMATION ON MOTHER/FATHER/PARENT | (Continued) INFORMATION ON MOTHER/FATHER/PARENT |
|---|---|
| 18. Citizenship Were you a U.S. citizen or U.S. Non-Citizen National when the child was born? ☒ Yes ☐ No | 19. Citizenship Were you a U.S. citizen or U.S. Non-Citizen National when the child was born? ☐ Yes ☒ No |

## MARITAL STATUS OF THE PARENTS

20. Were you married to the child's other biological parent when the child was born? ☒ Yes ☐ No

21. Date and Place of Marriage to the child's other biological parent and current status

08/19/2010 Toronto ____ ON ____ Canada
(month) (day) (year) (City) (State/Province) (Country)

☒ Still Married ☐ Divorced __/__/__ (month) (day) (year) ☐ Death __/__/__ (month) (day) (year)

| (Continued) INFORMATION ON MOTHER/FATHER/PARENT | (Continued) INFORMATION ON MOTHER/FATHER/PARENT |
|---|---|
| 22. Please list any other marriages. (Show Name(s) of Spouse(s), Dates and Current Status) if applicable (Death, Divorce, Still Married). If you have never been married, enter "None." (If additional space is needed, please use the Section D Continuation Sheet) | 23. Please list any other marriages (Show Name(s) of Spouse(s), Dates and Current Status) if applicable (Death, Divorce, Still Married). If you have never been married, enter "None." (If additional space is needed, please use the Section D Continuation Sheet) |
| None | None |

24. Precise Periods of Time in United States
(if additional space is needed, please use the Section D Continuation Sheet)

| Place (City, State) | Date (month-day-year) From | Date (month-day-year) To |
|---|---|---|
| Port Saint Lucie, FL | 12-18-2016 | 01-21-2017 |
| Los Angeles, CA | 10-21-16 | 10-23-16 |
| Los Angeles, CA | 6-10-16 | 6-19-16 |
| Port St. Lucie, FL | 2-19-16 | 2-22-16 |
| Los Angeles, CA | 11-20-15 | 11-29-15 |
| Detroit, MI | 9-4-15 | 9-8-15 |
| New Orleans, LA | 5-21-15 | 5-24-15 |
| Los Angeles, CA | 4-16-15 | 4-23-15 |
| Port St. Lucie, FL | 1-17-15 | 1-21-15 |
| Los Angeles, CA | 11-5-14 | 11-9-14 |
| Los Angeles, CA | 1-18-81 | 6-1-92 |
| Los Angeles, CA | 9-1-92 | 12-1-00 |
| Santa Barbara, CA | 6-1-01 | 12-15-05 |
| Los Angeles, CA | 6-1-06 | 1-1-07 |
| Los Angeles, CA | 4-1-07 | 7-1-07 |

25. Precise Periods of Time in United States
(if additional space is needed, please use the Section D Continuation Sheet)

| Place (City, State) | Date (month-day-year) From | Date (month-day-year) To |
|---|---|---|
| Port Saint Lucie, FL | 12-18-2016 | 01-21-2017 |
| Los Angeles, CA | 6-10-16 | 6-19-16 |
| Port St. Lucie, FL | 2-19-16 | 2-22-16 |
| Los Angeles, CA | 11-20-15 | 11-29-15 |
| Detroit, MI | 9-4-15 | 9-8-15 |
| Los Angeles, CA | 4-16-15 | 4-21-15 |

DS-2029 04-2016

Page 2 of 7

Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 010

| (Continued) INFORMATION ON MOTHER/FATHER/PARENT | | | (Continued) INFORMATION ON MOTHER/FATHER/PARENT | | |
|---|---|---|---|---|---|
| 26. Precise Periods Abroad in U.S. Armed Forces, in other U.S. Government Employment, with Qualifying International Organization, or as a dependent child of a person so employed *(Specify) (if additional space is needed please use the Section D Continuation Sheet)* | | | 27. Precise Periods Abroad in U.S. Armed Forces, in other U.S. Government Employment, with Qualifying International Organization, or as a dependent child of a person so employed *(Specify) (if additional space is needed please use the Section D Continuation Sheet)* | | |
| Branch/Agency/Org. | Date *(month-day-year)* | Date *(month-day-year)* | Branch/Agency/Org. | Date *(month-day-year)* | Date *(month-day-year)* |
| | From | To | | From | To |
| | From | To | | From | To |
| | From | To | | From | To |
| | From | To | | From | To |
| | From | To | | From | To |
| | From | To | | From | To |
| | From | To | | From | To |
| | From | To | | From | To |
| | From | To | | From | To |
| | From | To | | From | To |

**B. THIS SECTION TO BE COMPLETED BEFORE/BY CONSULAR OFFICER, NOTARY PUBLIC, OR OTHER PERSON QUALIFIED TO ADMINISTER OATH**

NOTE: If a U.S. citizen parent transmitting citizenship to the child born out of wedlock is not present, he or she may complete State Department Form DS 550 Affidavit of Parentage Physical Presence and Support and submit separately. Only the U.S. citizen father of a child born abroad out of wedlock must complete the acknowledgement of paternity and agreement to provide financial support.

28. I _____ do solemnly swear *(or affirm)(check all that apply)*

*(Name)*

☐ I am a U.S. citizen or non-citizen national.  ☐ I am the father of _____ .

*(Name of Child)*

who was born on _____ in _____ .  ☐ My child was born out of wedlock, and I am the

*(Date of Birth)*            *(Place of Birth)*

the father through whom he/she is claiming U.S. citizenship.  ☐ I agree to provide financial support for this child until he/she reaches the age of eighteen

_____

*(Signature of Affiant)*

SUBSCRIBED AND SWORN TO *(AFFIRMED)* before me this _____ day of _____ , _____

_____

*(Signature and Title of Administering Officer)*

*(SEAL)*

DS-2029
04-2016

Page 3 of 7

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 011**

(Continued)

### THIS SECTION TO BE COMPLETED BEFORE/BY CONSULAR OFFICER, NOTARY PUBLIC, OR OTHER PERSON QUALIFIED TO ADMINISTER OATHS

29. Affirmation:  I SOLEMNLY SWEAR (OR AFFIRM) THAT THE STATEMENTS MADE ON THIS APPLICATION ARE TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF.

| Name of Person(s) Providing Information | Relationship to the Child (Parent, Legal Guardian, Other (Specify)) | Signature of Person(s) Providing Information |
|---|---|---|
| ELAD OVASH-BANAS | Father | |
| Andrew Ovash-Banks | Father | |

| Type Name and Title of Official | Signature of Official | City | Date |
|---|---|---|---|
| TERRI N. DAY VICE CONSUL OF THE UNITED STATES OF AMERICA | | TORONTO | JAN 2 4 2017 (month) (day) (year) |

Subscribed to: (SEAL)

---

30. Approval of Consular Report of Birth

_____ (Printed Name of Consular Officer)

_____ (Signature of Consular Officer)

_____ (Approving Post)

__/__/__ (month) (day) (year) (Date of Approval)

DENIAL (Registration Number)

DS-2029
04-2016

Page 4 of 7

| C. | FOR OFFICIAL USE |
|---|---|

31. Documents Presented - Please mark accordingly and provide date of document. (If more space is required, list on separate page)

☑ Child's Birth Certificate   11 / 09 / 2016   MISSISSAUGA (City)   Ontario (Province)   Canada (Country)
(month) (day) (year)

☑ Marriage Certificate   10 / 05 / 2010   __/__/__   Toronto (City)   (State)
(month)(day) (year) (File Date)   (month)(day) (year) (Date of Issuance)

Ontario (Province)   Canada (Country)

☐ Divorce Decree(s) (a)   __/__/__   __/__/__   (City)   (State)
(month)(day) (year) (File Date)   (month)(day) (year) (Date of Issuance)

(Province)   (Country)

(b) __/__/__   __/__/__   (City)   (State)
(month)(day) (year) (File Date)   (month)(day) (year) (Date of Issuance)

(Province)   (Country)

(c) __/__/__   __/__/__   (City)   (State)
(month)(day) (year) (File Date)   (month)(day) (year) (Date of Issuance)

(Province)   (Country)

☐ Death Certificate(s) (a) __/__/__   (City)   (State)
(month) (day) (year)

(b) __/__/__   (City)   (State)
(month) (day) (year)

☑ Mother/Father/Parent's Passport   ▓▓▓▓▓ (Passport Number)   04 / 21 / 2010 (month) (day) (year) (Date of Issuance)   Israeli citizen (Nationality)

