# EXHIBIT G-4

## CONFIDENTIAL AGREEMENT

**THIS IS AN AGREEMENT** made on this 21ˢᵀ day of December, 2015

A M O N G:

### ANDREW DVASH-BANKS

(herein called "**Andrew**")

-and-

### ELAD DVASH-BANKS

(herein called "**Elad**")

-and-

### AMANDA MARIE ANNE ADAMS

(herein called the "**Gestational Carrier**")

## PART I
## BACKGROUND

1.1        Andrew and Elad (collectively called the "**Intended Parents**") are a same-sex married couple who require assisted reproductive technology to have a child.

1.2        The Intended Parents intend to conceive a Child by Transferring Ova supplied by a third party anonymous donor fertilized by Sperm supplied by Andrew and/or Elad to the Gestational Carrier.

1.3        The Gestational Carrier intends to act as the gestational carrier for the Child and to carry the Child until it is born. The Gestational Carrier has offered to carry the Child on an altruistic basis, and only those out of pocket expenses related to the surrogacy shall be reimbursed to her. The Gestational Carrier has ONE (1) child of her own and is not currently in a relationship of permanence.

1.4        Ova retrieved from the third party anonymous donor and Sperm supplied by Andrew and/or Elad will be incubated externally. Fertilization may occur during this incubation period when a Sperm penetrates the cell wall of an ovum and their nuclei join together creating a single cell fertilized ovum which develops into an embryo.

1.5        Unless in her sole discretion the Gestational Carrier agrees at the time to the insertion of a greater number of Embryos, a maximum of TWO (2) Embryos will be medically inserted in the uterus of the Gestational Carrier during each in vitro fertilization cycle.

A True Copy of the Signed Original.

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES

*C.C.*

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 023**

1.6        The Intended Parents and the Gestational Carrier know that more than one child may result from this procedure and, if more than one child is born, "Child" in this Agreement, will mean "Children".

1.7        The Gestational Carrier believes that it would be in the best interests of the Child for the Child to be in the custody of the Intended Parents immediately upon Birth, and the Gestational Carrier hereby expresses her intention to waive all parental rights which she may have to any Child.

1.8        The Intended Parents will be recognized as the Child's parents immediately upon the Child's Birth.

1.9        The Intended Parents intend to assume full care of, and all parental responsibility for the Child, and the Gestational Carrier intends to allow the Intended Parents to assume this care and responsibility without reserving any care or responsibility to herself.

1.10       Immediately upon the Birth of the Child, the Gestational Carrier will give the Child into the permanent custody of the Intended Parents and as soon as reasonably possible thereafter the Intended Parents will make an application in the Ontario Superior Court of Justice seeking a declaration of parentage on their part, and a declaration of non-parentage on the part of the Gestational Carrier.

1.11       All Parties to this Agreement wish to maintain confidentialities between themselves, one to another, and between themselves and the public.

1.12       It is expressly understood that this Agreement is not intended in any way to represent a contract regarding payment in exchange for a child, or for the relinquishment of a child, and that the Parties acknowledge that no consideration has been offered to or accepted by the Gestational Carrier which would induce her to act as a surrogate.

        **NOW THEREFORE THIS AGREEMENT WITNESSES** that in consideration of the mutual covenants and promises contained in this Agreement and with the intention of being fully bound by its terms, the Parties do hereby covenant and agree as follows.

## PART II
## DEFINITIONS

        Where used in this, unless the context otherwise requires, the following terms will have the following meanings:

(a)      "**Attending Physician**" means the physician or licensed midwife attending to the maternal care of the Gestational Carrier and attending at the Birth of the Child, as may be agreed to in writing by the Parties;

(b)      "**Birth**" means "birth" as defined in s. 1 of the *Vital Statistics Act* of Ontario, and includes a "Full Term Still-Birth" unless otherwise stated;

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 024**

(c)  "**Child**" means the child conceived by I.V.F. (defined below) as described in this Agreement and if there are multiple births means the children conceived by the procedure contemplated in this Agreement;

(d)  "**Clinic**" means The Toronto Institute for Reproductive Medicine, 56 Aberfoyle Crescent, Unit 300, Toronto, Ontario M8X 2W4;

(e)  "**Early Miscarriage**" means the complete expulsion or extraction from the Gestational Carrier of a product of conception before the beginning of the twelfth (12th) week of gestation;

(f)  "**Embryo**" or "**Fertilized Ova**" or "**Fertilized Ovum**" means the product of I.V.F. (hereinafter defined). For clarification, Fertilized Ova may result from Sperm supplied by Andrew and Elad with the potential of the Gestational Carrier becoming Pregnant with Fetuses that are genetically connected to each of Andrew and Elad;

(g)  "**Fetus**" means the Embryo from the moment of the completion of the Transfer until the moment of Birth;

(h)  "**Full Term Still-Birth**" means a still-birth which occurs during or after the 36th week of gestation;

(i)  "**Guardians**" means Tova and Mordehay Dvash;

(j)  "**Hospital**" means Trillium Health Partners;

(k)  "**Intended Parents**" means **ANDREW DVASH-BANKS** and **ELAD DVASH-BANKS**;

(l)  "**Gestational Carrier**" means **AMANDA MARIE ANNE ADAMS**;

(m)  "**I.V.F.**" means in vitro fertilization and embryo transfer which is a medical procedure whereby ova are inseminated with sperm and allowed to incubate so that fertilization occurs by a sperm penetrating the cell wall of an ovum and their nuclei joining together to create a single cell fertilized ovum. Several fertilized ova usually result from a single in vitro fertilization and after the single cell fertilized ova have started to divide to form an embryo, some will be Transferred into the uterus of the Gestational Carrier and some may be frozen for Transfer at a later date. The Embryo or Embryos that are Transferred pursuant to this may be from an Embryo or Embryos that have been incubated previously and frozen;

(n)  "**Miscarriage**" means the complete expulsion or extraction from the Gestational Carrier of a product of conception between the twelfth (12th) and twentieth (20th) week of gestation. Miscarriage in this Agreement does not include an Early Miscarriage;

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 025

(o)   "Ova" means the sex cells of a third party donor;

(p)   "Parties" means the parties to this Agreement, being ANDREW DVASH-BANKS, ELAD DVASH-BANKS, and AMANDA MARIE ANNE ADAMS, and "Party" means any one of the Parties individually;

(q)   "Pregnancy" means the medical condition that occurs when the Fertilized Ovum or Embryo, resulting from the third party anonymous Ova and the Sperm of Andrew and/or Elad, has been transferred to the Gestational Carrier and successfully implants, resulting in a pregnancy being diagnosed based on blood test results and does not include a chemical pregnancy;

(r)   "Requested Termination" means: (i) a termination of the Pregnancy with the consent of or at the request of the Intended Parents; or (ii) a termination of the Pregnancy performed in accordance with the recommendation of the Transfer Physician and/or the Attending Physician because the Pregnancy poses a serious risk to the health or life of the Gestational Carrier;

(s)   "Special Expense Amount" means the amount reimbursable under the section called SPECIAL EXPENSE AMOUNT, below;

(t)   "Sperm" means the sex cells of Andrew and/or Elad;

(u)   "Still-Birth" means "still-birth" as defined in s. 1 of the *Vital Statistics Act* of Ontario and does not include a Full Term Still-Birth unless otherwise stated;

(v)   "Term of this Agreement" means, subject to Section 25.1, the period commencing on the date of execution of this Agreement by the last Party to do so, and ending on the day which is the earlier of: (i) the date of termination of the Agreement; (ii) TWO (2) weeks after a Pregnancy ends in Early Miscarriage; (iii) FOUR (4) weeks after a Pregnancy ends in Miscarriage, Requested Termination or Still-Birth; or (iv) SIX (6) weeks after the Birth of a Child;

(w)   "Transfer" and "Transferred" mean the manual deposit of one or more Fertilized Ovum or Embryo into the uterus of the Gestational Carrier; and

(x)   "Transfer Physician" means Dr. Alfonso Del Valle or, in the event that Dr. Del Valle is not available, another physician in the Clinic, as may be agreed to by the Parties.

## PART III
## PSYCHOLOGICAL ASSESSMENTS

3.1      The Gestational Carrier acknowledges that prior to the execution of this Agreement, she was assessed by a counsellor at the Clinic (the "Counsellor"), who determined that she is fit to undertake the obligation to carry the Child during a Pregnancy, and that she is willing to relinquish the Child on Birth to the Intended Parents and is competent to enter into this

Dvash-Banks and Adams Surrogacy Agreement | Final Version

TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 026

Agreement. The Gestational Carrier further acknowledges that for the purposes of this Agreement only, she has made an exception to the privilege of confidentiality to allow the Counsellor to advise the Intended Parents whether or not she is psychologically fit to fulfill the obligations she has assumed under this Agreement, and has consented, and does hereby confirm the consent to the release to the Intended Parents of such information only.

3.2       The Intended Parents acknowledge receipt of the advice of the Counsellor about the assessment of the Gestational Carrier, and acknowledge that they are satisfied with the assessment and that they accept the findings and conclusions.