☑ Mother/Father/Parent's Passport   ▓▓▓▓▓ (Passport Number)   03 / 03 / 2010 (month) (day) (year) (Date of Issuance)   US citizen (Nationality)

☐ Other Identity Document of Mother/Father/Parent (e.g. Naturalization Certificate)   (Name of the Citizenship Document)   (Document Number)   __/__/__ (month) (day) (year) (Date of Issuance)

☐ Other Identity Document of Mother/Father/Parent (e.g. Naturalization Certificate)   (Name of the Citizenship Document)   (Document Number)   __/__/__ (month) (day) (year) (Date of Issuance)

☐ Other Identity Document of Mother/Father/Parent (e.g. Driver's License)   (Name of the Identity Document)   (Document Number)   __/__/__ (month) (day) (year) (Date of Issuance)

☐ Other Identity Document of Mother/Father/Parent (e.g. Driver's License)   (Name of the Identity Document)   (Document Number)   __/__/__ (month) (day) (year) (Date of Issuance)

☑ Other (Legal Guardianship; Power of Attorney, etc.)   custody documents (Name of the Document)   FS-16-2112 3 (Document Number)   __/__/__ (month) (day) (year) (Date of Issuance)

DS-2029
04-2016

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 013**

Page 5 of 7

**D.**  CONTINUATION SHEET *(USE THIS SPACE FOR ADDITIONAL INFORMATION)*

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 014**

Plaintiffs' Partial Summary Judgment Exhibit G
Page 214

Certified A True
Photostatic
Print of a Record

Photocopie certifiée
conforme d'un document

on file at the
Office of the Registrar General
Ontario, Canada

déposée aux dossiers du
Bureau du registraire général
(Ontario) Canada

Ontario

Office of the Registrar General
Bureau du registraire général

Registration Number:
Numéro d'enregistrement

Certificate number:
Numéro de certificat    P3319402

Date Issued:
Date de délivrance       Nov 09 2016

File number:
Numéro de dossier        01599220-01-

PAGE 1

### Ontario · ServiceOntario

Office of the
Registrar General
189 Red River Road
PO Box 4600
Thunder Bay ON P7B 6L8

**Statement of Live Birth**
Form 2
Vital Statistics Act

This is a permanent legal record.
Please read all instructions before completing this form.
Type or print clearly in blue or black ink and complete all items.

**Section A - Child's Information (see Instruction #1)**

| Last Name | | Sex of Child |
| --- | --- | --- |
| | | Male |
| First Name | Middle Name(s) | |
| Date of Birth (yyyy/mm/dd) 2016/09/16 | Name of hospital (if not hospital give exact location where birth occurred) Credit Valley Hospital | |
| Place of Birth (City/Town/Village/Township) Mississauga | (Regional municipality, county or district) PEEL | |

**Section B - Father's Information - (see Instruction #2)**  ·  **Section C - Father's Information - (see Instruction #3)**

| Current Legal Last Name Dvash-Banks | Current Legal Last Name Dvash-Banks |
| --- | --- |
| Legal Last Name at Birth Banks | Legal Last Name at Birth Dvash |
| First and Middle Name(s) Andrew Mason | First and Middle Name(s) Elad |
| Any Other Legal Last Name(s) | Any Other Legal Last Name(s) |
| Place of Birth (City/Town/Village/Township) Santa Monica | Place of Birth (City/Town/Village/Township) Ramat Gan |
| Place of Birth (Province/Country) California, USA  Date of Birth (yyyy/mm/dd) 1981  Age 35 | Place of Birth (Province/Country) Israel  Date of Birth (yyyy/mm/dd) 1985  Age 31 |

Marital Status of Parent in Section B:  [ ] Single  [✓] Married  [ ] Common Law  [ ] Divorced  [ ] Widowed

**Section D - Birth Information**

| Residence of Parent in Section B - Complete street address (City, town, village, township - if rural give Post Office or Rural Route address) Avenue, Toronto | Postal Code M6B4C6 |
| --- | --- |
| Mailing Address of Parent in Section B (if different from above - Complete street address (if rural give Post Office or Rural Route address)) | Postal Code |

| Duration of pregnancy (in weeks) 32 | Total number of children ever born to this parent including this birth  2 | Weight at birth Grams 1950 | Kind of birth [ ] Single  [✓] Twin  [ ] Triplet  [ ] Other | If multiple birth, state whether this child was born 1st, 2nd, etc. 2nd |
| --- | --- | --- | --- | --- |
| | Of this Total, number born live  2 | | | |
| | Of this Total, number stillborn  0 | | | |

Name of Attendant at birth  Dr Myckan Kerry   [✓] Physician  [ ] Midwife  [ ] Other, specify

**Section E - Certification of Informant (Please read Instruction #1 before signing)**

If you are choosing a last name that is not one of the parent's last names or a combination of those names, but is in accordance with the child's cultural, ethnic, or religious heritage, check one of the following boxes:

[ ] Cultural Heritage   [ ] Religious Heritage   [ ] Ethnic Heritage

I (We) certify the statements made on this form are true and correct. I (We) are(is) aware that it is an offence to wilfully make a false statement on this form.    Signature of Father X _Father_   Date (yyyy/mm/dd) 2016/10/08

I (We) have agreed that the child's last name will be as shown in section A.   [✓] Yes  [ ] No    Signature of Father X _Father_   Date (yyyy/mm/dd) 2016/10/08

Signature of Informant (see Instruction #1) X    Date (yyyy/mm/dd)

**Section F - Office Use Only**

I approve this statement and register the birth by signing this statement.   Signature of Manager X    Date (yyyy/mm/dd) 2016/11/03

Office Use Only

UPDATED GEO CODE

11332E (2016/08)  © Queen's Printer for Ontario, 2016

A True Copy of the
Signed Original.

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 015**

Alexandra Schmidt

**Alexandra Schmidt**
Deputy Registrar General
Registraire générale adjointe

---CERTIFIED COPY---
NOT VALID WITHOUT ALL PAGES

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 016**



A True Copy of the Signed Original.

TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 017





Certified A True
Photostatic
Print of a Record

on file at the
Office of the Registrar General
Ontario, Canada

Registration Number:
Numéro d'enregistrement :

Certificate number:
Numéro du certificat : **P 1338811**

Ontario

Office of the Registrar General
Bureau du registraire général

Photocopie certifiée
conforme d'un document

se trouvant dans les dossiers du
Bureau du registraire général
(Ontario) Canada

Date issued:
Date de délivrance : **Oct 05 2010**

File number:
Numéro de dossier : **01076584-01-3**

---

Ontario — Ministry of Government Services — Office of the Registrar General

**Marriage Licence**

Licence number: **E 0689966**

Part 1 – To be completed by the office issuing this licence

1. Date this licence was issued: 19 Aug 2010
2. Municipality where licence was issued: City of Toronto
3. Name of licence issuer or deputy issuer: Catherine Mannea
5. Proposed place of marriage: Toronto — 19 Aug 2010

Part 2 – Marriage Affidavit (Form 4)

7. Last legal name before this marriage: Banks
8. First and middle names: Andrew Mason
9. Marital status: [x] never married
11. Religious denomination: Jewish — 12. Age: 29 — Date of birth: 1981
13. Province where applicant was born: USA
14. Father's name: Banks, James Howard
15. Mother's name before marriage: Mason, Ann
16. Province where the applicant's father was born: Ontario
17. Province where the applicant's mother was born: Ontario

24. Last legal name before this marriage: Dvash
25. First and middle names: Elad
26. Marital status: [x] never married
28. Religious denomination: Jewish — 29. Age: 25 — Date of birth: 1985
30. Province where joint applicant was born: Israel
31. Father's name: Dvash, Mordelay
32. Mother's name before marriage: Abudi, Tova
33. Province where the joint applicant's father was born: Israel
34. Province where the joint applicant's mother was born: Israel

18. Name in full of applicant: Andrew Mason Banks
and
Name in full of joint applicant: Elad Dvash

...make oath and say as follows...