## PART IV
## ACKNOWLEDGEMENTS AND UNDERTAKINGS

4.1       Each Party acknowledges that the recitals are accurate, binding and form part of this Agreement.

4.2       Each Party acknowledges that he or she is fully informed about the I.V.F., egg retrieval and Transfer procedure and each understands the medical and legal issues involved.

4.3       In particular, the Gestational Carrier acknowledges that she has been informed by a physician specializing in fertility procedures of the risks to the Gestational Carrier involved in preparing her to receive the Transfer, the Transfer procedure itself, the Pregnancy and the Birth which may result, including the possibility of multiple births (or, alternatively, any termination or reduction of the Pregnancy) and further acknowledges that she understands these risks and releases the Intended Parents with respect to all such risks including, without limitation, the health of the Ova and any Embryos created with the Ova, which are transferred to the Gestational Carrier.

4.4       During the Term of this Agreement, each of the Parties agrees to inform each other forthwith, in writing, of any material change in their circumstances which may reasonably affect their performance of this Agreement in accordance with its terms. These changes include, but are not limited to, change in marital status, change of mailing address or email address, illness or death of a Party, loss of employment, changes in insurance coverage and exposure to communicable illness or any risk to health.

## PART V
## MEDICAL EXAMINATIONS

5.1       Within a reasonable period prior to undertaking any medical procedure contemplated by this Agreement, the Gestational Carrier and the Intended Parents will undergo a thorough consultation and evaluation by the Transfer Physician, to determine whether the Gestational Carrier is physically healthy and capable of conceiving and carrying a Child to Birth and to determine whether the Intended Parents are fit to proceed with the procedures contemplated by this Agreement. The evaluation of all Parties will include testing for transmittable diseases, including, but not limited to, Hepatitis B and C and HIV in order to

Dvash-Banks and Adams Surrogacy Agreement | Final Version



TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 027

protect the health of the Gestational Carrier and the Child.

5.2     The Gestational Carrier warrants and represents that she has disclosed her full medical history to the Transfer Physician and has advised the Transfer Physician of any medications which she is currently taking.

5.3     The Gestational Carrier and the Intended Parents will undergo any medical testing that the Transfer Physician and/or the Attending Physician deem necessary, within the time frame specified by the referring physician, acting reasonably, during the Term of this Agreement, at the expense of the Intended Parents.

5.4     Each Party, for the purposes of this Agreement only, has made or hereby makes an exception to the privilege of confidentiality to allow information to be given to the other Parties and their solicitors, and has consented or hereby consents, to the release of the reports, test results, and all relevant information obtained in the examination or examinations and tests to each of the other Parties, or any one or more of them.

### PART VI
### COUNSELLING PROGRAM AND MEDIATION

6.1     The Gestational Carrier acknowledges that she may choose to participate in a counselling program, or, she may choose to meet with a counsellor as required at any time during the Term of the Agreement. Any costs of this program will be included in the Special Expense Amount. Each Party for the purposes of this Agreement has made or hereby makes an exception to the privilege of confidentiality to allow information derived in counselling sessions to be given to the other Parties and their solicitors, and has consented or hereby consents to the release of relevant information pertaining to the wellbeing of the Pregnancy and obtained in the counselling sessions.

### PART VII
### SEXUAL ABSTINENCE

7.1     During the time period set out in this Agreement, the Gestational Carrier will not engage in any sexual activity whereby semen could cause her to conceive a child, or risk the health of the unborn Child. To this end, she will abstain from sexual intercourse completely for a continuous period commencing TWO (2) weeks before each Transfer and ending on the earlier of: (i) confirmation by the Transfer Physician that a Pregnancy has not been initiated; or (ii) the date on which the first ultrasound examination after each Transfer has been performed, unless the Transfer Physician recommends a longer period of abstinence.

7.2     The Intended Parents acknowledge that the Gestational Carrier is single. The Gestational Carrier agrees that she will provide notice to the Intended Parents if that status changes, and further agrees as follows:

(a)     Prior to commencing a sexual relationship with a new partner, the Gestational Carrier covenants and agrees that she will ensure that such

Dvash-Banks and Adams Surrogacy Agreement | Final Version

TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 028

individual undergoes testing for transmittable diseases, and further agrees not to engage in a sexual relationship with such new partner until the testing confirms that he does not have any transmittable diseases;

(b)  At all times during the Term of this Agreement, the Gestational Carrier shall engage only in safe sexual practices in order to protect herself and the Fetus from infection by the HIV virus or any venereal or other transmittable disease and agrees not to engage in sexual intercourse unless her partner uses a condom; and

(c)  If, during the Term of this Agreement, the Gestational Carrier becomes involved in a common law relationship, or becomes married, the Gestational Carrier agrees that she will ensure that her spouse signs an amending agreement pursuant to which he acknowledges that: (i) he is not the Child's father; (ii) he will release the Intended Parents from any claims he may have; (iii) he will co-operate with respect to any post-birth process confirming the parentage of the Intended Parents; and (iv) he will abide by the provisions of this Agreement including the requirement to refrain from sexual activity with a third party outside of his monogamous relationship with the Gestational Carrier.

7.3       At all times during the Term of this Agreement, the Intended Parents will not engage in any sexual activity with a third party outside of their marital relationship to protect themselves, the Gestational Carrier and the Child from infection by the HIV virus or any venereal or other transmittable disease.

## PART VIII
## TRANSFERS

8.1       The Gestational Carrier will hold herself available to receive Transfers under this Agreement to be scheduled at mutually convenient times for up to TWELVE (12) months from the date of the execution of this Agreement by the last Party to do so, and will not perform any act or any thing which would interfere with the proper performance of her obligations under this Agreement.

8.2       The Gestational Carrier will accept a Transfer implanted by the Transfer Physician at the Clinic on as many as FOUR (4) separate occasions, including Transfers of frozen Embryos, if any, at times recommended by the Transfer Physician and approved by the Parties in order to achieve a Pregnancy subject to all Transfers being completed within TWELVE (12) months from the date of the execution of this Agreement by the last Party to do so and thereafter the Gestational Carrier will have no obligation to accept any Transfer.

8.3       Unless the Parties mutually agree to a greater number of Embryos, on each Transfer a maximum of TWO (2) Embryos will be medically inserted in the uterus of the Gestational Carrier.

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 029

8.4     The Gestational Carrier will follow all medical instructions prescribed by the Transfer Physician prior to a Pregnancy and during the first trimester of a Pregnancy. The Gestational Carrier will continue to follow the protocol prescribed by the Transfer Physician, which will include stimulating the Gestational Carrier so that her uterine lining is prepared for the Transfer of Embryos. The Gestational Carrier will undergo all necessary testing (including blood testing and ultrasound testing) to determine the readiness of the Gestational Carrier's uterus for the Transfer of Embryos.

8.5     If a Pregnancy does not result after FOUR (4) Transfers (including Transfers of frozen Embryos) then this Agreement may be terminated by any Party giving notice in the manner prescribed by the section called NOTICE, below, to all other Parties at any time before a Pregnancy has occurred and, upon delivery of such notice, this Agreement will terminate and the Intended Parents and the Gestational Carrier will be released from all obligations under it, except the obligation to reimburse the Gestational Carrier's allowable expenses pursuant to the section called SPECIAL EXPENSES, below, which have been incurred to the time of the termination. If no such notice of termination is given, this Agreement will remain in full force and effect until a notice of termination is given.

8.6     Notwithstanding anything contained in this Agreement, the Intended Parents or the Gestational Carrier may terminate this Agreement at any time after the first Transfer upon giving notice to the other Party, if a Pregnancy has not resulted from the Transfer. Upon such a termination the Intended Parents and the Gestational Carrier will be released from all obligations under this Agreement, except for the obligation to reimburse the Gestational Carrier for any expense incurred to the time of termination and payable under the section called SPECIAL EXPENSES, below.

8.7     If a Transfer results in a Pregnancy, the Gestational Carrier will use her best efforts to carry the Fetus to term. The Gestational Carrier will give Birth to the Child at the Hospital or such other hospital as may be agreed to in writing by the Parties.

8.8     The Gestational Carrier agrees to provide the Intended Parents with a weekly update with respect to the Pregnancy, and such update may be by email, Skype or telephone as agreed to by the Parties.

8.9     The Gestational Carrier agrees that either or both of the Intended Parents may accompany her to any obstetrical appointment, or pre-natal test or procedure. The Gestational Carrier further consents to the presence of the Intended Parents in the delivery room at the time of the Birth of the Child. In the event that the Hospital limits the number of visitors that may be present at the Birth of the Child, the Intended Parents acknowledge and agree that the Gestational Carrier shall be entitled to select one such visitor. The Gestational Carrier agrees to contact the Intended Parents at the first indication that labour has begun.

Dvash-Banks and Adams Surrogacy Agreement | Final Version

TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 030

## PART IX
## PRENATAL OBLIGATIONS

9.1    The Gestational Carrier warrants and represents that:

(a)    she has never abused alcohol or drugs;

(b)    she has never taken any drugs, whether legal or illegal, which may impact upon the success of a Pregnancy contemplated by this Agreement and the Birth of a healthy Child;

(c)    she is not now using, and has not in the TWELVE (12) months previous to the date of this Agreement, used an illegal drug;

(d)    she will not, during the Term of the Agreement, use any illegal drugs; and

(e)    she has never been charged with a criminal offence.