Sworn/affirmed before me at City of Toronto in the Province of Ontario
this 19th day of August 2010

30. Present address of applicant: Avenue — 31. Province: ON — City or town: Toronto — Postal code: M4S 2H4 — Telephone number: 1 310-600-3568

33. Present address of joint applicant: Street — 37. Province — City or town: Givatayim, Israel — Postal code: 53482 — Telephone number: 1 723-573-2339

Part 3 – Statement of marriage – to be completed following the marriage ceremony (Form 5)

40. Place of marriage: TORONTO ONTARIO
41. Date of marriage: 19 AUGUST 2010

42. Signature of applicant: X
43. Signature of joint applicant: X

44. Signature of witness: X
45. Signature of witness: X

46. Signature of person who performed marriage: Bonkalo L. Bonkalo
47. Date: 19 AUGUST 2010

48. Name of person who performed marriage: BONKALO, ANNEMARIE ERIKA
49. Your status: [ ] Clergy [x] Judge [ ] Justice of the peace

50. Address of person who performed marriage: ONE QUEEN ST. EAST STE 8300, BOX 91, TORONTO ON M5C 2W5
51. Telephone number: 416 3A7 4824

52. Your registration number: T 2492
53. Your denomination (clergy only):

For use of the Registrar General only:
I am satisfied to the correctness of this statement and register this marriage

Signature: A.T. Leonetti
Date: AUG 2 5 2010

A True Copy of the
Signed Original.

Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 019

TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA



*Judith M Hartman*

Judith M. Hartman
Deputy Registrar General
Registraire générale adjointe
de l'état civil

11105(10/00)

—CERTIFIED COPY—
NOT VALID WITHOUT ALL PAGES

ONTARIO

**Superior Court of Justice**

*(Name of Court)*

at 393 University Avenue, Toronto, Ontario  M5G 1E6

*(Court office address)*

| Court File Number |
| --- |
| FS-16-21123 |

Form 25: Order (General)

☐ Temporary

☒ Final

SEAL

**Applicant(s)**

| | |
| --- | --- |
| *(Full legal name & address for service: street, number, municipality, postal code telephone & fax numbers & e-mail address (if any).* | *Lawyer's name & address: street, number, municipality, postal code, telephone & fax numbers & e-mail address (if any).* |
| **Elad Dvash-Banks and Andrew Dvash-Banks** ▮▮▮▮ Avenue, Unit ▮▮ Toronto, Ontario **M6B 4C6** | **Michelle Flowerday** **Flowerday Law | Fertility & Family** **158 McRae Drive** **Toronto, Ontario  M4G 1S7** T: 416.428.5511 F: 647.341.5111 E: michelle@flowerdaylaw.ca |

The Honourable

*[signature]*

Judge (Print or type name)

September 28, 2016

Date of order

**Respondent(s)**

| | |
| --- | --- |
| Full name & address for service: street, number, municipality, postal code telephone & fax numbers & e-mail address (if any). | Lawyer's name & address: street, number, municipality, postal code, telephone & fax numbers & e-mail address (if any). |
| **Amanda Marie Anne Adams** ▮▮▮▮ Avenue, Unit ▮▮ **Mississauga, Ontario** **L5A 2K7** **Deputy Registrar General for the Province of Ontario** **Ministry of the Attorney General** **Legal Services Branch** **77 Wellesley Street West** **Ferguson Block, 6th Floor** **Toronto, Ontario  M7A 1N3** | |

The court read an application/motion made by *(name of person or persons)*

The Applicants, Elad Dvash-Banks and Andrew Dvash-Banks

The following persons were in court *(names of parties and lawyers in court)*

Michelle Flowerday, Counsel for the Applicants

The court received evidence and heard submissions on behalf of *(name or names)*

The Applicants, Elad Dvash-Banks and Andrew Dvash-Banks

Under the *Children's Law Reform Act*, Section 4(1), (2) and (3), and the *Courts of Justice Act*, Section 97,

1. It is declared that the Applicants, Elad Dvash-Banks and Andrew Dvash-Banks, are the parents of the child, ▮▮▮ J▮▮ D▮▮-B▮▮ born September 16, 2016 ("the child"), and that the Applicants are recognized for all purposes in law to be the parents of the child.

2. It is declared that the Respondent, Amanda Marie Anne Adams, is not the mother of the child.

A True Copy of the
Signed Original.

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 021**

Under the *Vital Statistics Act*,

3.  The Deputy Registrar General for the Province of Ontario is directed to register the birth of the child so as to show the Applicants, Elad Dvash-Banks and Andrew Dvash-Banks, as the parents of the child.

~~Under the *Consolidated Provincial Practice Direction of the Ontario Superior Court of Justice*,~~ Section F, Paragraphs 106 and 107,

4.  Service and filing of a notice of motion or application with respect to the relief granted under paragraphs 6, 7 and 8 of this Order are dispensed with.

5.  Notice to the media with respect to the relief granted under paragraphs 6, 7 and 8 of this Order is dispensed with.

Under the *Courts of Justice Act*, Section 137(2),

6.  The Registrar of the Ontario Superior Court of Justice is directed to seal and treat as confidential all documents filed in this proceeding.

7.  No person shall publish or make public information that has the effect of identifying either Applicant or the other persons identified in the materials filed in this proceeding.

8.  The name of this proceeding shall be amended to show only the initials of the parties and the Registrar of the Ontario Superior Court of Justice is directed to amend the records accordingly.

9.  The Deputy Registrar General for the Province of Ontario is directed to seal and treat as confidential the Notice of Live Birth and all other records in its possession in connection with this case, including this Order, save and except for Form 2 (Statement of Live Birth) and the Birth Certificate.

*Put a line through any blank space left on this page.*

_Sept 28, 2016_
Date of signature

_Harrison Yua_
Signature of judge or clerk of the court

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

SUPERIOR COURT OF JUSTICE
COUR SUPÉRIEURE DE JUSTICE
ENTERED / ENTRÉ

SEP 2 8 2016

per/par        Justin DiGiacinto
LOCAL REGISTRAR / GREFFIER LOCAL

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 022**

## CONFIDENTIAL AGREEMENT

THIS IS AN AGREEMENT made on this 21ST day of December, 2015

A M O N G :

### ANDREW DVASH-BANKS

(herein called "**Andrew**")

-and-

### ELAD DVASH-BANKS

(herein called "**Elad**")

-and-

### AMANDA MARIE ANNE ADAMS

(herein called the "**Gestational Carrier**")

## PART I
## BACKGROUND

1.1        Andrew and Elad (collectively called the "**Intended Parents**") are a same-sex married couple who require assisted reproductive technology to have a child.

1.2        The Intended Parents intend to conceive a Child by Transferring Ova supplied by a third party anonymous donor fertilized by Sperm supplied by Andrew and/or Elad to the Gestational Carrier.

1.3        The Gestational Carrier intends to act as the gestational carrier for the Child and to carry the Child until it is born. The Gestational Carrier has offered to carry the Child on an altruistic basis, and only those out of pocket expenses related to the surrogacy shall be reimbursed to her. The Gestational Carrier has ONE (1) child of her own and is not currently in a relationship of permanence.

1.4        Ova retrieved from the third party anonymous donor and Sperm supplied by Andrew and/or Elad will be incubated externally. Fertilization may occur during this incubation period when a Sperm penetrates the cell wall of an ovum and their nuclei join together creating a single cell fertilized ovum which develops into an embryo.

1.5        Unless in her sole discretion the Gestational Carrier agrees at the time to the insertion of a greater number of Embryos, a maximum of TWO (2) Embryos will be medically inserted in the uterus of the Gestational Carrier during each in vitro fertilization cycle.

A True Copy of the Signed Original.

TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 023**

1.6      The Intended Parents and the Gestational Carrier know that more than one child may result from this procedure and, if more than one child is born, "Child" in this Agreement, will mean "Children".

1.7      The Gestational Carrier believes that it would be in the best interests of the Child for the Child to be in the custody of the Intended Parents immediately upon Birth, and the Gestational Carrier hereby expresses her intention to waive all parental rights which she may have to any Child.

1.8      The Intended Parents will be recognized as the Child's parents immediately upon the Child's Birth.

1.9      The Intended Parents intend to assume full care of, and all parental responsibility for the Child, and the Gestational Carrier intends to allow the Intended Parents to assume this care and responsibility without reserving any care or responsibility to herself.

1.10     Immediately upon the Birth of the Child, the Gestational Carrier will give the Child into the permanent custody of the Intended Parents and as soon as reasonably possible thereafter the Intended Parents will make an application in the Ontario Superior Court of Justice seeking a declaration of parentage on their part, and a declaration of non-parentage on the part of the Gestational Carrier.

1.11     All Parties to this Agreement wish to maintain confidentialities between themselves, one to another, and between themselves and the public.