9.2    The Gestational Carrier warrants and represents that she will strictly comply with all of her obligations set out in the following paragraphs:

9.3    The Gestational Carrier will follow all medical advice given by the Transfer Physician and the Attending Physician, and will undergo all medical procedures that either of them require to ensure that her obligations under this Agreement are safely and successfully performed for both the Gestational Carrier and the Child. Without limiting the generality of the foregoing, if the Attending Physician determines that a Caesarean Birth is advisable for the health and safety of either the Gestational Carrier or the Child, then the Gestational Carrier hereby consents to such procedure. The Gestational Carrier further consents to submit to amniocentesis and all other tests recommended by the Transfer Physician and the Attending Physician and those tests requested by the Intended Parents on the advice of the Transfer Physician, should she become Pregnant pursuant to the terms of this Agreement.

9.4    The Gestational Carrier will follow a prenatal medical examination schedule and prenatal procedures prescribed by the Transfer Physician and/or the Attending Physician who will be responsible for the Gestational Carrier's medical care during the prenatal period. If a medical illness or condition is suspected or diagnosed during the Pregnancy, the Gestational Carrier agrees that she will seek medical attention, and will follow all medical instructions and course of treatment as prescribed.

9.5    The Gestational Carrier covenants and agrees to have the integrated pre-natal screen (IPS), parts one and two:

(a)    at approximately 12 weeks, Part 1 of the IPS, which consists of a nuchal translucency ultrasound and associated maternal bloodwork; and

(b)    at approximately 16 weeks, Part 2 of the IPS, which consists of the appropriate

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
**UNITED STATES OF AMERICA**

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 031**

maternal blood tests.

The results of the IPS will be forwarded to the Attending Physician.

9.6

    (a)    The Gestational Carrier warrants that she does not smoke and will not smoke, or expose herself or allow herself to be exposed to second-hand smoke, for the length of time commencing THIRTY (30) days prior to each Transfer and throughout any ensuing Pregnancy.

    (b)    The Gestational Carrier warrants that she will not drink alcoholic beverages for the length of time commencing THIRTY (30) days prior to each Transfer and throughout any ensuing Pregnancy.

    (c)    The Gestational Carrier further warrants that she will maintain a proper diet and exercise regime as recommended by the Transfer Physician and/or the Attending Physician. All costs incurred by the Gestational Carrier in fulfilling her obligations pursuant to this Section 9.6(c) shall, subject to the cap on the Special Expense Amount, be included in the Special Expenses.

9.7    The Gestational Carrier will obtain adequate prenatal medical care including, without limitation, the care contemplated by this Part IX in order to enhance the success of the Pregnancy and the Birth of a healthy Child.

9.8    The Gestational Carrier covenants and agrees that during the Term of this Agreement she will not:

    (b)    not ingest, inhale, inject or absorb any drugs, pharmaceutical or herbal substances including, without limitation, over the counter medication, not prescribed or approved, in writing, by the Transfer Physician or the Attending Physician (with the exception of Tylenol consumed at or below the recommended dosage for pregnant women). If the Transfer Physician approves any such medications, the Gestational Carrier agrees to follow the instructions of the Transfer Physician and/or Attending Physician with respect to dosage of substances or medication;

    (c)    not have any part of her body pierced or tattooed;

    (d)    use her best efforts to avoid all exposure to radiation or toxic chemicals; and

    (e)    avoid any potentially hazardous situations or activities that a reasonable person would conclude are likely to result in harm to herself or the Fetus.

9.9    Failure to comply with this Part IX will constitute a material breach of the Gestational Carrier's obligations under this Agreement.

Dvash-Banks and Adams Surrogacy Agreement | Final Version

TERRI N. DAY
VICE CONSUL OF THE
UNITED
Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 032
ADB  EDR

9.10

(a) After the Gestational Carrier becomes Pregnant with the Child, the Gestational Carrier and the Intended Parents will keep each other reasonably informed of their whereabouts.

(b) From and after the first day of the 24th week of the Pregnancy, the Gestational Carrier may only travel outside of Canada: (i) in the event of a severe illness or death in her immediate family; (ii) if she has obtained the prior written consent of the Intended Parents, which shall not be unreasonably withheld; (ii) if she has the prior approval of the Attending Physician; and (iii) if she has a policy of travel health insurance covering her health care costs, the Birth of the Child and the Child's health care costs, which is in place prior to departure and for the duration of the travel.

(c) From and after the first day of the 24th week of the Pregnancy, the Gestational Carrier shall not travel to or visit the Provinces of Quebec, Saskatchewan, New Brunswick and/or Prince Edward Island.

(d) From and after the first day of the 28th week of the Pregnancy, the Gestational Carrier warrants and represents that she shall not travel by airplane.

(e) From and after the first day of the 34th week of the Pregnancy, the Gestational Carrier warrants and represents that she shall not travel more than a FORTY (40) minute drive from a hospital.

9.11    The Gestational Carrier will and hereby consents to the Transfer Physician and the Attending Physician keeping the Intended Parents informed at all material times of whether a Transfer has resulted in a Pregnancy, the progress of the Pregnancy, the results of all tests and any recommendations arising from test results, including all information relevant to the health of the Gestational Carrier and the Fetus, and the expected date of Birth. The Gestational Carrier will give the Attending Physician any further consent, authority or directions necessary to comply with this obligation to keep the Intended Parents so informed.

9.12    The Gestational Carrier hereby gives her consent, and will sign any medical consent forms to allow the Transfer Physician, the Attending Physician or any other doctor or hospital agreed to by the Parties to treat her as may be required in respect of the Pregnancy.

## PART X
## CONDITION PRECEDENT

10.1    The Parties each acknowledge that a finding by medical testing that either Andrew or Elad is a genetic parent of the Child is a condition precedent to the performance of the Intended Parents' obligations under this Agreement. For the purposes of determining the parentage of the Child, immediately after the Birth, the Intended Parents and the Gestational Carrier will submit to a DNA test and each Party consents to the immediate testing of the DNA

Dvash-Banks and Adams Surrogacy Agreement | Final Version

TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 033

of the Child.

10.2    A finding that neither Intended Parent is a genetic parent of the Child will constitute a material breach of this Agreement unless the parentage is due to a clinical or physician's error in the fertilization or Transfer procedure. If there is a finding that neither Intended Parent is a genetic parent of the Child, and the same degree of testing confirms that the Gestational Carrier is not the genetic mother of the Child, a clinical or physician's error in the fertilization or Transfer procedure shall be deemed to have occurred and the Intended Parents shall assume responsibility for the Child as if it were their own.

10.3    If the Gestational Carrier is the genetic mother of the Child, the Gestational Carrier will refund, within THIRTY (30) days of the request, any Special Expense Amount paid on her behalf, or reimbursed to her, and will forego the reimbursement of any further allowable Special Expense Amount that would otherwise be, or become, reimbursable to her and the Intended Parents shall not be obliged to accept any responsibilities, social, legal or custodial, toward the Child, without prejudice to any of the rights that the Intended Parents are entitled to claim under this Agreement.

## PART XI
## WARRANTIES AND ACKNOWLEDGEMENTS

11.1    The Gestational Carrier warrants that, to the best of her knowledge, she is physically capable of carrying the Fetus to term and is capable of carrying and bearing healthy, normal children.

11.2    The Gestational Carrier warrants that, to the best of her knowledge, she has no transmittable disease and will submit to tests, including tests for the presence of HIV and Hepatitis B and C.

11.3    Andrew and Elad each warrant that, to the best of their knowledge, neither has a transmittable disease and each will submit to tests, including tests for the presence of HIV and Hepatitis B and C.

11.4    The Gestational Carrier acknowledges that it will be in the best interests of the Child for the Child to be placed in the custody of the Intended Parents immediately upon the Birth of the Child and for the Gestational Carrier to forever waive all parental and other rights in and to the Child that she has or may acquire in the future immediately upon the Birth of the Child.

## PART XII
## EARLY TERMINATION OF PREGNANCY

12.1    The Parties acknowledge that the Gestational Carrier has the right to have the Pregnancy terminated at any time she and either the Transfer Physician or the Attending Physician, in their absolute discretion, determine the Pregnancy should be terminated. However, the Gestational Carrier has assured the Intended Parents that it is not her intention to have an

TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

abortion, unless the Intended Parents request that she does so in the circumstances set out below. The Gestational Carrier has further assured the Intended Parents that she will proceed with a Requested Termination at a time and place recommended by the Transfer Physician and/or Attending Physician if: (i) a test reveals that the Child is likely to have a serious genetic or congenital abnormality or defect; (ii) the Transfer Physician or the Attending Physician so recommends in writing; and (iii) the Intended Parents so request in writing. All costs incurred in connection with and directly related to the Requested Termination shall be borne by the Intended Parents and shall not form part of the Special Expense Amount.