1.12     It is expressly understood that this Agreement is not intended in any way to represent a contract regarding payment in exchange for a child, or for the relinquishment of a child, and that the Parties acknowledge that no consideration has been offered to or accepted by the Gestational Carrier which would induce her to act as a surrogate.

**NOW THEREFORE THIS AGREEMENT WITNESSES** that in consideration of the mutual covenants and promises contained in this Agreement and with the intention of being fully bound by its terms, the Parties do hereby covenant and agree as follows.

## PART II
## DEFINITIONS

Where used in this, unless the context otherwise requires, the following terms will have the following meanings:

(a)     "**Attending Physician**" means the physician or licensed midwife attending to the maternal care of the Gestational Carrier and attending at the Birth of the Child, as may be agreed to in writing by the Parties;

(b)     "**Birth**" means "birth" as defined in s. 1 of the *Vital Statistics Act* of Ontario, and includes a "Full Term Still-Birth" unless otherwise stated;

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 024**

(c)     "**Child**" means the child conceived by I.V.F. (defined below) as described in this Agreement and if there are multiple births means the children conceived by the procedure contemplated in this Agreement;

(d)     "**Clinic**" means The Toronto Institute for Reproductive Medicine, 56 Aberfoyle Crescent, Unit 300, Toronto, Ontario M8X 2W4;

(e)     "**Early Miscarriage**" means the complete expulsion or extraction from the Gestational Carrier of a product of conception before the beginning of the twelfth $(12^{th})$ week of gestation;

(f)     "**Embryo**" or "**Fertilized Ova**" or "**Fertilized Ovum**" means the product of I.V.F. (hereinafter defined). For clarification, Fertilized Ova may result from Sperm supplied by Andrew and Elad with the potential of the Gestational Carrier becoming Pregnant with Fetuses that are genetically connected to each of Andrew and Elad;

(g)     "**Fetus**" means the Embryo from the moment of the completion of the Transfer until the moment of Birth;

(h)     "**Full Term Still-Birth**" means a still-birth which occurs during or after the 36th week of gestation;

(i)     "**Guardians**" means Tova and Mordehay Dvash;

(j)     "**Hospital**" means Trillium Health Partners;

(k)     "**Intended Parents**" means **ANDREW DVASH-BANKS** and **ELAD DVASH-BANKS**;

(l)     "**Gestational Carrier**" means **AMANDA MARIE ANNE ADAMS**;

(m)     "**I.V.F.**" means in vitro fertilization and embryo transfer which is a medical procedure whereby ova are inseminated with sperm and allowed to incubate so that fertilization occurs by a sperm penetrating the cell wall of an ovum and their nuclei joining together to create a single cell fertilized ovum. Several fertilized ova usually result from a single in vitro fertilization and after the single cell fertilized ova have started to divide to form an embryo, some will be Transferred into the uterus of the Gestational Carrier and some may be frozen for Transfer at a later date. The Embryo or Embryos that are Transferred pursuant to this may be from an Embryo or Embryos that have been incubated previously and frozen;

(n)     "**Miscarriage**" means the complete expulsion or extraction from the Gestational Carrier of a product of conception between the twelfth $(12^{th})$ and twentieth $(20^{th})$ week of gestation. Miscarriage in this Agreement does not include an Early Miscarriage;

Dvash-Banks and Adams Surrogacy Agreement | Final Version     **TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 025**

(o) "Ova" means the sex cells of a third party donor;

(p) "Parties" means the parties to this Agreement, being ANDREW DVASH-BANKS, ELAD DVASH-BANKS, and AMANDA MARIE ANNE ADAMS, and "Party" means any one of the Parties individually;

(q) "Pregnancy" means the medical condition that occurs when the Fertilized Ovum or Embryo, resulting from the third party anonymous Ova and the Sperm of Andrew and/or Elad, has been transferred to the Gestational Carrier and successfully implants, resulting in a pregnancy being diagnosed based on blood test results and does not include a chemical pregnancy;

(r) "Requested Termination" means: (i) a termination of the Pregnancy with the consent of or at the request of the Intended Parents; or (ii) a termination of the Pregnancy performed in accordance with the recommendation of the Transfer Physician and/or the Attending Physician because the Pregnancy poses a serious risk to the health or life of the Gestational Carrier;

(s) "Special Expense Amount" means the amount reimbursable under the section called SPECIAL EXPENSE AMOUNT, below;

(t) "Sperm" means the sex cells of Andrew and/or Elad;

(u) "Still-Birth" means "still-birth" as defined in s. 1 of the *Vital Statistics Act* of Ontario and does not include a Full Term Still-Birth unless otherwise stated;

(v) "Term of this Agreement" means, subject to Section 25.1, the period commencing on the date of execution of this Agreement by the last Party to do so, and ending on the day which is the earlier of: (i) the date of termination of the Agreement; (ii) TWO (2) weeks after a Pregnancy ends in Early Miscarriage; (iii) FOUR (4) weeks after a Pregnancy ends in Miscarriage, Requested Termination or Still-Birth; or (iv) SIX (6) weeks after the Birth of a Child;

(w) "Transfer" and "Transferred" mean the manual deposit of one or more Fertilized Ovum or Embryo into the uterus of the Gestational Carrier; and

(x) "Transfer Physician" means Dr. Alfonso Del Valle or, in the event that Dr. Del Valle is not available, another physician in the Clinic, as may be agreed to by the Parties.

## PART III
## PSYCHOLOGICAL ASSESSMENTS

3.1    The Gestational Carrier acknowledges that prior to the execution of this Agreement, she was assessed by a counsellor at the Clinic (the "Counsellor"), who determined that she is fit to undertake the obligation to carry the Child during a Pregnancy, and that she is willing to relinquish the Child on Birth to the Intended Parents and is competent to enter into this

Dvash-Banks and Adams Surrogacy Agreement | Final Version

TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 026

ADB ∈ DB

Agreement. The Gestational Carrier further acknowledges that for the purposes of this Agreement only, she has made an exception to the privilege of confidentiality to allow the Counsellor to advise the Intended Parents whether or not she is psychologically fit to fulfill the obligations she has assumed under this Agreement, and has consented, and does hereby confirm the consent to the release to the Intended Parents of such information only.

3.2     The Intended Parents acknowledge receipt of the advice of the Counsellor about the assessment of the Gestational Carrier, and acknowledge that they are satisfied with the assessment and that they accept the findings and conclusions.

## PART IV
## ACKNOWLEDGEMENTS AND UNDERTAKINGS

4.1     Each Party acknowledges that the recitals are accurate, binding and form part of this Agreement.

4.2     Each Party acknowledges that he or she is fully informed about the I.V.F., egg retrieval and Transfer procedure and each understands the medical and legal issues involved.

4.3     In particular, the Gestational Carrier acknowledges that she has been informed by a physician specializing in fertility procedures of the risks to the Gestational Carrier involved in preparing her to receive the Transfer, the Transfer procedure itself, the Pregnancy and the Birth which may result, including the possibility of multiple births (or, alternatively, any termination or reduction of the Pregnancy) and further acknowledges that she understands these risks and releases the Intended Parents with respect to all such risks including, without limitation, the health of the Ova and any Embryos created with the Ova, which are transferred to the Gestational Carrier.

4.4     During the Term of this Agreement, each of the Parties agrees to inform each other forthwith, in writing, of any material change in their circumstances which may reasonably affect their performance of this Agreement in accordance with its terms. These changes include, but are not limited to, change in marital status, change of mailing address or email address, illness or death of a Party, loss of employment, changes in insurance coverage and exposure to communicable illness or any risk to health.

## PART V
## MEDICAL EXAMINATIONS

5.1     Within a reasonable period prior to undertaking any medical procedure contemplated by this Agreement, the Gestational Carrier and the Intended Parents will undergo a thorough consultation and evaluation by the Transfer Physician, to determine whether the Gestational Carrier is physically healthy and capable of conceiving and carrying a Child to Birth and to determine whether the Intended Parents are fit to proceed with the procedures contemplated by this Agreement. The evaluation of all Parties will include testing for transmittable diseases, including, but not limited to, Hepatitis B and C and HIV in order to

Dvash-Banks and Adams Surrogacy Agreement | Final Version



TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 027**

Page | 6

protect the health of the Gestational Carrier and the Child.

5.2     The Gestational Carrier warrants and represents that she has disclosed her full medical history to the Transfer Physician and has advised the Transfer Physician of any medications which she is currently taking.