12.2     In the interests of clarity, the Parties agree that any request to terminate the Pregnancy shall be in writing and signed by each of the Intended Parents.

12.3     The Gestational Carrier states that she does not intend to exercise her right to abortion:

    (a)     except as set out in this Part XII, or

    (b)     unless in the opinion of the Transfer Physician and/or the Attending Physician, terminating the Pregnancy is necessary to protect the Gestational Carrier's health or life, in which case the consent of the Intended Parents is not required.

12.4

    (a)     The Gestational Carrier will undergo ultrasound, chorionic villus sampling, IPS, amniocentesis and similar tests and procedures to detect genetic and congenital abnormalities or defects in the Fetus, as recommended by the Transfer Physician and/or the Attending Physician.

    (b)     The Intended Parents acknowledge the risks to the Pregnancy associated with any invasive testing and, provided that the Gestational Carrier is not otherwise in material breach of her obligations hereunder, hereby release the Gestational Carrier from all liability, losses, costs and expenses arising from any invasive testing performed at the request of or with the consent of the Intended Parents.

12.5     The tests will be performed or interpreted by the Transfer Physician, the Attending Physician, a physician or a technician recommended by either or both of them that is satisfactory to the Parties to this Agreement.

12.6

    (a)     If the Gestational Carrier is carrying a single Fetus and tests indicate that the Fetus has, or is likely to have, a serious genetic or congenital abnormality or defect, or if the Gestational Carrier is carrying a multiple pregnancy and the tests indicate that each Fetus has, or is likely to have a serious genetic or congenital abnormality or defect, then the Intended Parents may, in accordance with Section 12.1, inform the Gestational Carrier that it is their wish that the Pregnancy be

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 035**

terminated. The Gestational Carrier, in consultation with the Transfer Physician or Attending Physician, will follow the instructions of the Intended Parents to terminate the Pregnancy.

(b)  If the Gestational Carrier is carrying a multiple Pregnancy and the medical tests indicate that only one Fetus has or is likely to have, a serious genetic or congenital abnormality or defect, the Intended Parents may inform the Gestational Carrier that it is their wish that the Gestational Carrier undergo a selective reduction procedure and the provisions of Section 13.1 shall apply.

12.7  If the Gestational Carrier:

(a)  terminates the Pregnancy or undergoes a selective reduction procedure without the prior written approval of the Intended Parents where prior consent is required; or

(b)  refuses to terminate the Pregnancy, or to take all steps within her control to undergo a selective reduction procedure if requested to do so, within TWENTY (20) days of receiving notice of the Intended Parents' wish to have the Pregnancy terminated because the Fetus has, or is likely to have, a serious genetic or congenital abnormality or defect, or the multiple pregnancy poses a risk to the health or life of the remaining fetus(es) or the Gestational Carrier,

then the Gestational Carrier will be in material breach under this Agreement, and the Intended Parents will have no obligation to reimburse the Gestational Carrier for any Special Expenses incurred after the date of the termination or selective reduction in the event of Section 12.7(a), or the date of notice in the event of Section 12.7(b), and the Gestational Carrier will refund to the Intended Parents all amounts already reimbursed to her pursuant to the terms of this Agreement.

12.8  Subject to Section 12.1, if the Gestational Carrier refuses to terminate the Pregnancy or undergo a selective reduction procedure at the request of the Intended Parents and the Child is born with or without the serious genetic or congenital abnormality or defect detected or suspected from the tests referred to above, the Gestational Carrier will give the Child into the custody of the Intended Parents as provided in this Agreement and no expenses of the Gestational Carrier will be reimbursed after the date on which notice requesting termination or selective reduction was received, but all other terms of this Agreement will continue in full force and effect including, without limitation, the Intended Parents' obligation to take custody of and support the Child.

12.9  If the tests for congenital and genetic defects and abnormalities do not reveal any defects or abnormalities, but the Child is born with defects or abnormalities which do not result from the gross negligence of the Gestational Carrier, the Gestational Carrier will place the Child in the custody of the Intended Parents as provided in this Agreement and all other terms and obligations will remain in effect, including those in Section 26.

Dvash-Banks and Adams Surrogacy Agreement | Final Version

TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

## PART XIII
## SELECTIVE REDUCTION

13.1      If:

(a)      the Transfer of Embryos contemplated by this Agreement results in the
Gestational Carrier becoming pregnant with THREE (3) or more Children; or

(b)      the Gestational Carrier is carrying a multiple pregnancy and the test(s) indicate
that one or more Fetus has, or is likely to have a serious genetic or congenital
abnormality or defect, but at least one Fetus does not have any genetic or
congenital abnormality or defect; or

(c)      in the opinion of the Transfer Physician and/or the Attending Physician, the
multiple Pregnancy poses a risk to the Gestational Carrier's health or to one or
more Fetus;

then if the Intended Parents so request under Section 13.1(b) or upon recommendation of the
Transfer Physician and/or the Attending Physician under Section 13.1(a) or (c), the Gestational
Carrier will undergo a procedure in any location specified by the Attending Physician within
Canada to selectively reduce the number of Fetuses to twins or a single Fetus, as the case may
be.  If requested by the Intended Parents, the procedure will take place at the time and in a
manner determined to be medically appropriate by the Attending Physician.  The Gestational
Carrier acknowledges and agrees that she will not undergo a selective reduction procedure if she
is carrying two Fetuses without the consent in writing of the Intended Parents, unless the
Attending Physician is of the opinion that such procedure is necessary to avoid a serious risk to
the health of the Gestational Carrier or to the remaining Fetus or Fetuses.  All costs incurred in
connection with and directly related to the selective reduction procedure shall be borne by the
Intended Parents and shall not form part of the Special Expense Amount.

13.2      The Intended Parents acknowledge the risks to the Pregnancy associated with a
selective reduction procedure and, provided that the Gestational Carrier is not otherwise in
breach of her obligations hereunder, hereby release the Gestational Carrier from all liability,
losses, costs and expenses arising from a selective reduction procedure performed at the request
of or with the consent of the Intended Parents.

13.3      In the interests of clarity, any request to selectively reduce the Pregnancy shall be
in writing and signed by each of the Intended Parents.

## PART XIV
## CUSTODY OF CHILD AND PARENTAL RIGHTS

14.1      The Gestational Carrier has met or spoken with the Intended Parents and believes
that the Intended Parents will be loving and caring parents to any Child born pursuant to this
Agreement.  She acknowledges that it is in the best interests of the Child that the Intended
Parents have sole and exclusive custody and assume the legal and social parental responsibilities

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

for the Child, immediately upon Birth. For the purposes of this Agreement, "immediately upon birth" means as soon as the umbilical cord is cut.

14.2    The Gestational Carrier acknowledges that the Intended Parents will show the surname and the given names of the Child to be the names chosen by the Intended Parents on any form required on the Birth of the Child.

14.3    The Gestational Carrier will, at the request of the Intended Parents, participate in any legal proceeding or application supporting the Intended Parents' custody and parentage of the Child and will facilitate proof by affidavit or by giving evidence in person of all material facts within their knowledge and will attend at any and all court hearings, as required either prior to or after the Birth of the Child, until the proceeding or application is finally disposed of. All expenses incurred by the Gestational Carrier in fulfilling her obligations pursuant to this Section 14.3, shall be borne by the Intended Parents in addition to the Special Expense Amount.

14.4    The Gestational Carrier hereby expressly waives all parental, custodial and social rights that she has or may acquire to the Child.

14.5

(a)    The Gestational Carrier will, immediately upon the Birth of the Child, relinquish any and all custody rights she has or may have, and will make custody of the Child available to the Intended Parents forthwith upon the Birth of the Child. The Intended Parents will receive custody and assume the legal and social parental responsibilities for the Child;

(b)    The Gestational Carrier agrees that she will co-operate with the hospital staff and administration with respect to the agreement of the Parties as set out in Section 14.5(a) and, prior to the expected date of Birth, she will sign a joint letter of instruction and direction to the hospital staff and administration instructing the hospital to treat the Child as the Child of the Intended Parents immediately upon the Birth of the Child, to accept the instructions of the Intended Parents with respect to the Child's medical care, and to discharge the Child from the hospital to the custody of the Intended Parents; and

(c)    The Parties acknowledge that immediately upon Birth all medical decisions regarding the Child shall be made solely by the Intended Parents. The Gestational Carrier agrees that the Intended Parents shall be the persons authorized to care for and make treatment and any other decisions with respect to the Child from the moment of Birth and thereafter. Further, the Gestational Carrier agrees that if a health care provider recognizes her as a substitute decision-maker for the Child, she shall inform such person that she is not the parent of the Child and is therefore not willing to assume the responsibility of giving or refusing consent in accordance with Section 20(2)(e) of the *Health Care Consent Act*. The Gestational Carrier shall direct the health care staff to accept the instructions of

Dvash-Banks and Adams Surrogacy Agreement | Final Version



TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 038

the Intended Parents with respect to the health of the Child.