5.3     The Gestational Carrier and the Intended Parents will undergo any medical testing that the Transfer Physician and/or the Attending Physician deem necessary, within the time frame specified by the referring physician, acting reasonably, during the Term of this Agreement, at the expense of the Intended Parents.

5.4     Each Party, for the purposes of this Agreement only, has made or hereby makes an exception to the privilege of confidentiality to allow information to be given to the other Parties and their solicitors, and has consented or hereby consents, to the release of the reports, test results, and all relevant information obtained in the examination or examinations and tests to each of the other Parties, or any one or more of them.

## PART VI
## COUNSELLING PROGRAM AND MEDIATION

6.1     The Gestational Carrier acknowledges that she may choose to participate in a counselling program, or, she may choose to meet with a counsellor as required at any time during the Term of the Agreement. Any costs of this program will be included in the Special Expense Amount. Each Party for the purposes of this Agreement has made or hereby makes an exception to the privilege of confidentiality to allow information derived in counselling sessions to be given to the other Parties and their solicitors, and has consented or hereby consents to the release of relevant information pertaining to the wellbeing of the Pregnancy and obtained in the counselling sessions.

## PART VII
## SEXUAL ABSTINENCE

7.1     During the time period set out in this Agreement, the Gestational Carrier will not engage in any sexual activity whereby semen could cause her to conceive a child, or risk the health of the unborn Child. To this end, she will abstain from sexual intercourse completely for a continuous period commencing TWO (2) weeks before each Transfer and ending on the earlier of: (i) confirmation by the Transfer Physician that a Pregnancy has not been initiated; or (ii) the date on which the first ultrasound examination after each Transfer has been performed, unless the Transfer Physician recommends a longer period of abstinence.

7.2     The Intended Parents acknowledge that the Gestational Carrier is single. The Gestational Carrier agrees that she will provide notice to the Intended Parents if that status changes, and further agrees as follows:

          (a)     Prior to commencing a sexual relationship with a new partner, the Gestational Carrier covenants and agrees that she will ensure that such

Dyash-Banks and Adams Surrogacy Agreement I Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 028**

individual undergoes testing for transmittable diseases, and further agrees not to engage in a sexual relationship with such new partner until the testing confirms that he does not have any transmittable diseases;

(b) At all times during the Term of this Agreement, the Gestational Carrier shall engage only in safe sexual practices in order to protect herself and the Fetus from infection by the HIV virus or any venereal or other transmittable disease and agrees not to engage in sexual intercourse unless her partner uses a condom; and

(c) If, during the Term of this Agreement, the Gestational Carrier becomes involved in a common law relationship, or becomes married, the Gestational Carrier agrees that she will ensure that her spouse signs an amending agreement pursuant to which he acknowledges that: (i) he is not the Child's father; (ii) he will release the Intended Parents from any claims he may have; (iii) he will co-operate with respect to any post-birth process confirming the parentage of the Intended Parents; and (iv) he will abide by the provisions of this Agreement including the requirement to refrain from sexual activity with a third party outside of his monogamous relationship with the Gestational Carrier.

7.3        At all times during the Term of this Agreement, the Intended Parents will not engage in any sexual activity with a third party outside of their marital relationship to protect themselves, the Gestational Carrier and the Child from infection by the HIV virus or any venereal or other transmittable disease.

## PART VIII
## TRANSFERS

8.1        The Gestational Carrier will hold herself available to receive Transfers under this Agreement to be scheduled at mutually convenient times for up to TWELVE (12) months from the date of the execution of this Agreement by the last Party to do so, and will not perform any act or any thing which would interfere with the proper performance of her obligations under this Agreement.

8.2        The Gestational Carrier will accept a Transfer implanted by the Transfer Physician at the Clinic on as many as FOUR (4) separate occasions, including Transfers of frozen Embryos, if any, at times recommended by the Transfer Physician and approved by the Parties in order to achieve a Pregnancy subject to all Transfers being completed within TWELVE (12) months from the date of the execution of this Agreement by the last Party to do so and thereafter the Gestational Carrier will have no obligation to accept any Transfer.

8.3        Unless the Parties mutually agree to a greater number of Embryos, on each Transfer a maximum of TWO (2) Embryos will be medically inserted in the uterus of the Gestational Carrier.

Dvash-Banks and Adams Surrogacy Agreement | Final Version



**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 029**

8.4     The Gestational Carrier will follow all medical instructions prescribed by the Transfer Physician prior to a Pregnancy and during the first trimester of a Pregnancy. The Gestational Carrier will continue to follow the protocol prescribed by the Transfer Physician, which will include stimulating the Gestational Carrier so that her uterine lining is prepared for the Transfer of Embryos. The Gestational Carrier will undergo all necessary testing (including blood testing and ultrasound testing) to determine the readiness of the Gestational Carrier's uterus for the Transfer of Embryos.

8.5     If a Pregnancy does not result after FOUR (4) Transfers (including Transfers of frozen Embryos) then this Agreement may be terminated by any Party giving notice in the manner prescribed by the section called NOTICE, below, to all other Parties at any time before a Pregnancy has occurred and, upon delivery of such notice, this Agreement will terminate and the Intended Parents and the Gestational Carrier will be released from all obligations under it, except the obligation to reimburse the Gestational Carrier's allowable expenses pursuant to the section called SPECIAL EXPENSES, below, which have been incurred to the time of the termination. If no such notice of termination is given, this Agreement will remain in full force and effect until a notice of termination is given.

8.6     Notwithstanding anything contained in this Agreement, the Intended Parents or the Gestational Carrier may terminate this Agreement at any time after the first Transfer upon giving notice to the other Party, if a Pregnancy has not resulted from the Transfer. Upon such termination the Intended Parents and the Gestational Carrier will be released from all obligations under this Agreement, except for the obligation to reimburse the Gestational Carrier for any expense incurred to the time of termination and payable under the section called SPECIAL EXPENSES, below.

8.7     If a Transfer results in a Pregnancy, the Gestational Carrier will use her best efforts to carry the Fetus to term. The Gestational Carrier will give Birth to the Child at the Hospital or such other hospital as may be agreed to in writing by the Parties.

8.8     The Gestational Carrier agrees to provide the Intended Parents with a weekly update with respect to the Pregnancy, and such update may be by email, Skype or telephone as agreed to by the Parties.

8.9     The Gestational Carrier agrees that either or both of the Intended Parents may accompany her to any obstetrical appointment, or pre-natal test or procedure. The Gestational Carrier further consents to the presence of the Intended Parents in the delivery room at the time of the Birth of the Child. In the event that the Hospital limits the number of visitors that may be present at the Birth of the Child, the Intended Parents acknowledge and agree that the Gestational Carrier shall be entitled to select one such visitor. The Gestational Carrier agrees to contact the Intended Parents at the first indication that labour has begun.

TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 030**

## PART IX
### PRENATAL OBLIGATIONS

9.1      The Gestational Carrier warrants and represents that:

(a)      she has never abused alcohol or drugs;

(b)      she has never taken any drugs, whether legal or illegal, which may impact upon the success of a Pregnancy contemplated by this Agreement and the Birth of a healthy Child;

(c)      she is not now using, and has not in the TWELVE (12) months previous to the date of this Agreement, used an illegal drug;

(d)      she will not, during the Term of the Agreement, use any illegal drugs; and

(e)      she has never been charged with a criminal offence.

9.2      The Gestational Carrier warrants and represents that she will strictly comply with all of her obligations set out in the following paragraphs:

9.3      The Gestational Carrier will follow all medical advice given by the Transfer Physician and the Attending Physician, and will undergo all medical procedures that either of them require to ensure that her obligations under this Agreement are safely and successfully performed for both the Gestational Carrier and the Child. Without limiting the generality of the foregoing, if the Attending Physician determines that a Caesarean Birth is advisable for the health and safety of either the Gestational Carrier or the Child, then the Gestational Carrier hereby consents to such procedure. The Gestational Carrier further consents to submit to amniocentesis and all other tests recommended by the Transfer Physician and the Attending Physician and those tests requested by the Intended Parents on the advice of the Transfer Physician, should she become Pregnant pursuant to the terms of this Agreement.

9.4      The Gestational Carrier will follow a prenatal medical examination schedule and prenatal procedures prescribed by the Transfer Physician and/or the Attending Physician who will be responsible for the Gestational Carrier's medical care during the prenatal period. If a medical illness or condition is suspected or diagnosed during the Pregnancy, the Gestational Carrier agrees that she will seek medical attention, and will follow all medical instructions and course of treatment as prescribed.