(d)     Notwithstanding the above, if the Intended Parents are not available to take physical custody of the Child, or make medical decisions with respect to the Child, immediately after Birth, the Gestational Carrier shall do so on a temporary basis until the Intended Parents are available and same shall not derogate from the Intended Parents' legal parental rights with respect to the Child.

14.6     The Intended Parents will receive the custody of the Child at Birth, or as soon thereafter as is practicable, and if not present at the same time either Andrew or Elad will be deemed to receive custody on behalf of both of them.

14.7     The Parties agree that the Gestational Carrier shall not under any circumstances breastfeed the Child without the permission of the Intended Parents obtained in advance. The Parties acknowledge that the Gestational Carrier has agreed to pump breastmilk for the Child, if feasible at the time, and that the Intended Parents shall cover the direct cost of doing so in addition to the Special Expense Amount.

14.8     Each Party to this Agreement will do what is reasonably necessary to facilitate and expedite the performance of this Agreement including all things such as completing consent forms, hospital and statistical records and obtaining birth certificates.

## PART XV
## RELATIONSHIP WITH THE CHILD

15.1     The Gestational Carrier will avoid developing a parental relationship with the Child. The only time she will see the Child is in the Hospital before the Child is discharged, and thereafter upon the consent of the Intended Parents. After the Birth, the Gestational Carrier will not contact, nor attempt to contact, nor allow herself to be in contact with the Child in any manner whatsoever at any time, except with the express permission of the Intended Parents. At no time will the Gestational Carrier reveal or cause to be revealed to the Child the fact that the Gestational Carrier gave Birth to the Child, on the understanding that the Intended Parents shall have sole discretion about providing such information to the Child.

15.2     Notwithstanding the above, the Intended Parents hereby consent to allow the Gestational Carrier and her dependent child to spend time with the Child after Birth but prior to discharge from the Hospital, in the presence of the Intended Parents

## PART XVI
## WAIVER AND RELEASE

16.1     The Gestational Carrier waives all rights that she has or may in the future have to the custody of, access to, or information about the Child and releases the Intended Parents and each of them from all claims that she has, or may in the future have to the custody of, access to, or information about the Child.

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 039**

## PART XVII
### FURTHER AGREEMENT AS TO CUSTODY

17.1    After the Birth of the Child, the Gestational Carrier will, at the request of the Intended Parents, enter into a further agreement with the Intended Parents confirming the Intended Parents' custody of the Child.

17.2    On her part, the Gestational Carrier will confirm and covenant, among other things, that she waives all rights she may have in respect of the Child, and without restricting the generality of the foregoing, her right to custody of the Child and all rights incidental to custody, including the right of access to the Child.

17.3    On their part, the Intended Parents hereby agree, among other things, that:

(a)    they release the Gestational Carrier from all obligations that she has or may in the future have to provide for the support and education of the Child for such period of time as the Child is entitled to support pursuant to the laws of the jurisdiction in which he/she is habitually resident;

(b)    each of them will charge his estate with the obligation to provide for the adequate support and education of the Child; and

(c)    provided that the Gestational Carrier has made physical custody of the Child available to the Intended Parents, each of the Intended Parents will indemnify the Gestational Carrier with respect to any expense incurred by her to provide for the support or education of the Child, including without limitation any legal or other expenses the Gestational Carrier pays in connection with the defence thereof.

## PART XVIII
### DEATH OF INTENDED PARENTS AND
### GUARDIANSHIP OF CHILD

18.1    The Intended Parents shall each maintain a valid Will in good standing, recognizing the Child as their issue, naming a testamentary guardian for the Child and making adequate provision for the support and education of the Child.

18.2    If either Andrew or Elad dies before the Birth of the Child, or after the Birth, but before the Child is placed in their custody, the Gestational Carrier will place the Child in the custody of the survivor. If both Andrew and Elad die before the Birth of the Child, or after the Birth, but before the Child is placed in their custody, the Gestational Carrier will place the Child in the custody of the Guardians named below.

18.3    Each of the Intended Parents hereby declare that, in the event of both of their deaths during the term of this Agreement, the Guardians of any Child born pursuant to this Agreement are: Tova and Mordehay Dvash, who reside in Israel and who can be reached at +972-███████, +972███████, +972███████ or ███████@gmail.com or

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 040

███@bezeqint.net. The Guardians shall make any or all medical decisions with respect to the Child in the event that the Intended Parents are incapacitated and unable to do so.

18.4    The Gestational Carrier shall be entitled to rely on this Part XVIII without the requirement of any further evidence for the purpose of providing custody of the Child to the Guardians named herein in the event of the Intended Parents' death or for the purpose of the Guardians named herein making medical decisions for the Child in the event of the Intended Parents' inability to do so. The Intended Parents hereby warrant that they have not and will not enter into any conflicting document or agreement with respect to guardianship of the Child.

## PART XIX
## SEPARATION OR DIVORCE OF INTENDED PARENTS

19.1    If the Intended Parents separate or divorce before the Birth of the Child, or after the Birth, but before the Child is placed in their custody, the Gestational Carrier will place the Child in the care of either Andrew or Elad who will undertake to determine custody and any incidents of custody of the Child as between themselves by mutual agreement or by the Court.

## PART XX
## INCAPACITY OF GESTATIONAL CARRIER

20.1    The Gestational Carrier agrees that, if she becomes incapable of making decisions for herself, or if she requires life support to sustain her life, then all decisions relating to her medical care shall be made by her Attorney for Personal Care ("**Attorney**") as appointed by her Power of Attorney for Personal Care or, if she does not have an Attorney, by her Substitute Decision-Maker. However, the Gestational Carrier hereby expresses her wish that if she is Pregnant at the time she is assessed as incapable, and the Attending Physician or another physician deems that the Child would benefit from prolonging her life by artificial means until it is deemed safe to deliver the Child, and that the Gestational Carrier is not enduring pain and suffering, then the Attorney, or the Substitute Decision-Maker, as the case may be, will consent to prolonging the life of the Gestational Carrier by artificial means until after the Birth of the Child.

20.2    The Intended Parents shall reimburse the Gestational Carrier for the legal expenses incurred in having a Will and a Power of Attorney for Personal Care prepared for the purpose of fulfilling Section 20.1 above, in addition to the Special Expense Amount to a maximum of Five Hundred Dollars ($500.00).

## PART XXI
## LIFE INSURANCE POLICY FOR
## GESTATIONAL CARRIER

21.1    The Gestational Carrier hereby acknowledges that she currently has a policy of Life Insurance in place with coverage in the amount of TWO HUNDRED AND FIFTY THOUSAND DOLLARS ($250,000.00 Cdn.) on her life which will be kept in place for the period commencing on the date which is not later than the date of the first Transfer and shall end

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 041**

no earlier than the first to occur of the following dates (the "**Insurance Termination Date**"): (i) the date of termination of this Agreement; and (ii) the day which is TWO (2) months after the date of Birth. The Gestational Carrier may renew the life insurance, but the Intended Parents will have no obligation to pay for the cost of any premiums charged after the Insurance Termination Date.

21.2     The Intended Parents shall be named as revocable beneficiaries of SEVENTEEN PERCENT (17%) under the Life Insurance policy, and shall be removed as beneficiaries immediately following the earlier of: (i) the Birth; or (ii) the termination of the Agreement. The Gestational Carrier shall name the beneficiary of the remainder under the Life Insurance policy who shall hold same in trust for her children.

21.3     The Intended Parents may put an additional policy of life insurance into place on the Gestational Carrier's life and she shall take all reasonable steps to facilitate same.

## PART XXII
## ENFORCEMENT

22.1     The Parties have a right to enforce this Agreement in the Ontario Court of Justice including the right to seek an interlocutory and permanent injunction enjoining behaviour that is contrary to or in breach of the Agreement. The Parties acknowledge that a breach of this Agreement will result in irreparable harm to the aggrieved Party and to the Child.

## PART XXIII
## VITAL STATISTICS

23.1     The Gestational Carrier shall refrain from completing and filing the Statement of Live Birth after the Birth of the Child.

23.2     Upon confirmation by DNA tests, the Gestational Carrier will sign all necessary documents to obtain a legal declaration that she is not the genetic or intended mother of the Child, and that the Child was conceived through I.V.F. by the Ova fertilized with the Sperm.

## PART XXIV
## SUCCESSION

24.1     The Parties agree that for the purposes of succession law, and any Wills or estates, the Child will, at all times, be a child of the Intended Parents.

## PART XXV
## EARLY TERMINATION

25.1     If, without the fault of the Gestational Carrier, the Pregnancy ends in Early Miscarriage, Miscarriage, Requested Termination or Still-Birth, then:

(a)     the Intended Parents will be entitled to terminate this Agreement and will be

Dvash-Banks and Adams Surrogacy Agreement | Final Version

TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 042

Page | 21

released from all obligations under this Agreement;

(b)  the Gestational Carrier will be entitled to terminate this Agreement and retain any reimbursement of any Special Expense Amounts paid or payable up to and including the date of Early Miscarriage, Miscarriage, Requested Termination or Still-Birth; and

(c)  the Gestational Carrier shall be entitled to reimbursement of the Special Expenses for TWO (2) weeks after the date of an Early Miscarriage or FOUR (4) weeks after the date of a Miscarriage, Requested Termination or Still-Birth.