9.5      The Gestational Carrier covenants and agrees to have the integrated pre-natal screen (IPS), parts one and two:

(a)      at approximately 12 weeks, Part 1 of the IPS, which consists of a nuchal translucency ultrasound and associated maternal bloodwork; and

(b)      at approximately 16 weeks, Part 2 of the IPS, which consists of the appropriate

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 031**

maternal blood tests.

The results of the IPS will be forwarded to the Attending Physician.

9.6

    (a)    The Gestational Carrier warrants that she does not smoke and will not smoke, or expose herself or herself to be exposed to second-hand smoke, for the length of time commencing THIRTY (30) days prior to each Transfer and throughout any ensuing Pregnancy.

    (b)    The Gestational Carrier warrants that she will not drink alcoholic beverages for the length of time commencing THIRTY (30) days prior to each Transfer and throughout any ensuing Pregnancy.

    (c)    The Gestational Carrier further warrants that she will maintain a proper diet and exercise regime as recommended by the Transfer Physician and/or the Attending Physician. All costs incurred by the Gestational Carrier in fulfilling her obligations pursuant to this Section 9.6(c) shall, subject to the cap on the Special Expense Amount, be included in the Special Expenses.

9.7    The Gestational Carrier will obtain adequate prenatal medical care including, without limitation, the care contemplated by this Part IX in order to enhance the success of the Pregnancy and the Birth of a healthy Child.

9.8    The Gestational Carrier covenants and agrees that during the Term of this Agreement she will not:

    (b)    not ingest, inhale, inject or absorb any drugs, pharmaceutical or herbal substances including, without limitation, over the counter medication, not prescribed or approved, in writing, by the Transfer Physician or the Attending Physician (with the exception of Tylenol consumed at or below the recommended dosage for pregnant women). If the Transfer Physician approves any such medications, the Gestational Carrier agrees to follow the instructions of the Transfer Physician and/or Attending Physician with respect to dosage of substances or medication;

    (c)    not have any part of her body pierced or tattooed;

    (d)    use her best efforts to avoid all exposure to radiation or toxic chemicals; and

    (e)    avoid any potentially hazardous situations or activities that a reasonable person would conclude are likely to result in harm to herself or the Fetus.

9.9    Failure to comply with this Part IX will constitute a material breach of the Gestational Carrier's obligations under this Agreement.

Dvash-Banks and Adams Surrogacy Agreement | Final Version

TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

9.10

(a) After the Gestational Carrier becomes Pregnant with the Child, the Gestational Carrier and the Intended Parents will keep each other reasonably informed of their whereabouts.

(b) From and after the first day of the 24th week of the Pregnancy, the Gestational Carrier may only travel outside of Canada: (i) in the event of a severe illness or death in her immediate family; (ii) if she has obtained the prior written consent of the Intended Parents, which shall not be unreasonably withheld; (ii) if she has the prior approval of the Attending Physician; and (iii) if she has a policy of travel health insurance covering her health care costs, the Birth of the Child and the Child's health care costs, which is in place prior to departure and for the duration of the travel.

(c) From and after the first day of the 24th week of the Pregnancy, the Gestational Carrier shall not travel to or visit the Provinces of Quebec, Saskatchewan, New Brunswick and/or Prince Edward Island.

(d) From and after the first day of the 28th week of the Pregnancy, the Gestational Carrier warrants and represents that she shall not travel by airplane.

(e) From and after the first day of the 34th week of the Pregnancy, the Gestational Carrier warrants and represents that she shall not travel more than a FORTY (40) minute drive from a hospital.

9.11    The Gestational Carrier will and hereby consents to the Transfer Physician and the Attending Physician keeping the Intended Parents informed at all material times of whether a Transfer has resulted in a Pregnancy, the progress of the Pregnancy, the results of all tests and any recommendations arising from test results, including all information relevant to the health of the Gestational Carrier and the Fetus, and the expected date of Birth. The Gestational Carrier will give the Attending Physician any further consent, authority or directions necessary to comply with this obligation to keep the Intended Parents so informed.

9.12    The Gestational Carrier hereby gives her consent, and will sign any medical consent forms to allow the Transfer Physician, the Attending Physician or any other doctor or hospital agreed to by the Parties to treat her as may be required in respect of the Pregnancy.

## PART X
## CONDITION PRECEDENT

10.1    The Parties each acknowledge that a finding by medical testing that either Andrew or Elad is a genetic parent of the Child is a condition precedent to the performance of the Intended Parents' obligations under this Agreement. For the purposes of determining the parentage of the Child, immediately after the Birth, the Intended Parents and the Gestational Carrier will submit to a DNA test and each Party consents to the immediate testing of the DNA

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 033

of the Child.

10.2     A finding that neither Intended Parent is a genetic parent of the Child will constitute a material breach of this Agreement unless the parentage is due to a clinical or physician's error in the fertilization or Transfer procedure. If there is a finding that neither Intended Parent is a genetic parent of the Child, and the same degree of testing confirms that the Gestational Carrier is not the genetic mother of the Child, a clinical or physician's error in the fertilization or Transfer procedure shall be deemed to have occurred and the Intended Parents shall assume responsibility for the Child as if it were their own.

10.3     If the Gestational Carrier is the genetic mother of the Child, the Gestational Carrier will refund, within THIRTY (30) days of the request, any Special Expense Amount paid on her behalf, or reimbursed to her, and will forego the reimbursement of any further allowable Special Expense Amount that would otherwise be, or become, reimbursable to her and the Intended Parents shall not be obliged to accept any responsibilities, social, legal or custodial, toward the Child, without prejudice to any of the rights that the Intended Parents are entitled to claim under this Agreement.

## PART XI
## WARRANTIES AND ACKNOWLEDGEMENTS

11.1     The Gestational Carrier warrants that, to the best of her knowledge, she is physically capable of carrying the Fetus to term and is capable of carrying and bearing healthy, normal children.

11.2     The Gestational Carrier warrants that, to the best of her knowledge, she has no transmittable disease and will submit to tests, including tests for the presence of HIV and Hepatitis B and C.

11.3     Andrew and Elad each warrant that, to the best of their knowledge, neither has a transmittable disease and each will submit to tests, including tests for the presence of HIV and Hepatitis B and C.

11.4     The Gestational Carrier acknowledges that it will be in the best interests of the Child for the Child to be placed in the custody of the Intended Parents immediately upon the Birth of the Child and for the Gestational Carrier to forever waive all parental and other rights in and to the Child that she has or may acquire in the future immediately upon the Birth of the Child.

## PART XII
## EARLY TERMINATION OF PREGNANCY

12.1     The Parties acknowledge that the Gestational Carrier has the right to have the Pregnancy terminated at any time she and either the Transfer Physician or the Attending Physician, in their absolute discretion, determine the Pregnancy should be terminated. However, the Gestational Carrier has assured the Intended Parents that it is not her intention to have an

Dvash-Banks and Adams Surrogacy Agreement | Final Version

TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 034**

abortion, unless the Intended Parents request that she does so in the circumstances set out below. The Gestational Carrier has further assured the Intended Parents that she will proceed with a Requested Termination at a time and place recommended by the Transfer Physician and/or Attending Physician if: (i) a test reveals that the Child is likely to have a serious genetic or congenital abnormality or defect; (ii) the Transfer Physician or the Attending Physician so recommends in writing; and (iii) the Intended Parents so request in writing. All costs incurred in connection with and directly related to the Requested Termination shall be borne by the Intended Parents and shall not form part of the Special Expense Amount.

12.2       In the interests of clarity, the Parties agree that any request to terminate the Pregnancy shall be in writing and signed by each of the Intended Parents.

12.3       The Gestational Carrier states that she does not intend to exercise her right to abortion:

(a)       except as set out in this Part XII, or

(b)       unless in the opinion of the Transfer Physician and/or the Attending Physician, terminating the Pregnancy is necessary to protect the Gestational Carrier's health or life, in which case the consent of the Intended Parents is not required.

12.4

(a)       The Gestational Carrier will undergo ultrasound, chorionic villus sampling, IPS, amniocentesis and similar tests and procedures to detect genetic and congenital abnormalities or defects in the Fetus, as recommended by the Transfer Physician and/or the Attending Physician.