25.2    If the Intended Parents choose not to terminate this Agreement after an Early Miscarriage, Miscarriage, Requested Termination or Still-Birth, the Term of the Agreement shall continue and not be at an end, but the period for reimbursement of the Special Expense Amount shall be as set out above and shall be reset to the maximum Special Expense reimbursement of Twenty Thousand Dollars ($20,000) and shall resume TWO (2) weeks prior to the next Transfer. If the Pregnancy ends in a Full Term Still-Birth without the fault of the Gestational Carrier, the Agreement shall terminate on the day which is SIX (6) weeks after the date of the Full Term Still-Birth.

25.3    Notwithstanding anything set out in this Agreement, if the Pregnancy is terminated, results in a Still-Birth, results in a Full-Term Still Birth, or produces a Child that has a congenital abnormality or defect as a result of the negligent action or omission of the Gestational Carrier, or if the Gestational Carrier materially breaches this Agreement, the Gestational Carrier shall return to the Intended Parents an amount equal to the Special Expenses reimbursed to the Gestational Carrier within FIVE (5) days of a demand therefor, without prejudice to the Intended Parents' rights at law and pursuant to this Agreement to seek damages from the Gestational Carrier.

## PART XXVI
## SPECIAL EXPENSES

26.1    The Intended Parents will reimburse the Gestational Carrier for the following out of pocket expenses incurred by the Gestational Carrier in connection with the surrogacy to a maximum of Twenty Thousand Dollars ($20,000.00 CDN) inclusive of all taxes (the "**Special Expense Amount**") for all such expenses:

(a)  medical, pharmaceutical and laboratory expenses incurred by the Gestational Carrier as a result of the Transfer, Pregnancy or Birth not otherwise covered by the Ontario Health Insurance Plan ("OHIP") or any private health care insurance plan under which she is covered. However, it is understood and agreed that the Intended Parents will pay all expenses for the I.V.F. treatment directly to the Clinic and this cost will not be included in the Special Expense Amount;

(b)  the amount actually expended by the Gestational Carrier for groceries, prepared food and meals for her own consumption commencing two weeks prior to the date

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 043**

of the first Transfer and ending on the expiration or earlier termination of the Agreement;

(c)     a reasonable amount for automobile expenses incurred for local travel at the request of the Intended Parents or made necessary for the performance of her obligations under this Agreement calculated at a rate of $0.54 per kilometre travelled and all related parking costs;

(d)     communication costs including, without limitation, the costs of an internet account, cellular telephone charges, and the costs of acquiring a cellular telephone, and long distance telephone charges, all incurred by the Gestational Carrier in connection with the performance of her obligations under this Agreement;

(e)     vitamins and supplements required to maintain a healthy Pregnancy;

(f)     child care costs for the Gestational Carrier's ONE (1) dependent child incurred by the Gestational Carrier in connection with the performance of her obligations under this Agreement;

(g)     housekeeping, snow shovelling and lawn care costs incurred by the Gestational Carrier in order to reduce the physical strain and incurred by the Gestational Carrier in connection with the performance of her obligations under this Agreement;

(h)     counselling for the Gestational Carrier and her ONE (1) dependent child, if so required;

(i)     all expenses incurred by the Gestational Carrier for suitable maternity clothing to be worn throughout the Pregnancy and following the Birth, up to a maximum amount of Seven Hundred and Fifty Dollars ($750.00);

(j)     a reasonable amount for the Gestational Carrier's wellness expenses including, without limitation, costs incurred for acupuncture, massage, physiotherapy, naturopath, reflexology, chiropractic care, foot care, yoga membership and fitness membership, provided that participation in any of such activities is approved by the Transfer Physician and/or the Attending Physician;

(k)     the cost of a private Hospital room for the Gestational Carrier at the time of Birth, if one is available and which expense is not otherwise covered by OHIP or any private health care insurance plan under which the Gestational Carrier is covered; and

(l)     such other expenses as may be incurred by the Gestational Carrier as a result of the Pregnancy and as may be approved by the Intended Parents. The Parties agree that if the Gestational Carrier has already incurred expenses to the maximum limit

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

set out in this Section 26.1, the Intended Parents may, in their sole discretion, agree to pay the cost of any such other allowable expenses in addition to the Special Expense Amount.

26.2

(a)   The Parties acknowledge that for the purposes of Section 26, the Gestational Carrier's expenses incurred during the Reimbursable Period (as hereinafter defined) shall be reimbursed to her in accordance with Schedule "A" attached hereto and Part XXVI.

(b)   For the purposes of Section 26.2(c), the "**Reimbursable Period**" shall commence on the date of confirmation of the Pregnancy by blood test results and shall end on the earlier of: (i) the day of termination of the Agreement; (ii) TWO (2) weeks after a Pregnancy ends in Early Miscarriage; (iii) FOUR (4) weeks after a Pregnancy ends in Miscarriage, Requested Termination or Still-Birth; or (iv) SIX (6) weeks after the Birth of a Child.

(c)   The Reimbursable Period shall be divided into TEN (10) stages (individually referred to as a "**Stage**"):

   (i)   the first month after the Second Beta (the "**First Month**");

   (ii)   the second month after the Second Beta (the "**Second Month**");

   (iii)   the third month after the Second Beta (the "**Third Month**");

   (iv)   the fourth month after the Second Beta (the "**Fourth Month**");

   (v)   the fifth month after the Second Beta (the "**Fifth Month**");

   (vi)   the sixth month after the Second Beta (the "**Sixth Month**");

   (vii)   the seventh month after the Second Beta (the "**Seventh Month**");

   (viii)   the eighth month after the Second Beta (the "**Eighth Month**");

   (ix)   the ninth month after the Second Beta (the "**Ninth Month**"); and

   (x)   the period commencing on the day after Birth and ending SIX (6) weeks thereafter (the "**Post-Pregnancy**").

(d)   Notwithstanding anything contained herein to the contrary, the amount of the Special Expenses incurred by the Gestational Carrier and which are eligible for reimbursement by the Intended Parents shall be subject to the maximum amounts set out in the schedule attached hereto as Schedule "A", and subject to Section 25.1, if this Agreement is terminated, the current Stage shall end on the day of

Dvash-Banks and Adams Surrogacy Agreement | Final Version

TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

termination.

(e) If the Special Expenses incurred by the Gestational Carrier in any Stage are less than the maximum set for that Stage, the difference between the maximum allowable and the amount claimed shall be added to the maximum available for the next Stage. By way of an example, the Parties agree that if the maximum Special Expense Amount for the Fourth Month is Three Thousand Dollars and the Gestational Carrier claims expenses of One Thousand Dollars, the unused balance of Two Thousand Dollars will be added to the maximum available to be claimed in the Fifth Month.

(f) If the Special Expenses incurred by the Gestational Carrier in any Stage exceed the maximum set for that Stage, and if there is no unused balance to be carried forward pursuant to Section 26.2(e) or if there is insufficient unused balance to cover the excess, the amount of the excess can be claimed in the next Stage. By way of an example, the Parties agree that if the maximum Special Expense Amount for the Sixth Month is Three Thousand Dollars, and if there is no unused balance to be added to the Sixth Month maximum, and the Gestational Carrier claims expenses of Four Thousand Dollars, the excess of One Thousand Dollars may be claimed in the Seventh Month.

(g) If, without fault of the Gestational Carrier, the Child is born: (i) prior to the beginning of the Eighth Month, the current stage shall end on the date of Birth and the post-Birth period shall commence on the day after the Child's Birth. The balance of the Special Expense Amount available for reimbursement for the period commencing on the date of Birth and ending on the last day of the Ninth Month, shall not be available to be claimed and shall be deducted from the cap on the Special Expense Amount on the understanding that the Gestational Carrier's total out of pocket expenses related to the Pregnancy will be available only during the Pregnancy and the recovery period after Birth; or (ii) during the Eighth or Ninth Months of the Pregnancy, the current Stage shall end on the date of Birth and the balance of the Special Expense Amount available for reimbursement for the period commencing on the date of Birth and ending on the last day of the Ninth Month, shall be added to the Post-Pregnancy Stage.

26.3    Subject to the cap set out in Section 26.1, the Gestational Carrier may be reimbursed for all Special Expenses incurred by her for the period commencing on the date of execution of this Agreement by the Gestational Carrier, and ending on the earlier of the date of termination of this Agreement, TWO (2) weeks after a Pregnancy ends in Early Miscarriage, FOUR (4) weeks after a Pregnancy ends in Miscarriage, Requested Termination or Still-Birth or SIX (6) weeks after the Birth of a Child, as the case may be. No receipts may be submitted to the Intended Parents after the end of the Term of the Agreement, and notwithstanding anything contained herein to the contrary, the Intended Parents will have no obligation to reimburse the Gestational Carrier for any Special Expenses which are submitted to the Intended Parents for reimbursement after the expiration of the Term of the Agreement, regardless of when such

Dvash-Banks and Adams Surrogacy Agreement | Final Version

TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 046**

expenses were incurred.