(b)       The Intended Parents acknowledge the risks to the Pregnancy associated with any invasive testing and, provided that the Gestational Carrier is not otherwise in material breach of her obligations hereunder, hereby release the Gestational Carrier from all liability, losses, costs and expenses arising from any invasive testing performed at the request of or with the consent of the Intended Parents.

12.5       The tests will be performed or interpreted by the Transfer Physician, the Attending Physician, a physician or a technician recommended by either or both of them that is satisfactory to the Parties to this Agreement.

12.6

(a)       If the Gestational Carrier is carrying a single Fetus and tests indicate that the Fetus has, or is likely to have, a serious genetic or congenital abnormality or defect, or if the Gestational Carrier is carrying a multiple pregnancy and the tests indicate that each Fetus has, or is likely to have a serious genetic or congenital abnormality or defect, then the Intended Parents may, in accordance with Section 12.1, inform the Gestational Carrier that it is their wish that the Pregnancy be

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 035**

terminated. The Gestational Carrier, in consultation with the Transfer Physician or Attending Physician, will follow the instructions of the Intended Parents to terminate the Pregnancy.

(b)  If the Gestational Carrier is carrying a multiple Pregnancy and the medical tests indicate that only one Fetus has or is likely to have, a serious genetic or congenital abnormality or defect, the Intended Parents may inform the Gestational Carrier that it is their wish that the Gestational Carrier undergo a selective reduction procedure and the provisions of Section 13.1 shall apply.

12.7  If the Gestational Carrier:

(a)  terminates the Pregnancy or undergoes a selective reduction procedure without the prior written approval of the Intended Parents where prior consent is required; or

(b)  refuses to terminate the Pregnancy, or to take all steps within her control to undergo a selective reduction procedure if requested to do so, within TWENTY (20) days of receiving notice of the Intended Parents' wish to have the Pregnancy terminated because the Fetus has, or is likely to have, a serious genetic or congenital abnormality or defect, or the multiple pregnancy poses a risk to the health or life of the remaining fetus(es) or the Gestational Carrier,

then the Gestational Carrier will be in material breach under this Agreement, and the Intended Parents will have no obligation to reimburse the Gestational Carrier for any Special Expenses incurred after the date of the termination or selective reduction in the event of Section 12.7(a), or the date of notice in the event of Section 12.7(b), and the Gestational Carrier will refund to the Intended Parents all amounts already reimbursed to her pursuant to the terms of this Agreement.

12.8  Subject to Section 12.1, if the Gestational Carrier refuses to terminate the Pregnancy or undergo a selective reduction procedure at the request of the Intended Parents and the Child is born with or without the serious genetic or congenital abnormality or defect detected or suspected from the tests referred to above, the Gestational Carrier will give the Child into the custody of the Intended Parents as provided in this Agreement and no expenses of the Gestational Carrier will be reimbursed after the date on which notice requesting termination or selective reduction was received, but all other terms of this Agreement will continue in full force and effect including, without limitation, the Intended Parents' obligation to take custody of and support the Child.

12.9  If the tests for congenital and genetic defects and abnormalities do not reveal any defects or abnormalities, but the Child is born with defects or abnormalities which do not result from the gross negligence of the Gestational Carrier, the Gestational Carrier will place the Child in the custody of the Intended Parents as provided in this Agreement and all other terms and obligations will remain in effect, including those in Section 26.

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 036**

## PART XIII
## SELECTIVE REDUCTION

13.1    If:

(a)    the Transfer of Embryos contemplated by this Agreement results in the Gestational Carrier becoming pregnant with THREE (3) or more Children; or

(b)    the Gestational Carrier is carrying a multiple pregnancy and the test(s) indicate that one or more Fetus has, or is likely to have a serious genetic or congenital abnormality or defect, but at least one Fetus does not have any genetic or congenital abnormality or defect; or

(c)    in the opinion of the Transfer Physician and/or the Attending Physician, the multiple Pregnancy poses a risk to the Gestational Carrier's health or to one or more Fetus;

then if the Intended Parents so request under Section 13.1(b) or upon recommendation of the Transfer Physician and/or the Attending Physician under Section 13.1(a) or (c), the Gestational Carrier will undergo a procedure in any location specified by the Attending Physician within Canada to selectively reduce the number of Fetuses to twins or a single Fetus, as the case may be. If requested by the Intended Parents, the procedure will take place at the time and in a manner determined to be medically appropriate by the Attending Physician. The Gestational Carrier acknowledges and agrees that she will not undergo a selective reduction procedure if she is carrying two Fetuses without the consent in writing of the Intended Parents, unless the Attending Physician is of the opinion that such procedure is necessary to avoid a serious risk to the health of the Gestational Carrier or to the remaining Fetus or Fetuses. All costs incurred in connection with and directly related to the selective reduction procedure shall be borne by the Intended Parents and shall not form part of the Special Expense Amount.

13.2    The Intended Parents acknowledge the risks to the Pregnancy associated with a selective reduction procedure and, provided that the Gestational Carrier is not otherwise in breach of her obligations hereunder, hereby release the Gestational Carrier from all liability, losses, costs and expenses arising from a selective reduction procedure performed at the request of or with the consent of the Intended Parents.

13.3    In the interests of clarity, any request to selectively reduce the Pregnancy shall be in writing and signed by each of the Intended Parents.

## PART XIV
## CUSTODY OF CHILD AND PARENTAL RIGHTS

14.1    The Gestational Carrier has met or spoken with the Intended Parents and believes that the Intended Parents will be loving and caring parents to any Child born pursuant to this Agreement. She acknowledges that it is in the best interests of the Child that the Intended Parents have sole and exclusive custody and assume the legal and social parental responsibilities

Dvash-Banks and Adams Surrogacy Agreement | Final Version

TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA
**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 037**

for the Child, immediately upon Birth. For the purposes of this Agreement, "immediately upon birth" means as soon as the umbilical cord is cut.

14.2    The Gestational Carrier acknowledges that the Intended Parents will show the surname and the given names of the Child to be the names chosen by the Intended Parents on any form required on the Birth of the Child.

14.3    The Gestational Carrier will, at the request of the Intended Parents, participate in any legal proceeding or application supporting the Intended Parents' custody and parentage of the Child and will facilitate proof by affidavit or by giving evidence in person of all material facts within their knowledge and will attend at any and all court hearings, as required either prior to or after the Birth of the Child, until the proceeding or application is finally disposed of. All expenses incurred by the Gestational Carrier in fulfilling her obligations pursuant to this Section 14.3, shall be borne by the Intended Parents in addition to the Special Expense Amount.

14.4    The Gestational Carrier hereby expressly waives all parental, custodial and social rights that she has or may acquire to the Child.

14.5

(a)    The Gestational Carrier will, immediately upon the Birth of the Child, relinquish any and all custody rights she has or may have, and will make custody of the Child available to the Intended Parents forthwith upon the Birth of the Child. The Intended Parents will receive custody and assume the legal and social parental responsibilities for the Child;

(b)    The Gestational Carrier agrees that she will co-operate with the hospital staff and administration with respect to the agreement of the Parties as set out in Section 14.5(a) and, prior to the expected date of Birth, she will sign a joint letter of instruction and direction to the hospital staff and administration instructing the hospital to treat the Child as the Child of the Intended Parents immediately upon the Birth of the Child, to accept the instructions of the Intended Parents with respect to the Child's medical care, and to discharge the Child from the hospital to the custody of the Intended Parents; and

(c)    The Parties acknowledge that immediately upon Birth all medical decisions regarding the Child shall be made solely by the Intended Parents. The Gestational Carrier agrees that the Intended Parents shall be the persons authorized to care for and make treatment and any other decisions with respect to the Child from the moment of Birth and thereafter. Further, the Gestational Carrier agrees that if a health care provider recognizes her as a substitute decision-maker for the Child, she shall inform such person that she is not the parent of the Child and is therefore not willing to assume the responsibility of giving or refusing consent in accordance with Section 20(2)(e) of the *Health Care Consent Act*. The Gestational Carrier shall direct the health care staff to accept the instructions of

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 038**

the Intended Parents with respect to the health of the Child.

(d)    Notwithstanding the above, if the Intended Parents are not available to take physical custody of the Child, or make medical decisions with respect to the Child, immediately after Birth, the Gestational Carrier shall do so on a temporary basis until the Intended Parents are available and same shall not derogate from the Intended Parents' legal parental rights with respect to the Child.

14.6    The Intended Parents will receive the custody of the Child at Birth, or as soon thereafter as is practicable, and if not present at the same time either Andrew or Elad will be deemed to receive custody on behalf of both of them.