26.4    In addition to the amounts set out in Section 26.1 (the "**Additional Expense Amount**"), the Intended Parents shall directly cover, or shall reimburse the Gestational Carrier for, all expenses related to the Pregnancy or in the event of the circumstances described below, or so that the Gestational Carrier can fulfill her obligations under this Agreement as follows:

(a)    legal fees and disbursements incurred for obtaining independent legal advice relating to this Agreement to the date of execution of the Agreement, up to a maximum of One Thousand Three Hundred Dollars ($1,300.00) plus HST;

(b)    life insurance premiums as set out in Section 21;

(c)    travel medical insurance premiums as set out in Section 9.10(c);

(d)    all travel costs incurred by the Gestational Carrier in order to attend at the Clinic at the request of the Intended Parents before the Pregnancy and for each Transfer, including the cost of mileage, parking, meals and child care;

(e)    all expenses incurred and related to the Gestational Carrier's participation in any Transfer which she undergoes at the request of the Intended Parents to a maximum of Five Hundred Dollars ($500.00) for general reimbursable expenses, including prenatal vitamins and wellness expenses;

(f)    if the Child is delivered by way of Caesarean delivery, the sum of Three Thousand Five Hundred Dollars ($3,500.00) shall be added to the maximum available for reimbursement in the Post-Pregnancy Stage;

(g)    if a Pregnancy results in a multiple Birth of two or more Children, the sum of Three Thousand Five Hundred Dollars ($3,500.00) shall be added to the maximum available for reimbursement in the period commencing on the first day of the Seventh Month and ending on the last day of the Post-Pregnancy Stage. (Such Additional Expense Amounts shall increase the maximum amount of Special Expenses which may be incurred by the Gestational Carrier in recognition of the additional physical toll which a multiple Pregnancy or Caesarean delivery will exert on the Gestational Carrier and the increased need for assistance which will increase the Gestational Carrier's out of pocket expenses. In the interests of clarity, if two or more Children are born by Caesarean delivery, an additional total of Seven Thousand Dollars ($7,000.00) shall be available for maximum reimbursement under Section 26.4(f) and (g)); and

(h)    if, in the written opinion of the Transfer Physician or the Attending Physician and, at the option of the Intended Parents, in the written opinion of a second physician of their choice, complete bed rest is required in order to protect the health of the Gestational Carrier or the Fetus (the "**Disability**"), the Gestational Carrier will be entitled to reimbursements for the period commencing on the date of the

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

physician's order and ending on the earlier of: (i) the date on which the physician lifts the order for bed rest; (ii) the date of Birth, Early Miscarriage, Miscarriage, Requested Termination or Still-Birth; or (iii) the date of termination of this Agreement, for housekeeping and child care expenses for the Gestational Carrier's ONE (1) dependent child to a maximum of Four Hundred Dollars ($400.00) per week under this Section 26.4(h).

26.5    Notwithstanding anything to the contrary, the Parties acknowledge that regulations to Section 12 of the *Assisted Human Reproduction Act*, S.C. 2004, c.2, which govern the reimbursements to the Gestational Carrier under this Agreement, may come into full force and effect during the Term of the Agreement. If so, then all Parties agree to abide by these regulations even where they are not in accordance with this Agreement, so as not to contravene the law. The Gestational Carrier acknowledges and agrees that, as a result, she may not be entitled to reimbursement of all of the categories of expenses set out above.

## PART XXVII
## ADMINISTRATION AND PAYMENT OF SPECIAL EXPENSES

27.1    The Gestational Carrier will obtain receipts for all expenditures and will deliver these receipts to the Intended Parents or to an agent on their behalf on a monthly basis and in any event within FIVE (5) days of a request therefor. If required by law, the Intended Parents will instruct the Clinic, or their agent, to reimburse the Gestational Carrier for all Special Expenses in accordance with the terms of this Agreement. The Parties acknowledge and agree that no Special Expenses will be reimbursed to the Gestational Carrier unless a receipt is provided to the Intended Parents or to their agent for the expenditure.

## PART XXVIII
## REMEDIES FOR BREACH

28.1    If the Gestational Carrier materially fails to perform any of her obligations under this Agreement, or if any of the warranties made by the Gestational Carrier in this Agreement are not true then, without limiting the Intended Parents' remedies in equity or at law, and in addition to such remedies, the Gestational Carrier will, within THIRTY (30) days of request, refund to the Intended Parents all allowable expenses pursuant to the section called SPECIAL EXPENSES, above, which have been reimbursed to the Gestational Carrier by the Intended Parents, to the time of such failure.

28.2    If any Party materially violates any provision contained in this Agreement without legal excuse, such violation will constitute a material breach of this Agreement and, in addition to all other remedies available at law or equity, this Agreement may be terminated forthwith at the option of the aggrieved Party, without further liability on the part of the aggrieved non-breaching Party. If the Intended Parents terminate this Agreement pursuant to this provision, then not only will the Gestational Carrier refund all Special Expenses reimbursed to that date, the Intended Parents will be under no obligation to reimburse the Gestational Carrier for any expenses incurred after the date of the breach.

Dvash-Banks and Adams Surrogacy Agreement | Final Version

TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 048**

28.3     If the Intended Parents materially breach this Agreement without legal excuse, but the Gestational Carrier has performed her obligations under this Agreement then she will be entitled to have all Special Expenses reimbursed in accordance with this Agreement and the Intended Parents will be responsible for the support of the Child and all of the Child's needs until the Child is no longer entitled to support pursuant to the laws in which the Child is habitually resident. Further, if the Gestational Carrier has made physical custody of the Child available to the Intended Parents, the Intended Parents shall indemnify the Gestational Carrier for any and all amounts she pays in connection with the support of the Child, including without limitation, any legal or other fees and disbursements incurred in connection with the defence thereof.

28.4     A breach will not be considered to be a material breach of contract if it is capable of being cured. If so, the Party committing the breach will be given written notice of the alleged breach and will be given a reasonable period of time to cure it, if possible.

28.5     A breach by either of the Intended Parents will constitute a breach by both of them.

28.6     Without limiting the generality of the foregoing, any breach of warranty contained in this Agreement will constitute a material breach of this Agreement.

28.7     Any breach of this Agreement by the Intended Parents on their part, or the Gestational Carrier on her part, will cause the other of them significant damages, including emotional suffering and trauma and shall provide a cause of action for damages to the wronged Party. Each of the Parties acknowledges that because of the nature of this Agreement, monetary damages may not suffice to remedy a breach of this Agreement and that an injunction and/or any other interim judicial relief may properly be obtained to enjoin and/or address a breach of this Agreement in addition to damages.

## PART XXIX
## ASSUMPTION OF RISK

29.1     The Gestational Carrier assumes and accepts all risks related to the Transfer, Pregnancy and Birth, including but not limited to, the possibility of contracting AIDS, or other transmittable diseases, as a result of the exchange of body fluids and substances and all medical treatments, examinations and procedures involved, and any postpartum complications, and she hereby releases, indemnifies and saves harmless the Intended Parents (and each of them) from all liability, losses, costs and expenses arising, directly or indirectly, from the fulfilment of their obligations under this Agreement including, without limitation, any claim for illness, disfigurement, disability, death, funeral expenses, loss of the Gestational Carrier's future earnings or support for the Gestational Carrier's dependants, damages for loss of enjoyment of life and any other general damages, and for any legal expenses resulting from any dispute of this Agreement by the Gestational Carrier. The Gestational Carrier warrants and represents that she has independently consulted with a physician specializing in fertility procedures and has been made aware of all medical risks (including death), which may result from the procedures contemplated by this Agreement and further acknowledges that she understands these risks. The Gestational Carrier has undergone a thorough medical examination before undergoing any

Dvash-Banks and Adams Surrogacy Agreement | Final Version



TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 049**

procedure contemplated by this Agreement.

## PART XXX
## CONFIDENTIALITY

30.1

(a)    The Gestational Carrier warrants and represents that she will keep strictly confidential all information respecting the identity of the Intended Parents and the Child, the terms of this Agreement, and information respecting the activities contemplated or carried out under this Agreement (the "**Confidential Information**") forever. The Parties shall be entitled to discuss the terms of this Agreement with their legal advisors and with their counsellor, each of whom shall be advised of and requested to abide by the confidentiality provision in this Agreement. However, the Gestational Carrier shall be entitled to disclose that the Gestational Carrier intends to carry (or is carrying, if she is already Pregnant) a Child for a same-sex couple who require third party reproduction to have a Child, provided that no Confidential Information is disclosed. The Intended Parents also warrant and represent that they will keep strictly confidential all Confidential Information. However, the Gestational Carrier acknowledges and agrees that the Intended Parents shall disclose the existence and nature of this Agreement to the individual(s) whom they have named as Guardian(s) under their respective Wills.

(b)    Except as required by law and except as set out in this Agreement, none of the Parties will disclose the Confidential Information to any person or distribute it in any public forum whatsoever including, without limitation, newspapers, magazines, Internet, television or radio at any time. This covenant will survive the Birth of any Child conceived pursuant to this Agreement and the Parties acknowledge that a claim for damages, as well as injunctive relief may be sought if there is a breach of the warranties contained herein.