14.7    The Parties agree that the Gestational Carrier shall not under any circumstances breastfeed the Child without the permission of the Intended Parents obtained in advance. The Parties acknowledge that the Gestational Carrier has agreed to pump breastmilk for the Child, if feasible at the time, and that the Intended Parents shall cover the direct cost of doing so in addition to the Special Expense Amount.

14.8    Each Party to this Agreement will do what is reasonably necessary to facilitate and expedite the performance of this Agreement including all things such as completing consent forms, hospital and statistical records and obtaining birth certificates.

## PART XV
## RELATIONSHIP WITH THE CHILD

15.1    The Gestational Carrier will avoid developing a parental relationship with the Child. The only time she will see the Child is in the Hospital before the Child is discharged, and thereafter upon the consent of the Intended Parents. After the Birth, the Gestational Carrier will not contact, nor attempt to contact, nor allow herself to be in contact with the Child in any manner whatsoever at any time, except with the express permission of the Intended Parents. At no time will the Gestational Carrier reveal or cause to be revealed to the Child the fact that the Gestational Carrier gave Birth to the Child, on the understanding that the Intended Parents shall have sole discretion about providing such information to the Child.

15.2    Notwithstanding the above, the Intended Parents hereby consent to allow the Gestational Carrier and her dependent child to spend time with the Child after Birth but prior to discharge from the Hospital, in the presence of the Intended Parents

## PART XVI
## WAIVER AND RELEASE

16.1    The Gestational Carrier waives all rights that she has or may in the future have to the custody of, access to, or information about the Child and releases the Intended Parents and each of them from all claims that she has, or may in the future have to the custody of, access to, or information about the Child.

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 039**

## PART XVII
### FURTHER AGREEMENT AS TO CUSTODY

17.1    After the Birth of the Child, the Gestational Carrier will, at the request of the Intended Parents, enter into a further agreement with the Intended Parents confirming the Intended Parents' custody of the Child.

17.2    On her part, the Gestational Carrier will confirm and covenant, among other things, that she waives all rights she may have in respect of the Child, and without restricting the generality of the foregoing, her right to custody of the Child and all rights incidental to custody, including the right of access to the Child.

17.3    On their part, the Intended Parents hereby agree, among other things, that:

(a)    they release the Gestational Carrier from all obligations that she has or may in the future have to provide for the support and education of the Child for such period of time as the Child is entitled to support pursuant to the laws of the jurisdiction in which he/she is habitually resident;

(b)    each of them will charge his estate with the obligation to provide for the adequate support and education of the Child; and

(c)    provided that the Gestational Carrier has made physical custody of the Child available to the Intended Parents, each of the Intended Parents will indemnify the Gestational Carrier with respect to any expense incurred by her to provide for the support or education of the Child, including without limitation any legal or other expenses the Gestational Carrier pays in connection with the defence thereof.

## PART XVIII
### DEATH OF INTENDED PARENTS AND
### GUARDIANSHIP OF CHILD

18.1    The Intended Parents shall each maintain a valid Will in good standing, recognizing the Child as their issue, naming a testamentary guardian for the Child and making adequate provision for the support and education of the Child.

18.2    If either Andrew or Elad dies before the Birth of the Child, or after the Birth, but before the Child is placed in their custody, the Gestational Carrier will place the Child in the custody of the survivor. If both Andrew and Elad die before the Birth of the Child, or after the Birth, but before the Child is placed in their custody, the Gestational Carrier will place the Child in the custody of the Guardians named below.

18.3    Each of the Intended Parents hereby declare that, in the event of both of their deaths during the term of this Agreement, the Guardians of any Child born pursuant to this Agreement are: Tova and Mordehay Dvash, who reside in Israel and who can be reached at +972-          +972          +972          or          @gmail.com or

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 040

▮▮▮▮@bezeqint.net. The Guardians shall make any or all medical decisions with respect to the Child in the event that the Intended Parents are incapacitated and unable to do so.

18.4    The Gestational Carrier shall be entitled to rely on this Part XVIII without the requirement of any further evidence for the purpose of providing custody of the Child to the Guardians named herein in the event of the Intended Parents' death or for the purpose of the Guardians named herein making medical decisions for the Child in the event of the Intended Parents' inability to do so. The Intended Parents hereby warrant that they have not and will not enter into any conflicting document or agreement with respect to guardianship of the Child.

## PART XIX
## SEPARATION OR DIVORCE OF INTENDED PARENTS

19.1    If the Intended Parents separate or divorce before the Birth of the Child, or after the Birth, but before the Child is placed in their custody, the Gestational Carrier will place the Child in the care of either Andrew or Elad who will undertake to determine custody and any incidents of custody of the Child as between themselves by mutual agreement or by the Court.

## PART XX
## INCAPACITY OF GESTATIONAL CARRIER

20.1    The Gestational Carrier agrees that, if she becomes incapable of making decisions for herself, or if she requires life support to sustain her life, then all decisions relating to her medical care shall be made by her Attorney for Personal Care ("**Attorney**") as appointed by her Power of Attorney for Personal Care or, if she does not have an Attorney, by her Substitute Decision-Maker. However, the Gestational Carrier hereby expresses her wish that if she is Pregnant at the time she is assessed as incapable, and the Attending Physician or another physician deems that the Child would benefit from prolonging her life by artificial means until it is deemed safe to deliver the Child, and that the Gestational Carrier is not enduring pain and suffering, then the Attorney, or the Substitute Decision-Maker, as the case may be, will consent to prolonging the life of the Gestational Carrier by artificial means until after the Birth of the Child.

20.2    The Intended Parents shall reimburse the Gestational Carrier for the legal expenses incurred in having a Will and a Power of Attorney for Personal Care prepared for the purpose of fulfilling Section 20.1 above, in addition to the Special Expense Amount to a maximum of Five Hundred Dollars ($500.00).

## PART XXI
## LIFE INSURANCE POLICY FOR
## GESTATIONAL CARRIER

21.1    The Gestational Carrier hereby acknowledges that she currently has a policy of Life Insurance in place with coverage in the amount of TWO HUNDRED AND FIFTY THOUSAND DOLLARS ($250,000.00 Cdn.) on her life which will be kept in place for the period commencing on the date which is not later than the date of the first Transfer and shall end

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 041**

Page | 20

no earlier than the first to occur of the following dates (the "**Insurance Termination Date**"): (i) the date of termination of this Agreement; and (ii) the day which is TWO (2) months after the date of Birth. The Gestational Carrier may renew the life insurance, but the Intended Parents will have no obligation to pay for the cost of any premiums charged after the Insurance Termination Date.

21.2     The Intended Parents shall be named as revocable beneficiaries of SEVENTEEN PERCENT (17%) under the Life Insurance policy, and shall be removed as beneficiaries immediately following the earlier of: (i) the Birth; or (ii) the termination of the Agreement. The Gestational Carrier shall name the beneficiary of the remainder under the Life Insurance policy who shall hold same in trust for her children.

21.3     The Intended Parents may put an additional policy of life insurance into place on the Gestational Carrier's life and she shall take all reasonable steps to facilitate same.

### PART XXII
### ENFORCEMENT

22.1     The Parties have a right to enforce this Agreement in the Ontario Court of Justice including the right to seek an interlocutory and permanent injunction enjoining behaviour that is contrary to or in breach of the Agreement. The Parties acknowledge that a breach of this Agreement will result in irreparable harm to the aggrieved Party and to the Child.

### PART XXIII
### VITAL STATISTICS

23.1     The Gestational Carrier shall refrain from completing and filing the Statement of Live Birth after the Birth of the Child.

23.2     Upon confirmation by DNA tests, the Gestational Carrier will sign all necessary documents to obtain a legal declaration that she is not the genetic or intended mother of the Child, and that the Child was conceived through I.V.F. by the Ova fertilized with the Sperm.

### PART XXIV
### SUCCESSION

24.1     The Parties agree that for the purposes of succession law, and any Wills or estates, the Child will, at all times, be a child of the Intended Parents.

### PART XXV
### EARLY TERMINATION

25.1     If, without the fault of the Gestational Carrier, the Pregnancy ends in Early Miscarriage, Miscarriage, Requested Termination or Still-Birth, then:

(a)     the Intended Parents will be entitled to terminate this Agreement and will be

Dvash-Banks and Adams Surrogacy Agreement | Final Version

TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 042**

AAB   EAB