30.2    In order to maintain the confidentiality contemplated by this Agreement, if litigation arises out of this Agreement including, but not limited to, court applications for a custody proceeding, each of the Parties to this Agreement and their legal counsel, their heirs and representatives, agree to make all efforts to maintain such confidentiality as is intended by this Agreement including, but not limited to, requesting that the court records be sealed, requesting the court to invoke non-publication orders, requesting the court in its procedures and in the conduct of hearings to maintain confidential the identity of all of the Parties.

## PART XXXI
## ENTIRE AGREEMENT

31.1    This Agreement sets forth the entire Agreement between the Parties pertaining to the subject matter of the Agreement and supersedes all prior agreements, understandings, negotiations and communications, whether written or oral of the Parties.

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 050**

## PART XXXII
## SEVERABILITY

32.1     If any provision of this Agreement is held by the Court to be invalid or unenforceable, the remainder of the provisions of this Agreement will continue in full force and effect and will not be affected, impaired or invalidated thereby.

32.2     If a provision of this Agreement is held by the Court to be invalid or unenforceable due to its scope or breadth then it will be deemed to be valid to the extent permitted by the Court.

## PART XXXIII
## SURVIVAL

33.1     Notwithstanding any termination of this Agreement pursuant to the terms herein, or the expiration of the Term of the Agreement, the Parties agree that the provisions of the sections called REMEDIES FOR BREACH, ASSUMPTION OF RISK and CONFIDENTIALITY, above, will remain in full force and effect after the termination or expiration of the Term of the Agreement, as the case may be.

## PART XXXIV
## WAIVER

34.1     No supplement or modification of this Agreement will be binding unless executed in writing by the Party to be bound. No provision of this Agreement will be deemed waived and no breach excused, unless such waiver or consent excusing the breach is executed in writing by the Party to be charged with such waiver or consent. No waiver by a Party of any provision of this Agreement will be construed as a waiver of a further breach of the same provision and no waiver will be construed as a waiver of any other provision of this Agreement.

## PART XXXV
## GOVERNING LAW

35.1     This Agreement will be governed by, subject to and construed in accordance with the laws of the Province of Ontario.

35.2     The Parties to this Agreement acknowledge and agree that it is their express intention and desire to comply with the laws of the Province of Ontario and the Federal Laws of Canada. If during the Term of this Agreement any obligation of any Party becomes prohibited, the Parties agree that such obligation shall be severed from the Agreement (including, but not limited to, the financial obligations set out in this Agreement) and, so long as all Parties are agreeable, this Agreement shall remain in full force and effect.

35.3     The Parties to this Agreement acknowledge and agree that the procedure contemplated by this Agreement are novel and new and that the law applicable to such procedures and relationships is developing and unsettled. Although the possibility exists that this

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 051

Agreement may be declared void as against public policy, in whole or in part, and may be held unenforceable, in whole or in part, by an Ontario Court, all Parties nonetheless agree that they are entering into this Agreement with the intention of being fully bound by its terms. It is the intention of all Parties to comply with the provisions of the *Assisted Human Reproduction Act*, S.C. 2004, c.2, to the extent such Act has been proclaimed into force.

## PART XXXVI
### INDEPENDENT LEGAL ADVICE

36.1    The Gestational Carrier acknowledges that she has received independent legal advice in respect of this Agreement and acknowledges that she fully understands the intent and the purpose of this Agreement and her obligations under it.

36.2    The Gestational Carrier acknowledges that no coercion, force, pressure or undue influence has been used by any Party against her in making this Agreement.

36.3    The Gestational Carrier believes this Agreement to be fair, just and reasonable, that it will not result in circumstances that are unconscionable to any Party, and that it is in the best interests of the Child.

36.4    Each Party to this Agreement fully understands the Agreement and the legal consequences of this Agreement, and is signing the same freely and voluntarily. No Party to this Agreement has any reason to believe that the other Parties did not freely and voluntarily execute this Agreement.

## PART XXXVII
### INTERPRETATION OF AGREEMENT

37.1    No provision of this Agreement is to be interpreted for or against any Party to this Agreement merely because that Party, or that Party's solicitor drafted the provision.

## PART XXXVIII
### FACSIMILE TRANSMISSION AND
### EXECUTION IN COUNTERPART

38.1    The Parties hereby acknowledge that this Agreement may be executed through facsimile transmission and agree to treat these documents in the same manner and with the same legal effect as if they were original documents.

38.2    This Agreement may be executed in any number of counterparts and each such counterpart shall, for all purposes, constitute one agreement binding on all Parties hereto, notwithstanding that all Parties are not signatories to the same counterpart, provided that each Party has signed at least one counterpart.

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

G. a.
Ag. =Dr3

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 052**

## PART XXXIX
## NOTICE

39.1     All communications which may be or are required to be given by any Party to the other herein will be in writing and delivered or sent by prepaid registered mail, by personal delivery, by facsimile transmission (where possible), or by electronic mail, to the Parties at the following respective addresses:

Gestational Carrier:          ███████████ Avenue, Apartment ███

Mississauga, Ontario  L5A 2K7

Cell: 647 ███████████
Email: ███████████@gmail.com

Intended Parents:             ███████ Avenue, Apartment ███

Toronto, Ontario  M6B 4C6

Elad Cell: 647 ███████
Andrew Cell: 647 ███████
Email: ███████@gmail.com
Email: ███████████@gmail.com

39.2     If any communication is sent by prepaid registered mail, it will, subject to the following sentence, be conclusively deemed to have been received on the TENTH (10th) business day following the mailing thereof and if delivered, sent by facsimile transmission, or sent by electronic mail, it will conclusively be deemed to have been received at the time of delivery or transmission.

39.3     Notwithstanding the foregoing provisions with respect to mailing, if it may be reasonably anticipated that, due to any strike, lock-out or similar event involving an interruption in postal service, communication will not be received by the addressee by no later than the TENTH (10th) business day following the mailing thereof, then the mailing of any such communication as aforesaid will not have been an effective means of sending the notice, but rather any communication must then be sent by an alternative method which it may reasonably be anticipated will cause the payment or communication to be received reasonably expeditiously by the addressee. Any Party may from time to time change its address or facsimile number hereinbefore set forth by notice to the other of them in accordance with this Section.

## PART XL
## ARBITRATION

40.1     In the interests of the confidential nature of this Agreement and except as otherwise set out in this provision, if any dispute arises between the Parties in connection with any amounts referred to in Sections 26 or 27 of this Agreement and all matters related thereto, including, without limitation, enforcement of such provisions, the Parties agree that it shall be

Dvash-Banks and Adams Surrogacy Agreement | Final Version

TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 053**

Page 132

resolved by binding arbitration in accordance with the *Arbitrations Act* (Ontario).

## PART XLI
## ENUREMENT

41.1       The rights and obligations under this Agreement shall enure to and bind each of the Parties and their respective heirs, executors, administrators and assigns.

**[The remainder of this page is intentionally blank.]**

Dvash-Banks and Adams Surrogacy Agreement | Final Version

**TERRI N. DAY**
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 054**

TO EVIDENCE THEIR AGREEMENT, each of the Parties has signed this Agreement under seal before a witness.

SIGNED, SEALED AND DELIVERED in the presence of

Witness Signature

Witness Signature

Witness Signature

ANDREW DVASH-BANKS
Date of Execution: 12/21/15

ELAD DVASH-BANKS
Date of Execution: Dec. 21, 2015

AMANDA MARIE ANNE ADAMS
Date of Execution: Dec 21 2015

Dvash-Banks and Adams Surrogacy Agreement | Final Version

TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 055

## SCHEDULE "A"

Attached to and forming part of
an Agreement dated the 21ˢᵗ day of December, 2015 between
Andrew Dvash-Banks, Elad Dvash-Banks and Amanda Marie Anne Adams

| Maximum Reimbursements – Special Expenses | |
|---|---|
| Stage 1: First Month Following Second Beta Test | $1,000.00 |
| Stage 2: Second Month Following Second Beta Test | $1,000.00 |
| Stage 3: Third Month Following Second Beta Test | $1,000.00 |
| Stage 4: Fourth Month Following Second Beta Test | $2,000.00 |
| Stage 5: Fifth Month Following Second Beta Test | $2,000.00 |
| Stage 6: Sixth Month Following Second Beta Test | $2,500.00 |
| Stage 7: Seventh Month Following Second Beta Test | $2,500.00 |
| Stage 8: Eighth Month Following Second Beta Test | $3,000.00 |
| Stage 9: Ninth Month Following Second Beta Test | $3,000.00 |
| Stage 10: Post-Pregnancy | $2,000.00 |
| TOTAL MAXIMUM REIMBURSEMENT: | $20,000.00 |

TERRI N. DAY
VICE CONSUL OF THE
UNITED STATES OF AMERICA

**Case No. 2:18-cv-00523-JFW-JCx (C.D. Cal.) - Administrative Record - AR 056**